## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

GATEGUARD, INC.

          *Plaintiff*,

   v.

MVI SYSTEMS LLC;
SAMUEL TAUB,

      *Defendants*.

Civil Action No. _____

**JURY DEMAND**

**COMPLAINT**

Plaintiff GateGuard, Inc. ("GateGuard") brings this Complaint against Defendant MVI Systems LLC ("MVI") and Defendant Samuel Taub ("Taub"), and alleges as follows:

## INTRODUCTION

1. This action is brought to remedy the unlawful conduct of Defendants in the misappropriation and retention of GateGuard's confidential, proprietary and trade secret information.

2. Founded in 2014, GateGuard is a New York City startup focused on bringing multi-tenant apartment buildings into the 21st Century.

3. For over two years, GateGuard devoted thousands of hours of effort and hundreds of thousands of dollars towards the development of a suite of innovative technologies engineered to meet the needs of modern tenants, property owners, and property managers.

4. Among GateGuard's technologies was a video intercom/'AI Doorman' device that incorporated proprietary features and capabilities not found in existing intercom systems.

5. GateGuard's technologies also included a software platform that integrated proprietary machine vision and facial recognition algorithms with artificial intelligence ("AI") techniques to automate building access for tenants and enhance building security.

6. In parallel with GateGuard's technical development, the company invested heavily in developing a body of proprietary business intelligence. GateGuard expected that this body of knowledge and unique insights would enable a small startup to operate efficiently and grow rapidly, even within a real-estate industry known for being cutthroat and slow to adapt.

7. Recognizing the significant value held in GateGuard's proprietary technologies and business intelligence, GateGuard maintained such information as confidential trade secrets and imposed significant safeguards to prevent its disclosure.

8. Upon releasing its first 'AI Doorman' product in 2016, GateGuard received considerable interest from numerous multi-tenant property owners. Many prominent real estate owners recognized GateGuard's technology and feature set to be far superior to any other intercom system available on the market.

9. In late 2016, GateGuard received an unsolicited communication from Samuel Taub ("Taub"). In his communications, Taub represented himself as an installer of security systems who was impressed with GateGuard's products and was interested in serving as a reseller for GateGuard.

10. Prior to communicating with Taub (or any other potential customer or partner), GateGuard confirmed that Taub had acknowledged and agreed to GateGuard's 'Terms of Service'

("ToS"). Pursuant to the ToS, Taub acknowledged GateGuard's ownership of its intellectual property and trade secrets, agreed to maintain the confidentiality of GateGuard's confidential information, and represented he would not offer competing or similar products to GateGuard.

11. In reliance on Taub's acceptance of the ToS and his interest in serving as a GateGuard reseller, GateGuard's founder, Ari Teman ("Teman"), engaged Taub in a series of communications, including phone and video calls, emails, and other correspondence. During these communications, Teman disclosed to Taub numerous technical and business trade secrets developed by GateGuard.

12. Unbeknownst to Teman and GateGuard, Taub's representations were little more than a ruse hatched by Taub to induce GateGuard to disclose its valuable trade secrets.

13. Rather than serving as a reseller for GateGuard, in the subsequent months Taub used GateGuard's trade secrets as the technical and business foundation for MVI Systems LLC ("MVI") – a technology company that now competes directly with GateGuard.

14. Outside observers familiar with both MVI and GateGuard have remarked that GateGuard's "fingerprints are all over" MVI's products. MVI offers few if any features that were not misappropriated directly from GateGuard.

15. In addition to stealing GateGuard's proprietary technology, MVI and Taub misappropriated GateGuard's business trade secrets to achieve unfair and unlawful competitive advantages over GateGuard.

16. For example, having obtained GateGuard's confidential prospective and current customer lists, MVI and Taub unlawfully used these materials to aggressively target numerous

GateGuard's customers. To date, MVI has succeeded in "poaching" several of GateGuard's key customers, causing substantial and irreparable harm to GateGuard.

17. Not content to merely exploit GateGuard's trade secrets for monetary gain, Taub and MVI have gone so far as to apply for and receive patents that are fundamentally – if not exclusively – based on GateGuard's proprietary technologies.

18. In connection with these patent filings, Taub has certified to the United States Patent and Trademark Office ("USPTO") – under penalty of perjury – that he (Taub) believes himself to be the sole inventor of GateGuard's video intercom technology.

19. Like his interactions with GateGuard and Teman, Taub's actions and representations to the USPTO were knowingly false. In fact, effectively all the subject matter disclosed in Taub and MVI's patent filings was disclosed by Teman to Taub *seven months prior* to Taub's initial submission.

20. The referenced patents hold substantial value and strategic significance to MVI. In a recent interview with the 'AlleyWatch' website, ***Taub identified MVI's fraudulently-obtained patents as "[o]ur biggest achievements thus far."***

21. This misappropriation and exploitation of GateGuard's trade secrets has caused substantial and irreparable harm to GateGuard, including lost revenues, development and production delays, and other business interruptions.

22. GateGuard now seeks to hold Defendants accountable, stop them from further exploiting GateGuard's trade secrets, and put an immediate halt to the substantial and irreparable harm and damages Defendants have caused, and continue to cause GateGuard as a result of their unlawful activities.

## THE PARTIES

23. GateGuard, Inc. ("GateGuard") is a Delaware corporation having a principal place of business at 5 Penn Plaza #2372, New York, NY 10001.

24. Defendant MVI Systems LLC ("MVI") is a New York limited liability company having a principal place of business at 2607 Nostrand Avenue, Brooklyn, NY 11210.

25. Defendant Samuel "Sam" Taub ("Taub") is an individual residing at 1363 East 31st St., Brooklyn, NY, 11210. Upon information and belief, Taub is the Chairman, CEO, and Founder of MVI.

26. Upon information and belief, Defendants are and were at all relevant times the agents, affiliates, alter egos, partners, assignees, successors-in-interest, or principals of each other or were otherwise responsible for or participated in the performance of the wrongful acts alleged herein, and thereby are jointly and severally responsible for such acts and incurred liability therefore.

## JURISDICTION AND VENUE

27. This court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338 in that this case arises under various federal statutes, including 18 U.S.C. § 1836 *et seq.*, and its state law claims are part of the same case or controversy.

28. This Court has supplemental jurisdiction over all causes of action asserted herein, pursuant to 28 U.S.C. § 1367.

29. This Court has personal jurisdiction over Defendants because each of them resides and conducts business in New York and because they have committed torts in the State of New York and in this district.

30. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events, acts, omissions, and injuries giving rise to the claims occurred in this judicial district and because Defendants are subject to personal jurisdiction in this judicial district at the time this action has commenced.

## FACTUAL BACKGROUND

*GateGuard Established to Revolutionize Real-Estate Industry*

31. GateGuard is a technology company founded in New York City that develops technology products and services for multi-tenant apartment buildings.

32. Beginning in 2014, GateGuard's founder, Ari Teman ("Teman") identified several shortcomings in existing intercom systems utilized across thousands of multi-tenant apartment buildings.

33. In the subsequent years, Teman and GateGuard invested thousands of hours of efforts and hundreds of thousands of dollars to develop a suite of technologies designed to bring the real-estate industry into the 21st century.

*GateGuard Develops Proprietary Video Intercom Device, Software Platform, and Related Technologies*

34. Seeking to rebuild the apartment intercom system from "the ground up," Teman designed and engineered a unique intercom device that incorporated innovative features not found in previously available devices.

35. For example, Teman discovered that existing network-connected intercoms were dependent on consistent network connectivity to function properly. However, many of the

referenced devices regularly lost connectivity, disappointing tenants and property owners and running afoul of housing regulations.

36. With this in mind, GateGuard reengineered and reconfigured the internal architecture, hardware designs, and component configurations of its intercom device to incorporate proprietary connectivity capabilities. By incorporating these features, GateGuard's intercom was able to achieve and maintain reliable network connectivity in almost any setting.

37. Teman also identified significant deficiencies in the accessibility and security capabilities of existing systems. Specifically, Teman believed that tenants and other authorized individuals should be able to access their buildings with minimal friction or inconvenience. Teman also believed that property owners should be able to quickly and accurately identify instances of unauthorized access to a building (e.g., in an illegal sublet scenario) in order to protect rightful tenants and ensure compliance with housing regulations. However, existing intercom devices provided no such functionality.

38. Accordingly, GateGuard set out to develop a suite of pioneering image-processing technologies to enhance the accessibility and security capabilities of its intercom. Among these technologies were proprietary machine vision algorithms and applications for real-time processing of visual content captured in public areas (e.g., the front door or lobby of a multi-family property). When implemented together with additional biometric accessibility features, GateGuard's intercom enabled tenants and authorized individuals to access a building by simply approaching the door. Additionally, by combining artificial intelligence ("AI") techniques with GateGuard's proprietary image processing

technologies, GateGuard's intercom and platform were able to automatically identify and track instances of illegal subletting.

39. Additionally, Teman identified several business and logistical challenges associated with a technology product directed to the residential real-estate market. First, owners of multi-tenant properties are frequently thought of as "old fashioned" and hesitant to adopt new technology. Additionally, the setup and enrollment efforts required by other intercom products (e.g., to enroll a large number of tenants) was daunting even for technically-inclined property owners.

40. To address these shortcomings, GateGuard developed a proprietary "backend" software platform that automated numerous aspects of the tenant enrollment process, in addition to enabling property owners and managers to monitor event logs and configure other aspects of the system.

41. GateGuard also developed further proprietary technologies to address the unique needs and specifications of modern tenants, property owners and managers, and other related parties. These technologies include applications that enable and improve interactions with visitors, selectively provide building access to specific individuals (children, service providers, etc.), and coordinate package/delivery management. Additional aspects of these and other technologies developed by GateGuard are detailed below.

*Teman Travels to China, Coordinates Manufacturing, Further Refines Product*

42. Having invested over two years and hundreds of thousands of dollars to develop GateGuard's video intercom device, in April 2016 Teman was satisfied the device was ready for production.

43. Teman traveled extensively to and within China to finalize the design and development of GateGuard's intercom and coordinate its manufacture.

44. During his time in China, Teman implemented several proprietary refinements to GateGuard's intercom device, including refinements to the device's integrated optical sensor. These refinements further improved the performance of the device when operating under conditions common in large American cities.

### *GateGuard Protects Its Proprietary Technologies as Trade Secrets In Lieu of Patent Protection*

45. As a seasoned entrepreneur, Teman recognized that GateGuard's Intellectual Property was of immense value to the company. Specifically, Teman recognized that the substantial body of proprietary technologies developed by GateGuard could undoubtedly be protected via one or more patent(s).

46. However, upon further consideration, Teman became hesitant to pursue patent protection on GateGuard's technologies for several reasons.

47. First, Teman reflected on the cutthroat nature of many individuals within the real-estate industry and the likelihood that few of them have meaningfully encountered patents (as few patents relate to real estate).

48. Teman was also concerned that pursuing patent protection – which entails public disclosure of an invention – may be of little value in the cutthroat real estate industry. Rather, Teman anticipated that such a (hypothetical) patent filing may be used by others to exploit GateGuard's technology.

49. Additionally, Teman considered that individuals and entities in both real estate and technology industries may take a skeptical/harsh view of patents and may hesitate to work or partner with GateGuard in view of its (hypothetical) patent filing(s).

50. Finally, Teman believed GateGuard's proprietary technologies would not or could not be independently and lawfully developed or discovered by another individual or entity.

51. As a result, Teman elected not to file patent application(s) on GateGuard's proprietary technologies. Instead, GateGuard protected and maintained its proprietary technologies using trade secret protection.

52. Each of GateGuard's proprietary technologies is a secret not known outside of GateGuard's business.

53. GateGuard expended significant effort and expense to preserve and maintain the confidentiality of its trade secrets. For example, GateGuard personnel, customers, prospective customers, and any other relevant parties are required to execute detailed agreements in which they acknowledge and accept GateGuard's sole ownership of the trade secrets, agree to maintain the confidentiality of the trade secrets, and agree not to copy, reverse engineer, or create derivative works based on the trade secrets. One such agreement is GateGuard's Terms of Service ("ToS"), as outlined below.

54. In addition, GateGuard developed various proprietary security features and incorporated such technologies into GateGuard's products. These security features were developed and incorporated into GateGuard's intercom device to prevent unauthorized discovery of GateGuard's technical trade secrets (including those referenced above). For example, GateGuard developed and implemented a unique tamper-proof locking mechanism to ensure its intercom panel is not opened or tampered with. GateGuard also developed and

implemented a proprietary alarm feature that initiates alerts when the device is moved, uninstalled, disconnected, opened, or otherwise tampered with.

55.  These security features are themselves trade secrets of GateGuard. GateGuard expended significant effort and expense in both developing them and maintaining their confidentiality. GateGuard's security features further ensure that the confidentiality of GateGuard's trade secrets is maintained.

### *GateGuard Develops Proprietary Marketplace Intelligence, Business Contacts, and Sales Pipeline*

56. In parallel with the technical development of the described proprietary technologies, GateGuard also invested substantial financial resources and efforts in developing proprietary business intelligence necessary to market and sell the developed technologies.

57. For example, early in GateGuard's development, Teman considered the large number of owners of multi-tenant properties, each of whom was a potential GateGuard customer. However, Teman soon realized that, as a startup, GateGuard would be unable to enlist a team of sales representatives capable of reaching each owner. Teman also recognized that relatively few of such owners were likely to be "early adopters" of GateGuard's products.

58. Therefore, Teman concluded that in order to succeed, GateGuard would need to identify those multi-tenant property owners most likely to be early GateGuard adopters.

59. Over the course of the next year, GateGuard invested substantial efforts and resources to obtain and analyze large volumes of public and private real estate data.

60. Based on these efforts, GateGuard identified several proprietary criteria indicative of a property owner's expected interest in adopting GateGuard's technologies. Using these

criteria, GateGuard then identified a small number of property owners in the New York Metropolitan area who were most likely to consider adopting GateGuard.

61. GateGuard then invested further efforts in initiating contacts and developing business relationships with such identified property owners.

62. This information was of immense value to GateGuard, as it enabled the company to focus its limited manpower and resources towards potential customers likely to be receptive to GateGuard's offerings.

63. In connection with such sales efforts, GateGuard also developed proprietary sales and promotional materials, business plans, pricing insights, and other confidential business information developed over years of effort and experience.

### *GateGuard Protects Its Proprietary Business Information as Trade Secrets*

64. As with GateGuard's proprietary technologies, Teman recognized the immense significance and value of GateGuard's proprietary business information to the company.

65. Therefore, GateGuard protected and maintained its proprietary business information using trade secret protection.

66. GateGuard's proprietary business information includes numerous secrets not known outside of GateGuard's business. These secrets include but are not limited to GateGuard's proprietary customer identification techniques, current and prospective customer contact lists, sales and promotional materials, business plans, pricing insights, and other confidential business information developed over years of effort and experience.

67. For example, the identities of GateGuard's current and prospective customers are maintained confidentially and not disclosed or promoted publicly.

68. GateGuard expended significant effort and expense to preserve and maintain the confidentiality of its trade secrets. For example, GateGuard personnel, customers, prospective customers, and any other relevant parties are required to execute detailed agreements in which they acknowledge and accept GateGuard's sole ownership of the trade secrets, agree to maintain the confidentiality of the trade secrets, and agree not to copy, reverse engineer, or create derivative works based on the trade secrets. One such agreement is GateGuard's Terms of Service ("ToS"), as outlined below.

*GateGuard Acquires Numerous Customers; Achieves Industry Recognition*

69. After years of technical development and business efforts, in mid-2016 GateGuard began acquiring customers and installing its products in multi-tenant properties throughout New York City and beyond.

70. GateGuard's innovative products and business achievements were featured in various industry publications. For example, an article in "The Real Deal" dated October 27, 2016 reported that GateGuard had been sold to 24 buildings.

71. GateGuard's technical and business achievements and potential for future growth were also recognized by well-known venture capitalists and other investors, many of whom have invested in GateGuard.

*Taub Approaches GateGuard; Accepts Terms*

72. On or about November 16, 2016, Taub accessed GateGuard's website.

73. While navigating the website, Taub further accessed an interactive form through which he was presented with GateGuard's Terms of Service ("ToS")[1].

74. Taub completed the referenced form by providing his name, phone number, email address, and other information, and submitted the completed form.

75. Taub also indicated his acceptance of the ToS via the referenced form.

### *Taub Agrees Not To Create Derivative Works Based on GateGuard's Content*

76. The ToS acknowledged and accepted by Taub indicates, *inter alia*, that Taub may not:

> …(i) copy, modify, alter, adapt, replicate, make available, translate, port, reverse engineer, decompile, or disassemble any portion of the Content made available by GateGuard on or through the Site, or publicly display, reproduce, create derivative works from, perform, distribute, or otherwise use such Content; (j) copy, distribute, display, execute publicly, make available to the public, reduce to human readable form, decompile, disassemble, adapt, sublicense, make any commercial use, sell, rent, transfer, lend, process, compile, reverse engineer, combine with other software, translate, modify or create derivative works of any material that is subject to GateGuard's proprietary rights, including GateGuard's Intellectual Property…(w) provide any information we give you to any third party without our written consent…

77. In accepting the ToS, Taub also acknowledged and agreed that he:

> … will not use, copy, adapt, modify, prepare derivative works based upon, distribute, license, sell, transfer, publicly display, publicly perform, transmit, broadcast or otherwise exploit the Site and/or Content, except as expressly permitted in these Terms…

### *Taub Agrees To Protect The Confidentiality of and Not Disclose GateGuard's Proprietary Information*

78. The ToS further dictates that Taub may not:

---

[1] The GateGuard ToS as acknowledged and accepted by Taub in 2016 constituted an agreement between Taub and Touchless Labs LLC d/b/a GateGuard. Touchless Labs LLC subsequently executed an assignment that transferred full title and ownership of all GateGuard-related technology, assets, agreements, causes of action, intellectual property, and other rights to Plaintiffs GateGuard, Inc.

....disclose to third parties nor use for any purpose other than for the proper use of the Site any Confidential Information received from GateGuard in whatever form under these Terms or in connection with the Services without the prior written permission of GateGuard. "Confidential Information" shall mean all data and information, not made available to the general public, oral or written, that relates to GateGuard, the Site and/or the Services, including without limitation these Terms and any agreement between you and GateGuard...

79. Additionally, the ToS requires Taub to:

...protect the Confidential Information with the same degree of care, but no less than a reasonable degree of care, to prevent unauthorized disclosure or use of Confidential Information, as you exercise in protecting your own proprietary information...

### *Taub Acknowledges GateGuard's Ownership of All Intellectual Property Rights*

80. The ToS further dictates that:

...The Site, the Services the Content, and any other proprietary assets of GateGuard and any and all intellectual property rights pertaining thereto, including, but not limited to, inventions, patents and patent applications, trademarks, trade names, service marks, copyrightable materials and trade secrets, whether or not registered or capable of being registered (collectively, "Intellectual Property"), are owned by and/or licensed to GateGuard and are protected by applicable copyright and other intellectual property laws and international conventions and treaties....

### *Taub Acknowledges He Will Not Offer A Product That Competes with GateGuard*

81. Taub further acknowledged and represented that he "...will not offer a competing or similar product to GateGuard such as: intercoms, lobby kiosks, face recognition access control, building information screens, real estate management software...," as recited in the ToS.

***Taub Falsely Presents Himself as a Security Installer; Feigns Interest in Selling GateGuard***

82. In response to Taub's communication and in reliance on his acceptance of the ToS, Teman engaged Taub in further discussions and communications.

83. Over a series of telephone and video calls and email communications beginning on November 17, 2016, Teman and Taub discussed GateGuard.

84. During the referenced communications, Taub identified himself to Teman as a security integrator who was interested in acting as a reseller of GateGuard's products.

85. In connection with his expressed interest in reselling GateGuard's products, Taub asked Teman numerous technical and business questions. Taub represented to Teman that such information was necessary to enable Taub to effectively market and install GateGuard products.

86. Taub further requested additional GateGuard-related information and documentation from Teman.

***Pursuant to ToS, Teman Discloses GateGuard's Technical and Business Trade Secrets to Taub***

87. During the referenced communications, Teman re-confirmed Taub's acceptance of the ToS, including the confidentiality, non-disclosure, IP ownership, and other clauses referenced above.

88. Teman also reiterated the proprietary and confidential nature of GateGuard's technical and business trade secrets. Taub acknowledged the confidential, proprietary nature of GateGuard's trade secrets, and represented to Teman that he (Taub) had no background in technology nor any interest in developing technology products. Rather, Taub represented

that he was a security integrator/reseller and interested in GateGuard's technology only for the purposes of serving as a reseller for GateGuard.

89. In reliance on Taub's acceptance of the ToS, his acknowledgement of the proprietary and confidential nature of GateGuard's technical and business trade secrets, his agreement to maintain the confidentiality of such trade secrets, and his representation of himself as a security integrator interested only in reselling GateGuard's products, Teman disclosed certain technical and business trade secrets to Taub.

90. Among the technical trade secrets Teman conveyed to Taub were GateGuard's proprietary software and hardware designs, component configurations, and other related features.

91. For example, during a video call between Taub and Teman, Teman provided Taub with a detailed audiovisual tour of the internal components of GateGuard's video intercom panel. Teman further identified numerous features of GateGuard's intercom panel that were proprietary and unique to GateGuard.

92. Among the technical trade secrets Teman conveyed to Taub during the referenced communications were GateGuard's proprietary internal architecture and hardware designs. These proprietary technologies include circuit board designs, communication interface/port configurations, power supply/relay designs, sensor integrations, water/HVAC/electric monitoring capabilities, and other proprietary component configurations, applications, and other technical features.

93. Additionally, Teman outlined several proprietary applications GateGuard had developed to address the needs of modern tenants, property owners, and property managers. Among these applications were mobile applications and other unique features that enable and improve interactions with visitors, selectively providing building access to children and

service providers (dog walkers, apartment cleaners, maintenance staff), and package/delivery management.

94. Teman also conveyed to Taub detailed information and insight regarding a suite of pioneering image processing technologies developed by GateGuard and integrated into its products. These technologies include machine vision algorithms and applications for processing visual content captured in public areas (e.g., the front door or lobby of a multi-family property) to monitor or track individuals entering/exiting a building and provide related logs, statistics, and analytics. Teman also disclosed details of GateGuard's proprietary biometric accessibility features (including image processing algorithms and applications) that enable tenants and others to access a building by simply approaching the door, presenting a biometric information (e.g., a fingerprint), etc. Additionally, Teman disclosed details of GateGuard's proprietary image processing technologies that utilize artificial intelligence ("AI") to identify and track instances of illegal subletting.

95. During the referenced communications, Teman also communicated to Taub the extensive efforts GateGuard had invested in engineering and refining the design of GateGuard's intercom panel, including travel to China to coordinate with manufacturers and other engineering partners. For example, Teman disclosed several proprietary refinements GateGuard had implemented (including refinements to the optical sensor integrated within its intercom panel) to improve performance when operating under conditions common in large American cities.

96. Teman further conveyed to Taub detailed information regarding numerous proprietary security features incorporated into GateGuard's products. For example, Teman demonstrated a unique tamper-proof locking mechanism GateGuard had designed to

ensure its intercom panel could not be opened or tampered with. Teman further demonstrated a proprietary alarm feature developed by GateGuard to initiate alerts in the event that the device is moved, uninstalled, disconnected, opened, or otherwise tampered with.

97. The referenced security features had been developed and incorporated by GateGuard into the intercom device in order to prevent unauthorized disclosure or discovery of GateGuard's technical trade secrets (including those outlined above).

98. Additionally, Teman conveyed to Taub detailed information regarding additional features GateGuard had developed and was in the process of implementing towards a 'second generation' product, including additional sensors (including a QR code scanner), connected package lockers/closets and related controls, and other capabilities.

99. As noted, the referenced technical trade secrets were developed by GateGuard to address the unique needs and specifications of residential real estate users, including tenants, property owners, managers, and other related parties.

100.        During the referenced communications, Taub also requested access to GateGuard's proprietary "backend" software. GateGuard had developed the referenced "backend" to enable property owners and managers to enroll users, monitor event logs and other operations, and configure aspects of the system. Teman conveyed to Taub that these technologies had been developed by GateGuard with substantial effort and expense and included numerous unique features and interfaces that dramatically improved the tenant enrollment process and other functions. Teman also emphasized that GateGuard's policy is only to grant customers access to the "backend" after acknowledging and accepting GateGuard's ToS. Taub replied that he (Taub) would need a detailed familiarity with

19

GateGuard's backend in order to effectively serve as a reseller of GateGuard's products. Taub also acknowledged his acceptance of the ToS and confirmed that he would access the "backend" solely for the purposes of reselling GateGuard's products. In reliance on Taub's representations, Teman provided Taub with login credentials that enabled him (Taub) to access GateGuard's "backend."

101.    Teman also disclosed numerous business trade secrets to Taub during the referenced communications. For example, Taub requested that Teman disclose GateGuard's current and prospective customers, the manner in which GateGuard had succeeded in targeting and securing business relationships with such customers, the 'sales pitch' used by GateGuard representatives when selling the product, pricing information (including installation and subscription fees), and other information.

102.    In reliance on Taub's acceptance of the ToS, his acknowledgement of the proprietary and confidential nature of GateGuard's trade secrets, his agreement to maintain the confidentiality of such trade secrets, and his representation of himself as a security integrator interested only in reselling GateGuard's products, Teman disclosed the requested business trade secrets to Taub.

103.    Among the business trade secrets Teman disclosed were the identities of GateGuard's first customers, new customers GateGuard had recently acquired, prospective customers who were considering GateGuard's products, pricing/subscription information associated with such customers, the status of GateGuard's open customer orders, GateGuard's sales pitch and internal promotional materials, and other confidential information pertaining to GateGuard's business operations.

104.     In addition to disclosing the above business trade secrets to Taub, Teman detailed the efforts and resources GateGuard had invested to target and acquire the referenced current/prospective customers. Given the slow rate of adoption of new technology within the real estate industry, Teman explained to Taub how GateGuard had invested considerably in analyzing huge volumes of public and private data to identify – from many thousands of multi-family property owners – a target subset of those owners likely to be receptive to being "early adopters" of GateGuard's products. Teman also provided Taub with additional sales and pricing insights that GateGuard had gleaned after years of effort and experience.

*Taub Misappropriates GateGuard's Technical Trade Secrets to Build MVI*

105.     Upon information and belief, Taub unlawfully used and continues to use GateGuard's technical trade secrets to build MVI.

106.     For example, MVI promotes a "Smart   Video   Door   System," "Advanced Building  Management  Platform," and other offerings that incorporate similar or identical features to those offered by GateGuard.

107.     Upon information and belief, MVI's products, services, applications, and other offerings unlawfully incorporate GateGuard's proprietary technologies. For example, MVI's "Smart  Video  Door  System," incorporates many of GateGuard's technical trade secrets, including but not limited to circuit board designs, communication interface/port configurations, power supply/relay designs, sensor integrations, boiler/HVAC monitoring capabilities, proprietary component configurations, applications, security capabilities, and other  technical  features. By way of further example, MVI's "Advanced     Building

Management   Platform" incorporates many of GateGuard's technical trade secrets, including but not limited to unique interfaces, options, and other functions from GateGuard's proprietary "backend" software.

108.      Upon information and belief, details of these technologies were not known to the public and were disclosed by GateGuard and Teman to Taub in strict confidence, as outlined above.

109.      Upon information and belief, Taub knowingly misappropriated GateGuard's technical trade secrets by incorporating GateGuard's proprietary technologies into MVI's products.

### *Taub and MVI Apply For and Receive Patent On GateGuard's Technical Trade Secrets*

110.      On June 15, 2017, MVI and Taub filed U.S. Patent Application No. 15/623,502, entitled "ENTRANCEWAY OR FOYER-BASED, COMMUNICATION APPARATUS AND SYSTEM" (the " '502 Application").

111.      The subject matter encompassed by the specification and claims of the '502 Application is substantially identical to GateGuard's video intercom device, applications, management platforms, and other proprietary technologies, as developed beginning in 2014 and as confidentially disclosed to Taub in 2016.

112.      On December 18, 2018, the '502 Application formally issued as U.S. Patent No. 10,158,831 (the " '831 Patent"). Every claim of the '831 Patent encompasses proprietary technology developed by GateGuard and disclosed confidentially to Taub.

113.      Attached hereto and incorporated herein as **Exhibit A** is a true and accurate copy of the '831 Patent.

22

114.    With the issuance of the referenced patent, the USPTO records of the '502 Application also become public for the first time. Prior to December 18, 2018, GateGuard and Teman were unaware of the existence of the '502 Application and its contents.

115.    Upon information and belief, Taub and MVI have filed additional patent applications that disclose and claim GateGuard's technical trade secrets.

116.    For example, on October 22, 2018, MVI and Taub filed U.S. Patent Application No. 16/166,546 (the " '546 Application") as a 'continuation' of the '502 Application.

117.    Upon information and belief, Taub and MVI filed the '546 Application in order to further exploit GateGuard's technical trade secrets for the benefit of MVI.

118.    The referenced patent and patent applications have provided substantial value and strategic advantages to MVI. In a recent interview with the website 'AlleyWatch,' Taub identified the referenced patent and patent applications as MVI's "biggest achievements thus far."

***Taub Falsely Certifies to the USPTO That He Is the Sole Inventor of GateGuard's Technologies***

119.    Included in the USPTO "File Wrapper" records for the '502 Application is an 'Oath/Declaration' document executed by Taub on June 13, 2017.

120.    In the referenced declaration, Taub certifies that he believes he is "…the original inventor… of a claimed invention in the application."

121.    Taub further acknowledges that "…any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment…or both."

122.     Upon information and belief, Taub intentionally filed the '502 Application despite knowing that the application disclosed and claimed GateGuard's technical trade secrets, as enumerated above.

123.     Upon information and belief, Taub willfully executed the referenced declaration despite knowing that Teman – not Taub – was the inventor for the claimed invention(s) in the application.

***Taub and MVI Misappropriate GateGuard's Business Trade Secrets to Poach GateGuard's Customers and Interfere with GateGuard's Business Relationships***

124.     Upon information and belief, Taub and MVI have unlawfully used and continue to use GateGuard's business trade secrets to benefit MVI and harm GateGuard.

125.     For example, upon information and belief, MVI has used GateGuard's confidential customer and prospective customer information, and aggressively pursued such customers to choose MVI's offerings over GateGuard.

126.      By way of further example, upon information and belief, MVI has used GateGuard's confidential customer pricing/subscription information to 'undercut' GateGuard's agreements by offering such customers preferential or free pricing.

127.     Upon information and belief, these (and other) business trade secrets were not known to the public and were confidentially disclosed by GateGuard and Teman to Taub, as outlined above.

128.     Upon information and belief, Taub and MVI knowingly misappropriated GateGuard's business trade secrets by targeting GateGuard's customers in the manner outlined above.

*GateGuard Suffers Substantial Losses as a Result of Taub and MVI's Actions*

129.     Taub and MVI's actions have caused tremendous, irreparable harm to GateGuard.

130.     For example, as a result of Taub and MVI's actions, GateGuard has lost numerous key customers.

131.     Losing such customers and the revenues they represent has caused substantial business disruption to GateGuard.

132.     These lost revenues – which are directly attributable to Taub and MVI's actions – have caused substantial delays in GateGuard's technical development, product manufacturing and delivery, and sales efforts.

133.     The lost revenues have also devalued GateGuard in the eyes of numerous investors and funds who had previously committed to investing in GateGuard.

134.     Additionally, through the filing of the '502 Application, Taub and MVI have unlawfully disclosed numerous technical trade secrets that were previously maintained confidentially by GateGuard.

135.     This disclosure of GateGuard's technical trade secrets has significantly devalued GateGuard's product offerings.

## CAUSES OF ACTION

## COUNT I

### TRADE SECRET MISAPPROPRIATION UNDER
### THE DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836 *et seq.*)

136.     GateGuard realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 135 above.

137.     At all relevant times, GateGuard owned and possessed certain confidential, proprietary and trade secret information as alleged above, including but not limited to the technical trade secrets and business trade secrets enumerated herein.

138.     GateGuard's technical trade secrets and business trade secrets constitute legally-recognized trade secrets and proprietary and confidential information protected under federal law, and more particularly the Defend Trade Secrets Act, as defined under 18 U.S.C. § 1839(3).

139.     Such confidential, proprietary and trade secret information relate to GateGuard's products and services which are used in, or intended for use in, interstate or foreign commerce.

140.     As detailed herein, GateGuard has taken numerous reasonable measures to keep such information secret and confidential, including maintaining such information on secure computer systems to assure it is not discoverable by or disseminated to the general public; limiting access to such information to key personnel; and periodically monitoring communication systems to prevent dissemination.

141.     Such confidential, proprietary and trade secret information derives independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of such information.

142.     In violation of GateGuard's rights, Defendants Taub and MVI misappropriated such confidential, proprietary and trade secret information in the improper and unlawful manner as alleged above.

143.     At the time that GateGuard's confidential, proprietary and trade secret information was disclosed to Defendant Taub, Taub knew or had reason to know that the trade secret was protected confidential, proprietary information having significant economic value to GateGuard and giving rise to a duty to maintain the secrecy of GateGuard's trade secrets.

144.     At the time that Defendant Taub disclosed GateGuard's confidential, proprietary and trade secret information to Defendant MVI, MVI knew or had reason to know that the trade secrets were acquired through improper and unlawful means, under circumstances giving rise to a duty to maintain the secrecy of GateGuard's trade secrets.

145.     As a direct and proximate result of Defendants' conduct, GateGuard has suffered and continues to suffer the disruption of its operations and the loss of customers and potential customers, loss of revenues, dilution of good will, injury to its reputation, misappropriation of its trade secrets, and devaluation of its trade secrets and business.

146.     Defendants' misappropriation of GateGuard's confidential information and trade secrets has caused and will continue to cause GateGuard substantial injury, including, but not limited to actual damages, lost profits, harm to its reputation, and the diminution in value of its trade secrets and business. Defendants have been unjustly enriched by their misappropriation of GateGuard's confidential information and trade secrets.

147.     Defendants' misappropriation of GateGuard's trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive. GateGuard is entitled to an award of exemplary damages and reasonable attorneys' fees.

148.     Because GateGuard's remedy at law is inadequate, GateGuard seeks – in addition to damages – a temporary, preliminary, and permanent injunctive relief to protect its trade

secrets as well as GateGuard's legitimate business interests. GateGuard will continue to suffer irreparable harm absent injunctive relief.

## COUNT II

### MISAPPROPRIATION OF TRADE SECRETS AND CONFIDENTIAL INFORMATION UNDER NEW YORK STATE LAW

149.    GateGuard realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 148 above.

150.    The rights and interests of GateGuard in its confidential information, described above, constitute trade secrets as defined by the common law of the State of New York.

151.    GateGuard owns the rights, title and interest in and to the trade secrets that Defendants used and continue to use in developing, promoting, and operating MVI.

152.    Because of GateGuard's reliance on the confidentiality provisions in GateGuard's ToS as accepted by Defendant Taub (and in view of Taub's additional representations), GateGuard provided Defendant Taub with access to and knowledge of GateGuard's trade secrets and confidential information.

153.    Such trade secrets were and are primary assets of GateGuard and have actual and potential independent economic value for GateGuard. GateGuard has carefully guarded its trade secret information and has taken reasonable steps to maintain its secrecy. There has been no disclosure of the trade secrets and confidential information by GateGuard.

154.    Defendants had knowledge that GateGuard regarded the trade secret information as trade secrets and of their legal obligation and duty, by virtue of the GateGuard ToS and other representations, to preserve the confidentiality of GateGuard's trade secrets and confidential information and to limit their use.

155.     Upon information and belief, Defendants knowingly, willfully and maliciously violated the GateGuard ToS and the referenced representations and breached GateGuard's confidence by misappropriating GateGuard's trade secrets in order to develop, promote, and facilitate MVI's business.

156.     As a direct and proximate result of Defendants' conduct, GateGuard has suffered and continues to suffer the disruption of its operations and the loss of customers and potential customers, loss of revenues, dilution of good will, injury to its reputation, misappropriation of its trade secrets, and devaluation of its trade secrets and business.

157.     Defendants' misappropriation of GateGuard's confidential information and trade secrets has caused and will continue to cause GateGuard substantial injury, including, but not limited to actual damages, lost profits, harm to its reputation, and the diminution in value of its trade secrets and business. Defendants have been unjustly enriched by their misappropriation of GateGuard's confidential information and trade secrets.

158.     Defendants' misappropriation of GateGuard's trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive. GateGuard is entitled to an award of exemplary damages and reasonable attorneys' fees.

159.     Because GateGuard's remedy at law is inadequate, GateGuard seeks – in addition to damages – a temporary, preliminary, and permanent injunctive relief to protect its trade secrets as well as GateGuard' legitimate business interests. GateGuard will continue to suffer irreparable harm absent injunctive relief.

## COUNT III

## CORRECTION OF INVENTORSHIP OF
## U.S. PATENT NO. 10,158,831 UNDER 35 U.S.C. § 256

160.     GateGuard realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 159 above.

161.     Pursuant to 35 U.S.C. § 256, GateGuard is entitled to an Order from the Court requiring correction of the inventorship of U.S. Patent No. 10,158,831 (the " '831 Patent") and an Order directed to the U.S. Commissioner of Patents (the Director of the U.S. Patent and Trademark Office) requiring issuance of a Certificate of Correction.

162.     Ari Teman is and believes himself to be the first, true, and original inventor of the system claimed in the '831 Patent. Teman conceived of the invention and had a definite and permanent idea of the complete and operative invention claimed in the '831 Patent, as it was thereafter to be applied in practice, prior to the filing date of the '831 Patent.

163.     For example, as described in detail herein, Teman confidentially disclosed to Taub the embodiments of each of claims 1-19 of the '831 Patent *seven months before the '831 Patent was filed*. Teman also confidentially demonstrated to Taub GateGuard's suite of technologies, reflecting Teman's reduction to practice of each and every limitation of at least one claim of the '831 Patent.

164.     Through error, Teman is not named as an inventor in the '831 Patent.

165.     Upon information and belief, Taub did not conceive of or otherwise contribute to the conception of the inventions claimed in the '831 Patent.

166.     For example, each and every limitation of claims 1-19 of the '831 Patent had been conceived of and reduced to practice by Teman well in advance of the filing date of the '831 Patent. As described herein, Teman had also confidentially demonstrated his

reduction to practice of the claimed inventions seven months prior to the filing date of the '831 Patent.

167.     Upon information and belief, Taub, through error, is named inventor of the '831 Patent.

168.     In the alternative, Teman contributed to the conception of at least one of the inventions claimed in the '831 Patent.

169.     As the inventor, Teman has ownership interest in the '831 Patent.

170.     Teman has assigned to GateGuard his full rights in the '831 Patent and the inventions disclosed and claimed therein, including the right to pursue claims of inventorship.

171.     Therefore, GateGuard has been, and continues to be harmed by Taub and MVI's incorporation of GateGuard's trade secrets and other intellectual property into the '831 Patent and its claims.

172.     Pursuant to 35 U.S.C. § 256, GateGuard seeks correction of the inventorship of the '831 Patent to add Teman as an inventor and remove Taub as an inventor.

**COUNT IV**

**DECLARATORY JUDGMENT**

173.     GateGuard realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 172 above.

174.     There exists an actual, ripe, and justiciable controversy between GateGuard and Defendants regarding each party's rights and interests in connection with U.S. Patent No. 10,158,831 (the " '831 Patent"), U.S. Patent Application No. 16/166,546 (the " '546

Application"), and any other pending patent applications filed by MVI that incorporate GateGuard's trade secrets.

175.     As set forth above, Teman is a proper inventor of the '831 Patent and therefore owned rights to the '831 Patent as an inventor.

176.     As also set forth above, Teman has assigned his full rights to the '831 Patent to GateGuard.

177.     GateGuard is, therefore, a proper owner of the '831 Patent as the assignee of Teman's ownership interest in the patent. The same holds true for GateGuard's ownership of the '546 Application.

178.     As a result of the conduct and events described in detail above, GateGuard possesses legal ownership, and/or equitable ownership and/or other interests in the '831 Patent and the '546 Application inconsistent with and superior to any interest claimed by MVI.

179.     GateGuard's ownership and related interests include sole legal and equitable ownership of the '831 Patent and sole legal and equitable ownership of the '546 Application. The Court should so declare pursuant to 28 U.S.C. § 2201.


## COUNT V

### BREACH OF CONTRACT
### (AS TO DEFENDANT TAUB)

180.     GateGuard realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 179 above.

181.     The GateGuard ToS is a binding contract between GateGuard and Defendant Taub.

182.     By his conduct as alleged above, Defendant Taub has breached numerous provisions of the ToS.  In particular, Defendant Taub has breached his obligations, *inter alia*, not to copy, adapt, replicate, reverse engineer, any portion of the content provided by GateGuard; not to create derivative works from, distribute, or otherwise use the content provided by GateGuard; not to make available to the public, make any commercial use, sell, reverse engineer, combine with other software, modify or create derivative works of any material that is subject to GateGuard's proprietary rights, including GateGuard's Intellectual Property; and not to provide information obtained from GateGuard to any third party without written consent.

183.     Defendant Taub has also breached his obligations not to disclose to third parties nor use for any purpose any Confidential Information received from GateGuard. Taub has also breached his obligations to protect GateGuard's Confidential Information and to prevent unauthorized disclosure or use of GateGuard's Confidential Information.

184.     Defendant Taub has also breached his obligations not to offer a competing or similar product to GateGuard such as: intercoms, lobby kiosks, face recognition access control, building information screens, and real estate management software.

185.     As a direct and proximate result of Defendant Taub's conduct, GateGuard has suffered and continues to suffer the disruption of its business relationships and the loss of customers and potential customers, dilution of good will, injury to its reputation, and devaluation of its business.

186.     Defendant Taub's breach of contract has caused and will continue to cause GateGuard substantial injury, including, but not limited to actual damages, lost profits,

harm to its reputation, and the diminution in value of its business. Defendant has been unjustly enriched by his actions.

187. Defendant Taub's breach of contract was intentional, knowing, willful, malicious, fraudulent, and oppressive. GateGuard is entitled to an award of exemplary damages and reasonable attorneys' fees.

## COUNT VI

## CONVERSION

188. GateGuard realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 187 above.

189. By the above-alleged acts, Defendants, without authorization, assumed and exercised an unlawful right of ownership over GateGuard's proprietary technology, business intelligence, and substantial skill and expenditures to the exclusion of GateGuard's rights therein. The unlawful and improper acts of Defendants, as alleged above, also denied and violated GateGuard's dominion, rights, and possession over its proprietary technology, business intelligence, and substantial skill and expenditures, and excluded GateGuard from exercising its rights therein.

190. As a direct and proximate result of Defendants' conduct, GateGuard has suffered and continues to suffer the disruption of its business relationships and the loss of customers and potential customers, loss of revenues, dilution of good will, injury to its reputation, misappropriation of its proprietary technology, business intelligence, skills and expenditures, and devaluation of its valuable property rights, benefits, and business.

191.     Defendants' conduct has caused and will continue to cause GateGuard substantial injury, including, but not limited to actual damages, lost profits, harm to its reputation, and the diminution in value of its valuable property rights and benefits.  Defendants have been unjustly enriched by their misappropriation of GateGuard's proprietary technology and substantial skills and expenditures.

192.     Defendants' conduct was intentional, knowing, willful, malicious, fraudulent, and oppressive.  GateGuard is entitled to an award of exemplary damages and reasonable attorneys' fees.

193.     Because GateGuard's remedy at law is inadequate, GateGuard seeks – in addition to damages – a temporary, preliminary, and permanent injunctive relief to return its proprietary technology and substantial skills and expenditures to its dominion and possession.  GateGuard will continue to suffer irreparable harm absent injunctive relief.

### COUNT VII

### TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS UNDER NEW YORK LAW

194.     GateGuard realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 193 above.

195.     By the above-alleged acts, Defendants MVI and Taub have interfered and continue to interfere with GateGuard's existing and prospective business relationships with customers and potential customers.

196.     Upon information and belief, Defendants MVI and Taub, with full knowledge of GateGuard's business relationships, intentionally interfered and continue to interfere with those relationships by, *inter alia* operating and promoting MVI and using GateGuard's

trade secrets, confidential information, and property to develop and promote products and services virtually indistinguishable from those provided by GateGuard, and by using GateGuard's trade secret information to directly target and solicit GateGuard's current and potential customers.

197.     Upon information and belief, the unlawful and improper acts of Defendants, as alleged above, also prevented and continue to prevent customers and other third parties from entering into business relationships with GateGuard.

198.     Upon information and belief, Defendants' conduct was motivated solely by malice and/or to inflict injury on GateGuard by unlawful means.

199.     As a direct and proximate result of Defendants' conduct, Defendants have and continue to injure GateGuard by denying business to and diverting business opportunities from GateGuard, which GateGuard would have otherwise had and from which it would have derived benefits and/or other tangible success.

200.     Upon information and belief, by their acts alleged above, Defendants have made and will make substantial profits and gains to which they are not in law or equity entitled.

201.     Defendants' tortious interference with GateGuard's business relationships has caused and will continue to cause GateGuard substantial injury, including, but not limited to actual damages, lost benefits, harm to its reputation, and the diminution in value of its business. Defendants have been unjustly enriched by their unlawful conduct.

202.     Defendants' tortious interference with GateGuard's business relationships was intentional, knowing, willful, malicious, fraudulent, and oppressive. GateGuard is entitled to an award of exemplary damages and reasonable attorneys' fees.

203.     Upon information and belief, Defendants intend to continue to interfere with GateGuard's business existing and prospective business relationships unless restrained and enjoined by this Court.

## COUNT VIII

### FRAUD
### (AS TO DEFENDANT TAUB)

204.     GateGuard realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 203 above.

205.     Upon information and belief, Defendant Taub represented to GateGuard that he was a "security integrator" who was interested in acting as a reseller of GateGuard's products.

206.     Taub further represented that he required access to and knowledge of GateGuard's trade secrets and proprietary information solely for the purposes of marketing and installing GateGuard products.

207.     Taub also represented that he had no background in technology nor interest in developing technology products and was interested in GateGuard's technology only for the purposes of serving as a reseller for GateGuard.

208.     Additionally, Taub represented that he will not offer a competing or similar product to GateGuard such as: intercoms, lobby kiosks, face recognition access control, building information screens, and real estate management software.

209.     Upon information and belief, the foregoing representations by Defendant Taub were false and untrue. In fact and in truth, Defendant Taub intended to divert and misappropriate GateGuard's confidential information, trade secrets, property and other

assets and to utilize to the full extent possible GateGuard's unique skill and expertise in his own competing business or otherwise for improper purposes.

210.     Upon information and belief, the representations made by Defendant Taub were false and were known to be false by Defendant Taub when made.

211.     Upon information and belief, Defendant Taub further agreed to protect the confidentiality of GateGuard's business and the confidential information and trade secrets that were disclosed to him.

212.     Upon information and belief, all of the aforesaid representations by Defendant Taub were made for the purpose and with the specific intent of deceiving and defrauding GateGuard and to induce GateGuard in reliance thereon to believe Defendant Taub's representations as aforesaid.

213.     Upon information and belief, all the aforesaid representations and acts by Defendant Taub were made for the benefit of and on behalf of himself and Defendant MVI. Upon information and belief, Defendant Taub employed the artifice of fraud to misappropriate and divert GateGuard's confidential information, trade secrets, and other property.

214.     Upon information and belief, the foregoing misrepresentations, fraud and deceit were perpetrated by Defendant Taub with the specific intent to extract an unfair and illegal advantage from GateGuard.

215.     Upon information and belief, GateGuard believed in the representations provided by Defendant Taub and that the aforesaid statements and representations made by Defendant Taub with respect to the protection of GateGuard's confidential information were true.

216.     As a result of the fraud and deceit perpetrated by Defendant Taub against GateGuard, GateGuard was harmed and Defendant Taub's conduct was a substantial factor in causing GateGuard's harm. GateGuard is entitled to an award of exemplary damages and reasonable attorneys' fees.

## COUNT IX

### UNJUST ENRICHMENT

217.     GateGuard realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 216 above.

218.     By the unlawful conduct alleged above, Defendants MVI and Taub have been unjustly enriched to the detriment of GateGuard's business and professional expectancies.

219.     Defendants MVI and Taub have unlawfully taken and retained from GateGuard the value of its trade secrets and confidential information, intellectual property, existing and prospective business relationships, and other property, without just compensation to GateGuard.

220.     Upon information and belief, by the above-alleged acts, Defendants MVI and Taub have made and will make substantial profits and gains to which they are not in law or equity entitled.

221.     As a direct and proximate result of Defendants' above-alleged acts, GateGuard has suffered irreparable harm and damage and is suffering monetary damages in an amount to be determined at trial.

222.     The circumstances surrounding Defendants' acts are such that equity and good conscience require Defendants to make full restitution to GateGuard for their unjust enrichment.

223.    Defendants' conduct, as-alleged above, was intentional, knowing, willful, malicious, fraudulent, and oppressive. GateGuard is entitled to an award of exemplary damages and reasonable attorneys' fees.

## COUNT X

### UNFAIR COMPETITION
### MISAPPROPRIATION OF SKILLS AND EXPENDITURES

224.    GateGuard realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 223 above.

225.    GateGuard has invested substantial labor, skill, and expenditures in developing its valuable property rights and benefits in its proprietary technology and business intelligence, and other valuable assets.

226.    Defendants misappropriated GateGuard's substantial labor, skill, and expenditure in bad faith by, *inter alia*, intentionally, knowingly, willfully, and maliciously violating their contractual obligations and using and disclosing GateGuard's valuable and proprietary rights and benefits in GateGuard's proprietary technology and business intelligence for Defendants' own commercial advantage.

227.    As a direct and proximate result of Defendants' conduct, GateGuard has suffered and continues to suffer the disruption of its business relationships and the loss of customers and potential customers, dilution of good will, injury to its reputation, misappropriation of its skills and expenditures, and devaluation of its valuable property rights, benefits, and business.

228.    Defendants' misappropriation of GateGuard's substantial skills and expenditures has caused and will continue to cause GateGuard substantial injury, including, but not

limited to actual damages, lost profits, harm to its reputation, and the diminution in value of its valuable proprietary rights and benefits. Defendants have been unjustly enriched by their misappropriation of GateGuard's substantial skills and expenditures.

229.     Defendants' misappropriation of GateGuard's substantial skills and expenditures was intentional, knowing, willful, malicious, fraudulent, and oppressive. GateGuard is entitled to an award of exemplary damages and reasonable attorneys' fees.

230.     Because GateGuard's remedy at law is inadequate, GateGuard seeks – in addition to damages – a temporary, preliminary, and permanent injunctive relief to protect its substantial skills and expenditures and valuable proprietary rights and benefits as well as GateGuard's legitimate business interests. GateGuard will continue to suffer irreparable harm absent injunctive relief.

**COUNT XI**

**BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING**

231.     GateGuard realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 230 above.

232.     The GateGuard ToS and other assurances between GateGuard and Defendant Taub impose an obligation of good faith and fair dealing on Defendants.

233.     Defendants owed GateGuard a duty to deal fairly and in good faith, including but not limited to, a duty to refrain from reducing the goodwill of GateGuard, to maintain the secrecy and refrain from misappropriating and unlawfully using and disclosing GateGuard's trade secrets and confidential information, and to avoid from tortuously interfering with GateGuard's business relationships.

234.     By the acts described above, Defendants breached these duties by, *inter alia*, misappropriating and unlawfully using and disclosing GateGuard's trade secrets and confidential information to establish, develop, and promote competing products and services and to solicit existing and prospective customers away from GateGuard.

235.     As a direct and proximate result of Defendants' breaches, GateGuard was deprived of the GateGuard ToS and other assurances between GateGuard and Defendant Taub.

236.     Defendants' conduct, as alleged-above, has caused and will continue to cause GateGuard substantial injury, including, but not limited to actual damages, lost profits, harm to its reputation, and the diminution in value of its business.

237.     Defendants' conduct, as-alleged above, was intentional, knowing, willful, malicious, fraudulent, and oppressive. GateGuard is entitled to an award of exemplary damages and reasonable attorneys' fees.

238.     Upon information and belief, Defendants intend to continue their conduct unless restrained and enjoined by this Court.


## JURY DEMAND

Plaintiff hereby requests a trial by jury on all issues so triable by right.


## DEMAND FOR RELIEF

Plaintiff requests that the Court find in its favor and against Defendants, and that the Court grant Plaintiff the following relief:

a.  Awarding damages as described in each of the above claims, in favor of Plaintiff and against Defendants in amounts to be determined at trial;

b.  Granting a temporary restraining order, and preliminary and permanent injunction against Defendants, enjoining them from violating their legal and contractual duties to Plaintiff, from accessing, using or disclosing Plaintiff's trade secrets and from any further infringement of Plaintiff's intellectual property;

c.  Awarding punitive damages in favor of Plaintiff and against Defendants in an amount to be determined at trial;

d.  Enjoin Defendants from further prosecution of patent applications of which Plaintiffs are the rightful owner or which contain Plaintiffs' trade secrets;

e.  Correcting the inventorship of U.S. Patent No. 10,158,831 by adding Teman as an inventor and removing Taub as an inventor;

f.  Declare that GateGuard possesses legal or equitable ownership or another interest in U.S. Patent No. 10,158,831 and U.S. Patent Application No. 16/166,546 inconsistent with or superior to any interest asserted by Defendants;

g.  Awarding Plaintiff pre-judgment and post-judgment interest, and its attorneys' fees, costs and other expenses incurred in this action;

h.  Granting Plaintiff such other and further relief as the Court may deem just and proper under the circumstances.

RESPECTFULLY SUBMITTED,

March 20, 2019

*/s/ Ariel Reinitz*
Ariel Reinitz
FISHERBROYLES, LLP
445 Park Avenue, Ninth Floor
New York, NY 10022
(646)494-6909
Ariel.Reinitz@FisherBroyles.com
*Attorneys for Plaintiff*
*GateGuard*