## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

GATEGUARD, INC.,

       *Plaintiff*,

    v.

MVI SYSTEMS LLC; SAMUEL TAUB,

      *Defendants.*

Case No. 1:19-cv-02472 (RA)

## DEFENDANTS' MOTION TO DISMISS THE COMPLAINT, ALTERNATIVELY FOR SUMMARY JUDGMENT

OSTROLENK FABER LLP
Max Moskowitz
Ariel Peikes
845 Third Avenue, 8th Floor
New York, NY 10022
Ph: (212) 596-0500
mmoskowitz@ostrolenk.com
apeikes@ostrolenk.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ................................................................................................. 4

DISCUSSION ..................................................................................................................... 5

      A.      Requirements for Motion to Dismiss…………………………………………...5

      B.      Requirements for Motion for Summary Judgment……………………………..6

      C.      Requirements for and GateGuard's failure to Adequately Plead its Trade Secrets Claims and Elements…………………………………………………………………………6

            1.      The FAC Does Not Adequately Identify Any Information That Rises To The Level Of A Trade Secret Under The DTSA…………………………6

            2.      The FAC Fails to Meet any of the Factors Required under the DTSA……7

      D.      The Court Lack's Jurisdiction over the Ownership of MVI's Pending Patent Application (Count VI)……………………………………………………………………..10

      E.      Samuel Taub Never Entered into any Binding Agreement with Ari Teman and/or GateGuard…………………………………………………………………………..11

            1.      Samuel Taub did not Enter into any Binding Agreement with GateGuard on November 16, 2016……………………………………………………..12

            2.      Samuel Taub did not Enter into any Binding Agreement with GateGuard on November 17, 2016……………………………………………………..13

      F.      Neither Samuel Taub nor MVI have Engaged in any Activity that Constitutes Tortious Inference with Business Relations…………………………………………………..14

      G.      GateGuard's FAC fails to Allege the Elements Required to Show Legal Fraud…………………………………………………………………………..15

      H.      Samuel Taub Never Entered into any Relationship with GateGuard that Gave Rise to any Implied Duties……………………………………………………………………16

      I.      Samuel Taub did not Convert any Property of GateGuard………………...16

CONCLUSION................................................................................................................... 17

## <u>**TABLE OF AUTHORITIES**</u>

<u>*Cases*</u>

*Ace Sec. Corp. Home Equity Loan Tr. v. DB Structured Prods. Inc.,*
   5 F. Supp. 3d 543 (S.D.N.Y. 2014) ………………………………………..………..5-6

*AIM Int'l Trading, L.L.C. v. Valcucine S.p.A.,*
   No. 02 Civ. 1363, 2003 WL 21203503, at *5 (S.D.N.Y. May 22, 2003) …….………....14

*Anderson v. Liberty Lobby,*
   477 U.S. 242 (1986) …………………………………………………….………….6

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) …………………………………………………….………….5

*ATSI Commc'ns Inc. v. Shaar Fund Ltd.,*
   493 F.3d 87 (2d Cir.2007) …………………………………………….…………….5

*Beard v. Banks,*
   548 U.S. 521 (2006)………………………………………………………………….6

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) …………………………………………………….………….5

*Bose v. Interclick, Inc.,*
   No. 10 Civ. 9183, 2011 WL 4343517, at *10 (S.D.N.Y. Aug. 17, 2011) ………….…..14

*Cobble Hill Nursing Home v Henry & Warren Corp.,*
   74 NY2d 475, 482 (1989), cert denied 498 US 816 (1990) ……………………….......12

*Colavito v N. Y. Organ Donor Network, Inc.,*
   8 NY3d 43, 860 N.E.2d 713, 827 N.Y.S.2d 96 (2006) …………......................................16

*Eli Lilly & Co. v. Aradigm Corp.,*
   376 F.3d 1352 (Fed. Cir. 2004) …………………………………………………...10-11

*Elsevier Inc. v. Doctor Evidence, LLC,*
   No. 17-CV-5540 (KBF), 2018 WL 557906, at *5 (S.D.N.Y. Jan. 23, 2018)………....…5-7

*Faucette v. Chantros,*
   322 S.W.3d 901 (Tex. App. 2010) …………...………………....…………….............15

*Galesi v Galesi,*
   37 AD3d 249 (1st Dept 2007) …………………………………………………..…12

*HIF Bio, Inc. v. Yung Shin Pharms. Indus. Co.,*
    600 F.3d 1347 (Fed. Cir. 2010) ……………………………………………..……10-11

*IDX Sys. Corp. v. Epic Sys. Corp.,*
    285 F.3d 581 (7th Cir. 2002) …………………………………………………7

*In re Document Techs. Litig.,*
    275 F. Supp. 3d 454 (S.D.N.Y. 2017) …………………………………………7

*In re Optimal U.S. Litigation,*
    813 F. Supp. 2d 351 (S.D.N.Y. 2011) …………………………………….…..15

*Joseph Martin, Jr., Delicatessen v. Schumacher,*
    52 NY2d 105 (1981) ……………………………………………………………12

*King v King,*
    208 AD2d 1143 (3d Dept 1994) ……………………………………...……11

*Kowalchuk v. Stroup,*
    61 AD3d 118, 121 (1st Dept 2009) ……………………………………..……11

*Leo Silfen vs. Cream,*
    29 N.Y.2d 387 (1972) …………………………………………………...……9

*Matter of Express Indus. & Term. Corp v New York State Dept. of Transp.,*
    93 NY2d 584 (1999) ……………………………………………………………12

*Next Commc'ns v. Viber Media, Inc.,*
    2016 WL 1275659, at *3 (S.D.N.Y. Mar. 30, 2016)………………………..……….7

*PortDock & Stone Corp. v. Oldcastle Ne., Inc.,*
    507 F.3d 117 (2d Cir. 2007)........................................................5

*Serova v. Teplen, No. 05 Civ. 6748(HB),*
    2006 U.S. Dist. LEXIS 5781, 2006 WL 349624, at *8 (S.D.N.Y. Feb. 16, 2006)………15

*Specht v. Netscape Communications Corporation,*
    306 F.3d 17 (2nd Cir. 2002) ...................................................1, 13

<u>Statutes</u>

18 U.S.C. § 839(3)..............................................................................6-7

35 U.S.C. § 116 ................................................................... ……...11

35 U.S.C. § 256 ..............................................................................11

## _Rules_

F.R.C.P. Rule 12(b)(6) ........................................................................................ 1, 10

F.R.C.P. Rule 56.................................................................................................. 1, 10

## _Miscellaneous_

21 NY Jur 2d, Contracts § 53.....................................................................................11

22 NY Jur 2d, Contracts §§ 9….................................................................................11

Restatement Second of Contracts § 33(2) .................................................................12

Williston on Contracts § 6:10, at 68 (4th ed) ...........................................................11

Defendants MVI Systems LLC and Samuel Taub (collectively "MVI") move to dismiss the instant Plaintiff, GateGuard, Inc.'s ("GateGuard") Amended Complaint under F.R.C.P. Rule 12(b)(6), or alternatively, for summary judgment under F.R.C.P. Rule 56.

## I.    INTRODUCTION

The cornerstone proposition of GateGuard's present lawsuit rests on the mistaken, legally untenable, proposition that anyone who merely visits GateGuard's website portal becomes contractually bound to its various terms, regardless of whether they have purchased anything from GateGuard or entered into any formal service agreement or otherwise.  While legal precedence recognizes the existence of "browse wrap" agreements, e.g., *Specht v. Netscape Communications Corporation*, 306 F.3d 17 (2nd Cir. 2002), GateGuard is mistaken that it can enforce what amounts here to a "**browse trap**," unwanted, binding agreement, regardless how onerous its terms.  Consider GateGuard's current website terms of service ("ToS") dated February 7, 2019 (attached as Exhibit Q to the Taub Declaration).  Thus, paragraph 1 of GateGuard's ToS states that anyone who accesses, i.e., merely visits, the GateGuard website "whether or not you become a registered user of the services" becomes contractually bound to GateGuard, on pain of <u>civil and criminal penalties</u>. Outrageously, the ToS in section 4 (penultimate paragraph) reads as follows:

> …you acknowledge and agree that you will not share Content or any other information provided to you by us…with any employee, contractor, agent…or anyone with any relationship with…, including, without limitation, Runs Like Butter, Inc., <u>MVI Systems</u>, Carson, Latch, Latch Access, Comelit, Akuvox, BLVS, Doorport, Doorbird, Doorking, Mircom, Liftgate, BuildingLink, Kent, SW24, VIrtual Doorman, Concierge Doorman, <u>or anyone providing intercom</u>, remote doorman, video phone, door phone or similar type <u>services</u>.  You agree <u>you will cease any and all communication and business with these individuals upon placing any **inquiry** or order with us for or about our products or services</u>. If you violate this provision, you agree to pay <u>$50,000 per day</u> for the use or

communication with any of the services until your relationship with them is ended and their devices are removed from any and all properties with which you have any ownership or management responsibilities. (Emphasis added).

The import of the foregoing is astounding. GateGuard advocates to this Court that an MVI customer using MVI's smart intercom who happens to stumble and click on GateGuard's website, must then immediately "cease any and all communication and business with these individuals…", i.e., with MVI, and pay GateGuard $50,000.00 per day in penalties for as long as the customer continues using MVI's smart intercom.

GateGuard's First Amended Complaint ("FAC"), in paragraph 83, asserts that by "visiting" GateGuard's web portal on November 16, 2016, Defendant Sam Taub has effectively agreed that he "…will not offer a competing or similar product to GateGuard's such as: intercoms, face recognition access control…," forever. Even assuming arguendo that Mr. Taub actually read the ToS (which he did not), he received nothing in "consideration" for visiting that website, not any product, not any software or anything else. There was no meeting of the minds or any intention by Mr. Taub to enter into any agreement with GateGuard, not on November 16, 2016, not ever.

To the extent that GateGuard alleges that it listed its "trade secrets" on its website portal, relying on those ToS for maintaining their "secrecy," those alleged trade secrets have all become vitiated under New York law, which demands very high, even drastic measures to be taken to protect and guard "trade secrets" from disclosure, which is clearly not met by someone who lists his/her trade secrets on a public web portal that anyone can access including by using an assumed identity.

Samuel Taub had one telephone conversation with Ari Teman of GateGuard on November 17, 2016. Samuel Taub and MVI never purchased anything from GateGuard, never

signed any service agreement with GateGuard and could not have entered into any contractual relationship with GateGuard by visiting GateGuard's web portal.

Perhaps recognizing the folly and illogic of the argument that Mr. Taub bound himself to GateGuard's ToS by merely visiting the GateGuard web portal, GateGuard's Ari Teman asserts that, during a November 17, 2016 telephone conversation, Mr. Taub orally agreed to be bound by GateGuard's ToS, and based thereon, Mr. Teman then proceeded to reveal to Mr. Taub (a complete stranger to Mr. Teman) GateGuard's highly valuable trade secrets. Mr. Teman straight-facedly asserts that he disclosed his most guarded trade secrets on nothing more than Mr. Taub's oral promise, without requesting a signed confidentiality agreement. The further assertions that Mr. Teman continued those trade secret disclosures in later telephone calls, emails and audiovisual communications is not just implausible; it is downright impossible.

Equally impossible to accept is the (ridiculous) notion that Mr. Taub read and understood GateGuard's ToS, and agreed, on November 17, 2016, to accept them, despite their (alleged) inclusion of clauses forbidding Mr. Taub to make or provide any smart intercom system on his own. Yet, as shown below, prior to November 17, 2016, the MVI smart intercom system was already fully conceived at MVI, and MVI had already entered into binding agreements with third party software and hardware vendors to construct MVI's smart intercom system, as detailed in the annexed Taub and Smith Declarations and the documents attached to Taub's declaration.

The FAC states (in Par. 53): "*GateGuard expended significant effort and expense to preserve and maintain the confidentiality of its trade secrets. For example, GateGuard personnel, customers, prospective customers, and any other relevant parties are required to* <u>*execute detailed agreements*</u> *in which they acknowledge …the trade secrets, agree to maintain the confidentiality of the trade secrets…or create derivative works based on the trade secrets.*"

(Emphasis added). Mr. Taub did not execute any agreement with GateGuard, and the mere notion that he would have done so is just ridiculous.

Further, even accepting Mr. Teman's (strange) story that he disclosed GateGuard's utmost secrets to a complete stranger, doing so means that under New York's trade secret law and the Defend Trade Secrets Act ("DTSA"), Mr. Teman's has, by his very own acts, destroyed the status of whatever he regarded as GateGuard's "trade secret," by disclosing them to Mr. Taub without taking even minimal steps to guard those secrets from being divulged.


## II.    STATEMENT OF FACTS

Samuel Taub accessed GateGuard's web portal on November 16, 2016, left his name, email address and telephone number and asked to be contacted.  Mr. Teman of GateGuard called Mr. Taub on November 17, 2016, and they spoke for about 30 minutes. Shortly after the call, Mr. Teman sent Mr. Taub an email enclosing 2 pages containing GateGuard marketing material. Mr. Taub never followed up or responded. It is impossible for Mr. Teman to have any physical or electronic evidence of later telephone or email or audio/visual communications because there were none. No trade secrets were ever disclosed, and it is impossible for Mr. Teman to produce either physical or electronic records of the communications of trade secrets that never took place.

Furthermore, Mr. Taub never read any Terms of Service, never agreed to, and would have never been able to agree to GateGuard's ToS which ostensibly say that anyone accessing GateGuard's web portal is FOREVER barred from offering or even using products or services that are competitive or similar to those of GateGuard.[1]

---

[1] Another section of GateGuard's ToS (Exhibit Q) states: "In the event you sign up as a customer, have your investor or client or staff or associate or friend or other relationship sign up as a customer, to gain information about our system, sales process, marketing materials, plans,

The relevant facts are set forth in detail in the annexed Declaration of Samuel Taub and in the exhibits attached thereto, in the Declaration of David Smith, and in the Defendants' Statement of Undisputed Facts.

## III.    DISCUSSION

### A.    Requirements for Motion to Dismiss

To survive a motion to dismiss, a plaintiff must allege facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Conclusory allegations are "not entitled to be assumed [to be] true." *Id.* at 681. A complaint cannot survive a motion to dismiss if "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Id.* at 679.

The factual allegations must be "sufficient to raise a right to relief above the speculative level." *Elsevier Inc. v. Doctor Evidence, LLC*, No. 17-CV-5540 (KBF), 2018 WL 557906, at *5 (S.D.N.Y. Jan. 23, 2018) citing *ATSI Commc'ns Inc. v. Shaar Fund Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). The Court should give "no effect to legal conclusions couched as factual allegations." *PortDock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121 (2d Cir. 2007) citing *Twombly*, 550 U.S. at 555. "In addition to the allegations in the complaint itself, a court may consider documents attached as exhibits, incorporated by reference, or relied upon by the plaintiff in bringing suit, as well as any judicially noticeable matters." *Ace Sec. Corp. Home Equity Loan Tr. v. DB Structured Prods. Inc.*, 5 F. Supp. 3d 543, 551 (S.D.N.Y. 2014).

---

pricing, or the like you agree that **we own your business (minus any debts it holds which you personally will become and remain responsible for)**, **its contracts, clients, real, digital, personal, and other property**." (Emphasis supplied).

### B.    Requirements for Motion for Summary Judgment

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed .R. Civ. P. 56(a); *Beard v. Banks,* 548 U.S. 521, 529 (2006). A genuine issue of material fact exists only when a disputed fact, if proven, "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

If the movant's burden is met, the nonmoving party must then present specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56. If such evidence "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250-51. A party opposing summary judgment cannot rest "merely on allegations or denials" in its pleadings, but "must set out specific facts showing a genuine issue for trial." *Beard v. Banks*, 548 U.S. at 529.

### C.    Requirements for and GateGuard's failure to Adequately Plead its Trade Secrets Claims and Elements

GateGuard's trade secrets claims (Counts I through IV and VI) must be dismissed because they fail to plead any information that Defendant Taub may have reviewed or otherwise received that constitute trade secrets owned by GateGuard under the DTSA (Defend Trade Secrets Act), what steps GateGuard took to protect the confidentiality of that particular information, or how such information has been misappropriated by Mr. Taub.

### 1.    The FAC Does Not Adequately Identify any Information That Rises To The Level of a Trade Secret Under The DTSA

The DTSA (Defend Trade Secrets Act) protects trade secrets, which are defined as "all forms and types of financial, business, scientific, technical, economic, or engineering

information" that "the owner thereof has taken reasonable measures to keep such information secret," and that has an economic value because it is not "generally known." 18 U.S.C. § 839(3). "Trade secrets are a narrow category of confidential information; to survive a motion to dismiss, a party alleging that it owns a trade secret must put forth *specific allegations* as to the information owned and its value." *Elsevier Inc.*, 2018 WL 557906, at *4 (emphasis added) (citing *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583 (7th Cir. 2002)); *Next Commc'ns v. Viber Media, Inc.*, 2016 WL 1275659, at *3 (S.D.N.Y. Mar. 30, 2016)).

Information is not a "trade secret" merely because it is confidential.  New York federal courts (interpreting the DTSA) generally consider the following factors in defining a trade secret: "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Elsevier Inc.*, 2018 WL 557906, at *3-*4 (citing *In re Document Techs. Litig.*, 275 F. Supp. 3d 454, 461-62 (S.D.N.Y. 2017)).  The FAC falls short of this standard in multiple respects.

### 2.    **The FAC Fails to Meet any of the Factors Required under the DTSA**

The FAC fails to actually describe or even identify any technical or business "trade secrets" of GateGuard. Instead, it merely lists and recites, mantra-like, commonly known and used electrical terms, everyday circuit and software components and/or business terms, generically known in the technical and business world. Thus, the FAC identifies as trade secrets: "proprietary connectivity capabilities" (paragraph 36); "pioneering image-processing

technologies" …"proprietary machine vision algorithms" (paragraph 38); "proprietary 'back-end' software" (paragraph 40); "application that enable and improve interactions with visitors"… "coordinate package/delivery management" (paragraph 41); "unique tamper-proof mechanism" (paragraph 54); "proprietary customer identification techniques" …"business plans, pricing insights" (paragraph 66); "proprietary software and hardware designs, component configurations" (paragraph 92); "internal components of GateGuard's video intercom panel (paragraph 93); "proprietary internal architecture…circuit board designs, communication interface/port configurations, power supply/relay designs, sensor integrations, water/HVAC/electric monitoring capabilities" (paragraph 94); and "advanced configurations through which GateGuard could integrate additional cameras and other sensors…proprietary biometric accessibility features…" (paragraph 96).

Not one of the hardware, software or business items listed above constitutes something not known for decades in the electrical, software and business world. For example, GateGuard lists as an example of its trade secrets "image processing" that has been around, literally, for decades. By merely prefacing each of these known terms with descriptors such as "proprietary" or "pioneering" or "unique" or "advanced," GateGuard has not come close to meeting the DTSA's requirement to identify what GateGuard regards as its "trade secrets." Commonplace terms such as "proprietary internal architecture…circuit board designs, communication interface/port configurations, power supply/relay designs, sensor integrations" and the like cannot constitute GateGuard's trade secrets. Indeed, not a single word or phrase in GateGuard's over 250 paragraphs long FAC enables even an expert in the electrical, software and/or business fields to identify a single item that provides even a remote hint of a "trade secret."

The second factor requires determining the extent to which the trade secrets are known by employees and others involved in the business, relative to which the FAC pleads no facts at all.

GateGuard concedes that trade secrets require careful and elaborate procedures to protect and prevent divulgation thereof. Indeed, GateGuard describes that to protect the secrecy of its confidential information it REQUIRES, prior to allowing anyone to see its "secret" information, "to execute detailed confidentiality agreements." (FAC pars. 53 and 101). Yet, in this action, GateGuard incongruently alleges that the contents of its publically accessible website contain some of its trade secrets, and that by accessing its web portal Mr. Taub agreed to maintain that information secret and not use it for his own purposes, which makes no sense at all. To the contrary, the very act of posting secret information on a public forum inherently destroys any secrecy aspects thereof. In the same vein, even accepting Mr. Teman's (untrue) assertions that he disclosed trade secrets to Mr. Taub, a complete stranger, doing so without executing a "detailed confidential agreement" means that the secrecy status of the (non-existing) information conveyed to Mr. Taub has thereby been vitiated pursuant to the DTSA. All the "trade secret" counts in this action must be and therefore should be summarily dismissed.

Regarding the value of the trade secret information, nothing plead in the FAC provides even a rudimentary indication or hint of what it would take to develop the (undisclosed) trade secrets. Indeed, some of the alleged trade secrets, for example, customer lists, are deemed in the law not to rise to the level of a trade secret. See *Leo Silfen vs. Cream*, 29 N.Y.2d 387 (1972). Besides, lists of New York Metropolitan area buildings and management companies are widely available, and the FAC does not identify a single GateGuard customer whose identity Mr. Teman disclosed to Mr. Taub.

Regarding the ease or difficulty of acquiring the information and duplicating it, the FAC fails to address that issue at all. And regardless, the trade secret items that are identified are commonly known and widely used in the relevant technical fields.

Thus, GateGuard's FAC describes no trade secrets, not even generally, and instead relies on conclusory allegations. Instead of trade secrets, GateGuard lists widely known circuits and software components and functionalities. And as immutably shown below, GateGuard did not and could not have ever physically examined any circuit or software component of MVI's smart intercom system. Its FAC relies, at most, on published information contained in MVI's patent or MVI's web portal www.mvisystems.com, which undermines the notion that Mr. Teman could have possibly formed a subjective good faith belief that the MVI system actually incorporates so much as a single line of software code or hardware components that either was present in GateGuard's AI Doorman or internally known to Mr. Teman prior to November 17, 2016.

On the above presentation, all the FAC counts that are anchored on the notion that Mr. Taub received GateGuard's "trade secrets" should be dismissed pursuant to FRCP Rule 12(b)(6), or by granting MVI summary judgment of non-liability, pursuant to FRCP Rule 56. This includes Counts I through IV and VI, which should be all dismissed because they rest on the frivolous allegations that MVI has improperly incorporated into its smart intercom system GateGuard's trade secrets.

### D.    The Court Lacks Jurisdiction over the Ownership of MVI's Pending Patent Application (Count IV)

Count IV can be dismissed on the additional ground that the MVI pending patent application, referenced in paragraph 121 of the FAC, is not subject to the jurisdiction of this Court, which cannot resolve issues of inventorship and ownership relating thereto.  The law is

crystal clear that Federal Courts do not have jurisdiction over pending patent applications. See

*Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352 (Fed. Cir. 2004), footnote 1. More recently in

*HIF Bio, Inc. v. Yung Shin Pharms. Indus. Co.*, 600 F.3d 1347 (Fed. Cir. 2010), the Circuit Court

stated:

> To the extent *Eli Lilly* failed to resolve this issue, we expressly hold that §116 does not provide a private right of action to challenge inventorship of a pending patent application. Once a patent issues, however, 35 U.S.C. §256 provides a private right of action to challenge inventorship, and such challenge arises under §1338(a). *Larson*, 569 F.3d at 1325-24 ("there is no doubt that §256 supplies such a valid basis for federal jurisdiction: an action to correct inventorship under §256 "arises under the patent laws for purposes of §1338(a)" (alteration in original).

> Indeed, in this district, Judge Kenneth M. Karas stated:

> To the extent that Plaintiff seeks to once again bring a correction of inventorship claim for any patent application referenced in the SAC,… such an attempt must be denied. As this Court has already emphasized, there is no 'private right of action to challenge inventorship of a pending patent application.' *HIF Bio, Inc. v. Yung Shin Pharm. Indus. Co.*, 600 F.3d 1347, 1354 (Fed.Cir.2010)…

*Kamdem-Ouaffo v. Pepsi Co., Inc.*, 160 F.Supp. 3d 553, 569 (S.D.N.Y. 2016).

### E.    Samuel Taub Never Entered into any Binding Agreement with Ari Teman and/or GateGuard

To establish the existence of an enforceable agreement, a plaintiff must establish an offer,

acceptance of the offer, consideration, mutual assent, and an intent to be bound. 22 NY Jur 2d,

Contracts § 9. That meeting of the minds must include agreement on all essential terms.

*Kowalchuk v. Stroup*, 61 AD3d 118, 121 (1st Dept 2009). "As a general rule, in order for an

acceptance to be effective, it must comply with the terms of the offer and be clear, unambiguous

and unequivocal." *King v King*, 208 AD2d 1143, 1143-1144 (3d Dept 1994), citing 21 NY Jur

2d, Contracts § 53, at 470, and 2 Lord, Williston on Contracts § 6:10, at 68 (4th ed).

No contract can come into existence without "a manifestation of mutual assent to [its] essential terms." *Matter of Express Indus. & Term. Corp. v New York State Dept. of Transp.*, 93 NY2d 584, 590 (1999) (internal quotation marks omitted); see also e.g. *Galesi v Galesi*, 37 AD3d 249, 249 (1st Dept 2007).

The law is clear that although the parties may intend to enter into a contract, if essential terms are omitted from their agreement, or if some of the terms included are too indefinite, no legally enforceable contract will result. *Cobble Hill Nursing Home v Henry & Warren Corp.*, 74 NY2d 475, 482 (1989), cert denied 498 US 816 (1990); *Joseph Martin, Jr., Delicatessen v Schumacher*, 52 NY2d 105, 109 (1981); see also Restatement Second of Contracts § 33 (2).

The FAC allegations do not permit concluding that Mr. Taub has bound himself contractually to GateGuard in any legal sense. The analysis is two-pronged. It requires determining whether Mr. Taub became contractually bound to GateGuard, in any respect whatsoever, when he visited its website on November 16, 2016, accessed its "CONTACT US" field and left his contact information requesting to be called. Secondly, it requires determining whether Mr. Taub became contractually bound to GateGuard, in any respect whatsoever, during his telephone conversation with Mr. Teman the next day, on November 17, 2016.

1.    **Samuel Taub did not Enter into any Binding Agreement with GateGuard on November 16, 2016**

GateGuard's FAC does not allege and indeed Mr. Taub did not click on any "I Agree" box or dialog link present on GateGuard's web portal, on November 16, 2016. Indeed, at no time ever did Mr. Taub download any software from that website or receive any hardware product by GateGuard, or anything at all. Mr. Taub received no "consideration" at all from GateGuard to serve as the foundation of any agreement. There was no "mutual assent" of any type whatsoever. And Mr. Taub clearly had no "intention" whatsoever to enter into any agreement, let alone an

agreement that forever bars him from offering the public products that compete with or are similar to those of GateGuard, as advocated in FAC paragraph 83.

 As explicated in *Specht vs. NetScape Communications*, supra, Taub received nothing and therefore could not become bound to GateGuard's ToS and whatever language it included on that date. Parenthetically, Taub never saw or read any ToS of GateGuard allegedly existing on November 16, 2016. Significantly, the FAC fails to attach a copy of the allegedly then existing ToS terms, which are actually quoted in paragraphs 78 – 82 of the FAC. And as noted above, GateGuard could not have listed on its publicly accessible website "trade secrets" for doing so would have immediately vitiated and destroyed their status as trade secrets. Therefore, Mr. Taub's mere "visiting" of GateGuard's web portal on November 16, 2016 did not contractually bind him to GateGuard in any manner.

2.    **Samuel Taub did not Enter into any Binding Agreement with GateGuard on November 17, 2016**

 It is undisputed that Mr. Teman called Mr. Taub on November 17, 2016 to discuss the possibility of Mr. Taub becoming an "installer" of GateGuard's AI Doorman system that was at the time advertised by GateGuard to the general public. There was never any discussion of Mr. Taub becoming a "user" of that system, just an installer, which never happened. It is undisputed that on that date, Mr. Taub was a complete stranger to Mr. Teman. Arguably, Mr. Taub could have been an imposter who stole the identity of a real "Mr. Taub," or a person with an assumed identity. Yet, despite the FAC admission that GateGuard would not disclose its "secrets" to anyone without an "executed detailed agreement," in the case of the complete stranger Mr. Taub, GateGuard makes the spurious, on its face impossible, assertion by Mr. Teman that, after he exacted from Mr. Taub an "oral" promise to keep his "secrets," he proceeded to spill his

company's utmost technical and business secrets over the course of the next days, orally and also through of series of emails and audiovisual presentations, of which there is no (and cannot be any) evidence, not physical and not electronic in any shape or form. Even if true, which of course it is not, Mr. Teman's divulgations to Mr. Taub of information that he considered to be "trade secrets" divested them of constituting "trade secrets" under the DTSA. Therefore, Mr. Taub received no consideration, and no contract formed between Taub and Teman.

Count V for breach of contract should therefore be dismissed from this action. \

### F.    Neither Samuel Taub nor MVI have Engaged in any Activity that Constitutes Tortious Inference with Business Relations

First, and most basically, the tortious interference with contract count must be dismissed because Plaintiff has not adequately pled the existence of an enforceable contract. Under New York's tortious interference standard, courts in this Circuit have regularly dismissed tortious interference claims that fail to adequately allege details regarding the purported contract, including—most notably—where the complaint fails to specifically identify the counterparty to the contract. *See*, *e.g.*, *AIM Int'l Trading, L.L.C. v. Valcuine S.p.A.*, No. 02 Civ. 1363, 2003 WL 21203503, at *5 (S.D.N.Y. May 22, 2003) (dismissing claim that alleged contracts with unidentified "[p]roducts dealers"); *Bose v. Interclick, Inc.*, No. 10 Civ. 9183, 2011 WL 4343517, at *10 (S.D.N.Y. Aug. 17, 2011) (dismissing claim for failure to identify details of contracts, including identity of counterparties).  Here, Plaintiff has not identified the counterparty to any alleged written or oral contract, nor has it provided any details whatsoever regarding the parties' rights and obligations under any contract involving GateGuard's AI Doorman system.

In the same vein, the instant FAC falls far short of meeting the needed elements to maintain a claim for tortious interference with "prospective" business relations. A plaintiff seeking to establish such a claim must plead and prove four elements:

> (1) a reasonable probability that the parties would have entered into a contractual relationship; (2) an "independently tortious or unlawful" act by the defendant that prevented the relationship from occurring; (3) the defendant did such act with a conscious desire to prevent the relationship from occurring or knew that the interference was certain or substantially certain to occur as a result of his conduct; and (4) the plaintiff suffered actual harm or damage as a result of the defendant's interference.

*Faucette v. Chantros*, 322 S.W.3d 901, 914 (Tex. App. 2010).

Nothing in the FAC comes close to identifying any existing or potential contractual relationships of GateGuard. Therefore, counts VII and X should be dismissed.

### G.    GateGuard's FAC fails to Allege the Elements Required to Show Legal Fraud

To state claim for common law fraud under New York law, a plaintiff must demonstrate "(1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which plaintiff reasonably relied; and (5) which caused injury to plaintiff." *In re Optimal U.S. Litigation*, 813 F. Supp. 2d 351, 381 (S.D.N.Y. 2011). "The elements of fraud under New York law are essentially the same as those for a claim of securities fraud under Section 10(b) and Rule 10b-5." *Serova v. Teplen*, No. 05 Civ. 6748(HB), 2006 U.S. Dist. LEXIS 5781, 2006 WL 349624, at *8 (S.D.N.Y. Feb. 16, 2006).

In the instant FAC, Count VIII for fraud fails for two reasons. First, in fact nothing was provided to Samuel Taub that constituted a legally cognizable "trade secret." Prong (5) above was not met here. No trade secrets were ever divulged to Samuel Taub. Secondly, a business

person receiving a blind call from a complete stranger requesting information about the products

that the business is selling, cannot divulge to that person his/her trade secrets without taking

adequate measures to protect them, e.g. by ascertaining the identity and credentials of the

inquiring person and securing from that person a written, executed agreement of confidentiality.

GateGuard has not met prong (4) needed for pleading a cause of action for "fraud."

### H.     Samuel Taub Never Entered into any Relationship with GateGuard that Gave Rise to any Implied Duties

Since Samuel Taub was never and is not alleged to have been a principal or key

employee or agent or to have any formal relationship to GateGuard, he never had any formal or

implied duty not to compete with GateGuard or not to solicit the same customer base for

products such as smart intercom systems.

### I.     Samuel Taub did not Convert any Property of GateGuard

"A conversion takes place when someone, intentionally and without authority, assumes or

exercises control over personal property belonging to someone else, interfering with that person's

right of possession." *Colavito v N. Y. Organ Donor Network, Inc.*, 8 NY3d 43, 49-50, 860

N.E.2d 713, 827 N.Y.S.2d 96 (2006). "Two key elements of conversion are (1) plaintiff's

possessory right or interest in the property and (2) defendant's dominion over the property or

interference with it, in derogation of plaintiff's rights. *Id.* at 50 (internal citations omitted).

Since as shown above, the FAC does not establish the existence of any property right

such as proprietary trade secrets, Mr. Taub cannot be said to have "converted" those trade

secrets.  Secondly, MVI is not to its present knowledge exercising "dominion" over any

technology or property of GateGuard. Therefore, the FAC's conversion count (VI) should be

dismissed.

**IV.     CONCLUSION**

The instant defendants have not received from Mr. Teman and have not incorporated in their products, any proprietary information, including any trade secrets. The instant defendants have not entered into any binding agreement with GateGuard, not on November 16, 2016 nor at any time thereafter. The instant Defendants have done nothing that constitutes tortious interference with GateGuard's existing or potential business relationships.

Therefore, the causes of action for theft of trade secrets; breach of contract and tortious interference should be summarily dismissed, or summary judgment should be granted to defendants relative thereto. With that, GateGuard's other counts, requesting ownership of MVI's patent and patent application and the assertions of conversion, unjust enrichment (Count IX), unfair competition (Count X) and breach of implied duties should be dismissed as well.


Dated: July 1, 2019                          Respectfully submitted,

                                             /s/ *Max Moskowitz*
                                             Max Moskowitz
                                             Ariel S. Peikes
                                             OSTROLENK FABER LLP
                                             845 Third Avenue
                                             New York, New York 10022
                                             Telephone: (212) 596-0500
                                             Facsimile: (212) 382-0888
                                             E-mail: mmoskowitz@ostrolenk.com
                                                      apeikes@ostrolenk.com
                                             *Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 1, 2019, I caused a true and correct copy of DEFENDANTS'

MOTION TO DISMISS THE COMPLAINT, ALTERNATIVELY FOR SUMMARY

JUDGMENT to be served on counsel of record via the ECF filing system pursuant to Federal

and Local rules.


<u>/s/ Max Moskowitz</u>
Max Moskowitz