UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GATEGUARD, INC.,<br><br>                        Plaintiff,<br><br>      - against -<br><br>MVI SYSTEMS LLC; SAMUEL TAUB; and MVI INDUSTRIES, LLC<br><br>                 Defendants. | Civil Action No.: 19-cv-02472 (JPC)(DPF)<br><br><br>ORAL ARGUMENT REQUESTED |

**MEMORANDUM OF LAW IN SUPPORT OF MVI SYSTEMS LLC'S AND SAMUEL TAUB'S MOTION TO COMPEL ARBITRATION OR, IN THE ALTERNATIVE, DISMISS PLAINTIFF'S CLAIMS ON SUBSTANTIVE GROUNDS**

**THE ENGEL LAW GROUP, PLLC**
280 Madison Avenue – Suite 705
New York, NY  10016
(212) 665-8095
aee@elgpllc.com

*Counsel for Defendants MVI Systems and Samuel Taub*

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... 1

STATEMENT OF FACTS ........................................................................................... 2

STANDARD ............................................................................................................... 2

ARGUMENT .............................................................................................................. 2

I.    ARBITRATION MUST BE COMPELLED BECAUSE THE PLAINTIFF'S CLAIMS ARE BASED ON THE GATEGUARD ToS, WHICH PROVIDES THAT ALL QUESTIONS OF ARBITRABILITY ARE FOR THE ARBITRATOR, NOT THE COURT ........................................................................................................... 2

II.    THE PLAINTIFF'S CONTRACT, MISAPPROPRIATION, TORTIOUS INTERFERENCE, AND UNFAIR COMPETITION CLAIMS FAIL AS A MATTER OF LAW AND SHOULD BE DISMISSED ON SUBSTANTIVE GROUNDS ........... 6

    A.    PLAINTIFF'S CONTRACT CLAIM ................................................... 6

        1.    The Allegations Regarding Taub's Interaction with the GateGuard Website Do Not Allege He Agreed to the GateGuard ToS ......................................... 6

        2.    The Purported Contract Is Not a Bargained For Exchange of Consideration 8

        3.    The Allegations Regarding the Alleged Contract Affirmatively Show that Taub Was Not Put On "Inquiry Notice." ........................................................ 9

    B.    BUSINESS-RELATED TRADE SECRETS, UNFAIR COMPETITION, AND TORTIOUS INTERFERENCE CLAIMS .......................................... 11

III.    PATENT CLAIMS ............................................................................................ 15

    A.    Complete Substitution of Inventors Is Only Available in Cases of "Collaboration" ....................................................................................... 15

    B.    GateGuard Has Not Met the High Bar for Pleading a Claim for Correction of Inventorship and Fails to Allege "Corroboration" .................................. 17

        1.    Correction of Inventorship Under Section 256 Is Not an Available Remedy Unless the Plaintiff is the Inventor of Every Single Claim Set Forth in the Issued Patent ............................................................................................... 17

        2.    The Plaintiff Must Allege "Corroboration" to Survive a Motion to Dismiss ..................................................................................................................... 21

    C.    GateGuard's Newly Pled Theory of "Joint Inventorship" Is Flatly Contradicted by the Factual Allegations in the Third Amended Complaint. ... 25

    D.    Motion to Dismiss as a Prophylactic Against Discovery Abuse ...................... 27

    E.    MVIS and Taub Are Not Proper Defendants Because Neither Has a Financial Interest in the MVII Patents ......................................................................... 28

IV.    PLAINTIFF'S TECHNICAL TRADE SECRETS CLAIMS ................................ 28

V.    FRAUDULENT CONVEYANCE CLAIMS ......................................................... 32

CONCLUSION .......................................................................................................... 34

## TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ............................................................................ 13, 25

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...................................................................... 13, 27

*Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 388 (E.D.N.Y. 2015) ..................................... 7, 9, 10, 11

*Blue Gentian v. Tristar Prod., Inc.*, No. CV 13-1758 (NLH/AMD), 2020 WL 241345, at *8 (D.N.J. Jan. 16, 2020) .................................................................................................................... 22

*Chou v. Univ. of Chicago*, 254 F.3d 1347, 1359 (Fed. Cir. 2001) ................................................ 28

*Compass Prods. Int'l LLC v. Charter Commc'ns, Inc.*, No. 18 CIV. 12296, 2019 WL 4198586, at *5 (S.D.N.Y. Aug. 8, 2019) ............................................................................................... 6

*Contec Corp. v. Remote Solution Co.*, 398 F.3d 205, 208 (2d Cir. 2005) ................................. 5, 6

*David L. Threlkeld & Co. v. Metallgesellschaft Ltd.*, 923 F.2d 245, 250 (2d Cir. 1991) ................ 4

*DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) ............................................ 5

*Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1358 (Fed. Cir. 2004) ................................ 21, 32

*Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1461 (Fed. Cir. 1998) .............................. 21

*Ethicon, Inc. v. U.S. Surgical Corp.*, 937 F. Supp. 1015, 1034 (D. Conn. 1996) ........................ 21

*Ferring B.V. v. Allergan, Inc.*, 166 F. Supp. 3d 415, 424 (S.D.N.Y. 2016) ........................... 18, 19

*Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) ............................. 5

*Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 980 (Fed.Cir.1997) .......................... 21

*HIF Bio, Inc. v. Yung Shin Pharm. Indus. Co., Ltd.*, 600 F.3d 1347, 1353 (Fed. Cir. 2010) ........... 29

*Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) ................................................... 5

*In re Enron Corp.*, No. 01-16034(AJG), 2006 WL 2385194, at *2 (Bankr. S.D.N.Y. June 2, 2006) ................................................................................................................................... 25

*Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir.1995) ...................... 5

*Inventio Ag v. Otis Elevator Co.*, No. 06 CIV. 5377 CM, 2011 WL 3480946, at *1 (S.D.N.Y. Aug. 4, 2011) .................................................................................................................... 31

*Jensen v. Cablevision Sys. Corp.*, No. 217CV00100ADSAKT, 2017 WL 4325829, at *2 (E.D.N.Y. Sept. 27, 2017) ................................................................................................................ 7

*Larson v. Correct Craft, Inc.*, 569 F.3d 1319, 1326 (Fed. Cir. 2009) ........................................ 28

*Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995) ...................................... 9

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985) ................... 4

*Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.* ................................................................. 4

*Opternative, Inc. v. JAND, Inc.*, No. 17 CIV. 6936 (JFK), 2019 WL 624853, at *8 (S.D.N.Y. Feb. 13, 2019) ................................................................................................................... 22, 23

*Rawlplug Co. v. Hilti Aktiengesellschaft*, 777 F. Supp. 240, 242 (S.D.N.Y. 1991) .......................... 15

*Ray v. Ray*, 799 F. App'x 29, 30-31 (2ⁿᵈ Cir. 2020) ................................................................. 33

*Red Carpet Studios v. Midwest Trading Grp., Inc.*, No. 1:12CV501, 2016 WL 5661681, at *4 (S.D. Ohio Sept. 30, 2016) ...................................................................................................... 15

*Rubin v. Gen. Hosp. Corp.*, 523 F. App'x 719, 722 (Fed. Cir. 2013) ......................................... 15

*Rubin v. Gen. Hosp. Corp.*, No. CIV.A. 09-10040-DJC, 2011 WL 1625024, at *10 (D. Mass. Apr. 28, 2011) ................................................................................................................... 16, 17

*Satispie, LLC v. Travelers Prop. Cas. Co. of Am.*, No. 6:17-CV-06234 EAW, 2020 WL 1445874, at *4 (W.D.N.Y. Mar. 25, 2020) ............................................................................................ 6

*Schneider v. Kingdom of Thailand*, 688 F.3d 68, 71 (2d Cir. 2012) ............................................. 4

*Speedfit LLC v. Woodway USA, Inc.*, 226 F. Supp. 3d 149, 159–60 (E.D.N.Y. 2016) ............. 29, 31

*Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1295-96 (Fed. Cir. 2008) ............ 23

*Uddoh v. United Healthcare*, 254 F. Supp. 3d 424, 429 (E.D.N.Y. 2017) ........................................ 25

*Univ. of Pittsburg of Commonwealth Sys. of Higher Educ. v. Hedrick*, No. CV04-9014 CBM
    AJWX, 2008 WL 8627085, at *7 (C.D. Cal. June 9, 2008) ......................................................... 18

*Yahusz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003) .................................................. 27

Pursuant to Fed. R. Civ. P. 12(b)(1) and (6), and Fed. R. Civ. P. 9(b), and the Federal Arbitration Act, Defendants MVI Systems LLC ("MVIS") and Samuel Taub ("Taub"), by and through their undersigned counsel, hereby submit this Memorandum of Law in Support of their Motion to Compel Arbitration or, in the Alternative, Dismiss Plaintiff's Claims on Substantive Grounds.

## INTRODUCTION

After resisting for more than a year, and only after being ordered to do so by Judge Freeman, the Plaintiff finally produced to the Defendants a copy of the purported contract upon which all of its claims are based (the "GateGuard ToS"). As the Defendants long suspected based on informal discovery, the GateGuard ToS incorporates a dispute resolution framework that not only has Delaware choice of law and choice of forum provisions (the Defendants have twice briefed motions to dismiss under New York law, in this New York Court), but also has an arbitration provision that covers the entirety of this case. More importantly, at this stage of the litigation, the GateGuard ToS explicitly incorporates the Commercial Arbitration Rules of the American Arbitration Association (the "AAA"), which in turn state in no uncertain terms that the AAA shall determine all questions of arbitrability and the scope of its own jurisdiction. As such, it has now become clear that the Plaintiff's concealment of the GateGuard ToS for over a year in this case have caused the Defendants to expend considerable resources briefing several motions under law that does not apply, in a Court that does not have jurisdiction, on substantive matters that are not even ripe for review prior to the AAA addressing any issues of arbitrability that the Plaintiff might raise, all in furtherance of Plaintiff's effort to avoid the consequences of an absurdly lopsided contract of adhesion that Plaintiff itself drafted.

Moreover, despite being given a third opportunity to amend its complaint, with each of these amendments coming after the Plaintiff was faced with *three* successive motions to dismiss by the

Defendants, GateGuard has failed to remedy the problems identified by the Court in granting significant portions of the Defendants' second motion to dismiss, added allegations that fatally undermine its claims, and alleged new claims that fall far short of the applicable pleading standard. As explained below, GateGuard must be compelled to arbitrate all of its claims, each of which, in any event, fails as a matter of law and should there be dismissed on substantive grounds.

## STATEMENT OF FACTS

The movants respectfully refer the Court to the Statement of Facts set forth in co-Defendant MVII's motion papers submitted simultaneously herewith on October 16, 2020, which are incorporated herein by reference.

## STANDARD

The movants incorporate by reference the Standard of Review section set forth in co-Defendant MVII's motion papers submitted simultaneously herewith on October 16, 2020.

## ARGUMENT

**I.    ARBITRATION MUST BE COMPELLED BECAUSE THE PLAINTIFF'S CLAIMS ARE BASED ON THE GATEGUARD ToS, WHICH PROVIDES THAT ALL QUESTIONS OF ARBITRABILITY ARE FOR THE ARBITRATOR, NOT THE COURT**

The Plaintiff first filed this lawsuit on March 20, 2019.  After multiple amendments in search of a firm footing for its claims, GateGuard is now on its fourth iteration of its Complaint.  In each instance, the gravamen of GateGuard's Complaint has been that Defendant Samuel Taub, in his role as principal of Defendant MVIS, filled out an online form at GateGuard's website whereby he requested additional information about GateGuard and allegedly agreed to the GateGuard ToS, thereby purportedly forming a binding and enforceable contract between the Defendants and GateGuard.  According to Plaintiff, this binding contract explicitly required the Defendants to refrain from using any "confidential" or "proprietary" information that GateGuard might share with Defendants, or from competing with GateGuard in the future.  Based on the Defendants' alleged

2

agreement to these terms, GateGuard claims that it shared virtually every detail about its business, including technical and business development information, in one or more phone calls and other communications with the Defendants.  The Defendants allegedly then misappropriated all of this "trade secret" information and used it to solicit and steal GateGuard's customers and prospects, to build technology it otherwise would not have known how to build, and then filed for and obtained two patents based on this same technology that it misappropriated.  All of Plaintiff's claims, however denominated, arise from and depend on the existence of the alleged contract between GateGuard and the Defendants, as embodied in the GateGuard ToS.

Despite the obvious centrality of the GateGuard ToS to the Plaintiff's claims, and the fact that the Plaintiff has quoted from the GateGuard ToS extensively in each version of its complaint, and despite the Defendants' requests over the course of this litigation, the Plaintiff never included a copy of the GateGuard ToS as an exhibit to any of its complaints.  During an August 4, 2020 telephone conference with Judge Freeman in this matter, and in response to the Defendants' request, the Court ruled that whatever version of the GateGuard ToS the Plaintiff had chosen to rely on in its Complaint should have been produced to the Defendants in conjunction with the Plaintiff's Initial Disclosures (then more than a year old), and ordered the Plaintiff to produce a copy of the GateGuard ToS as soon as practicable.  After weeks of prodding, the Plaintiff finally produced the GateGuard ToS on which its entire case is based, which document in turn explicitly incorporated GateGuard's "Governing Law and Dispute Resolution" policy (the "Dispute Resolution Policy"). *See,* Engel Decl. Exh. A (the GateGuard ToS) at GG000013, GG000024.

As the Defendants had suspected, the GateGuard ToS contains an applicable arbitration provision, a Delaware choice of law provision, a Delaware Federal Court choice of forum provision for injunctive relief (all other claims mandated to arbitration), and a damages cap of $10,000.00. Specifically, the Dispute Resolution Policy first lays out its broad scope:

3

> Notwithstanding anything to the contrary contained herein, you and GateGuard agree that any dispute, claim or controversy arising out of or relating to the Terms or the breach, termination, enforcement, interpretation or validity thereof, or to the use of the Site will be settled by binding arbitration, except that GateGuard alone retains the right to seek injunctive or other equitable relief in a court of competent jurisdiction to prevent the actual or threatened infringement, misappropriation or violation of a its copyrights, trademarks, trade secrets, patents, or other Intellectual Property rights.

Engel Decl. Exh. A at GG000024. Next, the Dispute Resolution Policy makes clear that:

> The arbitration will be administered by the American Arbitration Association ("AAA") in accordance with the Commercial Arbitration Rules and the Supplementary Procedures for Consumer Related Disputes (the "AAA Rules") then in effect, except as modified by this "Dispute Resolution" section. (The AAA Rules are available at www.adr.org/arb_med or by calling the AAA at 1-800-778-7879.)

*Id.* Together, these two provisions mandate that the entirety of this case must be sent to the AAA where that body can determine the scope of its own jurisdiction over the Plaintiff's claims and adjudicate said claims.

Under the Federal Arbitration Act ("FAA"), a written agreement to arbitrate "shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. The FAA establishes an "emphatic federal policy in favor of arbitral dispute resolution." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985). Courts should therefore "construe arbitration clauses as broadly as possible," *David L. Threlkeld & Co. v. Metallgesellschaft Ltd.*, 923 F.2d 245, 250 (2d Cir. 1991), and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24–25 (1983).

The arbitrability of the claims in this case is a threshold matter that must be resolved by the AAA, not this Court, and the Defendants' motion to compel should be granted for this reason alone. While the question of arbitrability is often an issue for judicial determination, that is not so where, as here, "the parties clearly and unmistakably provide otherwise." *Schneider v. Kingdom of Thailand*, 688 F.3d 68, 71 (2d Cir. 2012) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S.

4

79, 83 (2002)).  As the Supreme Court very recently held, "[w]hen the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract."  *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019).  "In those circumstances, a court possesses no power to decide the arbitrability issue."  *Id.*

Where, as here, the parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, such "incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator."  *Contec Corp. v. Remote Solution Co.*, 398 F.3d 205, 208 (2d Cir. 2005).[1]  More specifically, *Contec* holds that an arbitration provision referencing the AAA's Commercial Arbitration Rules constitutes "clear and unmistakable evidence" that the parties intended to delegate the issue of arbitrability to the arbitrator, not the courts.  *Id.*  That is because Rule 7(a) of the AAA's Commercial Arbitration Rules delegates the issue of arbitrability to the arbitrator:  "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."[2]  Rule 8 further gives the AAA arbitrator the sole power to interpret the AAA Rules, including Rule 7 ("The arbitrator shall interpret and apply these rules insofar as they relate to the arbitrator's powers and duties.").

The applicable arbitration provision in the GateGuard ToS, set forth above, incorporates the AAA's Commercial Arbitration Rules.  As such, the clause constitutes "clear and unmistakable evidence" that the parties intended to delegate the issue of arbitrability to the arbitrator, and this

---

[1]  The GateGuard ToS are integral to the Complaint and may be considered by the Court without transforming this motion into one for summary judgment.  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that a district court considering a dismissal pursuant to Fed. R. Civ. 12(b)(6) "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint…. Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document 'integral' to the complaint….); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir.1995) (per curiam) (same).
[2]  AAA Commercial Arbitration Rules and Mediation Procedures, American Arbitration Association, (https://www.adr.org/sites/default/files/Commercial%20Rules.pdf), at p.13 (last visited October 15, 2020)

Court should enforce that intent and compel arbitration of the entirety of this case. *Contec Corp.*, 398 F.3d at 205.

## II. THE PLAINTIFF'S CONTRACT, MISAPPROPRIATION, TORTIOUS INTERFERENCE, AND UNFAIR COMPETITION CLAIMS FAIL AS A MATTER OF LAW AND SHOULD BE DISMISSED ON SUBSTANTIVE GROUNDS

### A. PLAINTIFF'S CONTRACT CLAIM

The amendments to GateGuard's contract claim (against Defendant Taub only), while not particularly lengthy, reveal the absurdity of GateGuard's contract claim and fatally undermine it. Under New York law, the four elements of a breach of contract cause of action are: "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Satispie, LLC v. Travelers Prop. Cas. Co. of Am.*, No. 6:17-CV-06234 EAW, 2020 WL 1445874, at *4 (W.D.N.Y. Mar. 25, 2020). The five elements of contract formation are: "(1) offer; (2) acceptance; (3) consideration; (4) mutual assent; and (5) mutual intent to be bound." *Compass Prods. Int'l LLC v. Charter Commc'ns, Inc.*, No. 18 CIV. 12296, 2019 WL 4198586, at *5 (S.D.N.Y. Aug. 8, 2019). Specific to this case, during the January 15, 2020 hearing on the first Motion to Dismiss decided by the Court, the Court cited *Berkson v. Gogo LLC* as authority for the proposition that the relevant standard to be applied is "whether Taub was a reasonably prudent user on inquiry notice of the terms of the contract on the website." Engel Decl. Exh. B ("MTD Hrg. Tran") at p.6. GateGuard's newly amended contract claim fails on several fronts.

### 1. The Allegations Regarding Taub's Interaction with the GateGuard Website Do Not Allege He Agreed to the GateGuard ToS

As an initial matter, GateGuard's newly pled contract allegations affirmatively show that GateGuard is trying to enforce, for lack of a better term, the wrong contract.[3] In the TAC,

---

[3] This is precisely why the undersigned successfully urged the Court to direct GateGuard to flesh out the facts surrounding Taub's alleged assent to the purported agreement with GateGuard. MTD Hrg. Tran at p. 16-17.

6

GateGuard alleges for the first time that:

> 82.    While navigating the [GateGuard] website, Taub further accessed an interactive form.
> 83.    The referenced form included numerous fields into which identifying information was to be provided, including email address, first name, last name, company name, phone number, etc.
> 84.    The referenced form further included the following text, immediately below the referenced fields:  "By submitting form [sic] you accept *our terms and conditions*." (emphasis added).

Most notably, GateGuard alleges that the form that Taub allegedly submitted stated that Taub was thereby accepting GateGuard's "terms and conditions."  The contract that GateGuard is trying to enforce, however, is titled GateGuard's "Terms of Service."  TAC ¶ 279 ("The GateGuard ToS is a binding contract between GateGuard and Defendant Taub.").  The phrases "terms and conditions" and "Terms of Service" are not the same thing, and denote different levels of engagement and commitment.  For example, in *Jensen v. Cablevision Sys. Corp.*, the purported contract that Cablevision was trying to enforce was an amalgam of several different documents, including one set of documents collectively titled the "Terms of Service" and another document titled the "Terms and Conditions."  *Jensen v. Cablevision Sys. Corp.*, No. 217CV00100ADSAKT, 2017 WL 4325829, at *2 (E.D.N.Y. Sept. 27, 2017).

Not only were they technically separate documents, Cablevision acknowledged that there may be conflicts between them, and provided guidance regarding which agreement would control: "In the event of any conflict between these Terms and Conditions below and the Terms of Service, the Terms of Service shall control."  *Id.*  It is blackletter law that "at common law[,] an acceptance [of a contract], in order to be effective, must be positive and unambiguous."  *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 388 (E.D.N.Y. 2015) (*citing* 2 Williston on Contracts § 6:10 (4th ed.)).  Here, even assuming the truth of GateGuard's allegations, Taub did not assent, ambiguously or otherwise, to be bound by a document titled "Terms of Service" by agreeing to be bound by the "terms and conditions" on GateGuard's website.

### 2.    The Purported Contract Is Not a Bargained For Exchange of Consideration

GateGuard has not pled that it undertook any obligations under the purported contract at issue, and therefore did not and cannot plead that it "performed" its obligations thereunder.  While not stated explicitly in the TAC – which conspicuously fails to include a full copy of the purported contract at issue – it is reasonable to infer from these allegations quoted above (TAC ¶¶ 82-84) that the referenced form was intended by GateGuard to be used by people interested in communicating further with GateGuard, which is exactly what happened in this case.  TAC ¶ 95 ("In response to Taub's communication . . . Teman engaged Taub").  The TAC alleges a litany of obligations that Taub allegedly undertook under the alleged contract (TAC ¶¶ 89-94), but nowhere does the TAC ever mention, even by implication, any obligation(s) that GateGuard undertook.

GateGuard does not allege that it had any duty under the alleged contract to ever communicate with Taub.  Mr. Teman, GateGuard's principal, did so voluntarily.  GateGuard does not allege that it had any duty to disclose any, and certainly not *all,* of its confidential information to Taub in a phone call with a person Teman had never met, although Teman allegedly did so voluntarily.  GateGuard does not allege that it had a duty to engage in business with Taub, and it did not do so.  In other words, GateGuard does not allege any bargained for consideration represented in the purported contract between GateGuard and Taub.  While the contract it is trying to enforce is titled "Terms of Service," this is a misnomer, as GateGuard did not undertake to provide any service, and the purported contract was not connected to any transaction between GateGuard and Taub.  As such, GateGuard's contract claim must be dismissed as illusory.

For these reasons, GateGuard also never alleges that it "performed" under the alleged contract, an essential element of its breach of contract claim.  TAC ¶¶ 278-285 (reiterating the litany of obligations Taub allegedly undertook, and detailing the many ways that he allegedly breached the contract, but never mentioning GateGuard's obligations or performance thereof).  As such,

GateGuard has failed to allege not only contract formation, but its own performance, and its contract claim must be dismissed.

> **3.    The Allegations Regarding the Alleged Contract Affirmatively Show that Taub Was Not Put On "Inquiry Notice."**

As mentioned above, the Court cited *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359 (E.D.N.Y. 2015) with approval in its discussion of GateGuard's contract claims.  In *Berkson*, the court engaged in an exhaustive study of the element of "assent," including as originally conceived and up through the modern era where consumers are constantly barraged with adhesion contracts on a daily basis.  The court enunciated several factors relevant to analyzing assent in connection with internet-based contracts, and reached several conclusions that doom GateGuard's contract claim.

The assent/contract formation question "will often turn on whether a reasonably prudent offeree would be on [inquiry] notice *of the term[s] at issue*."  *Berkson* at 393 (E.D.N.Y. 2015) (citations omitted, emphasis added).  This means that the analysis of assent proceeds on a term-by-term basis, namely whether the defendant was put on inquiry notice *of the particular term* that the plaintiff is trying to enforce.  The indicia of assent are also assessed in light of the importance and impact of the term as issue.  *See, Berkson* at 403 (E.D.N.Y. 2015) ("Proof of . . . adequate warning of *adverse terms* by the design of the agreement page or pages should be required before adverse terms, such as compelled arbitration or forced venue, are enforced.") (emphasis added); *Id.* at 402 ("Did the merchant clearly draw the consumer's attention to material terms that would alter what a reasonable consumer would understand to be her *default rights*.") (emphasis added); *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995) ("As a practical matter, it seems unlikely that petitioners . . . had any idea that by signing a standard-form agreement to arbitrate disputes they might be giving up an *important substantive right*.  In the face of such doubt, we are unwilling to impute this intent [to assent to such terms] to petitioners.").

Here, the adhesion contract that Taub allegedly assented to included extremely onerous provisions, including the preposterous term that he would not compete, at all, in the same industry as GateGuard, as well as all manner of confidentiality provisions, and the potential waiver of important intellectual property rights, which all create the very real potential for disputes and, of course, litigation.  TAC ¶¶ 89-94.  Given that the alleged GateGuard ToS contained so many, and so extreme, "adverse terms" that materially altered Taub's rights and obligations, GateGuard carries a heavy burden to establish that it put Taub on sufficient notice that he was agreeing to such absurdly harmful terms.

The *Berkson* court noted several factors as important in assessing the adequacy of the notice provided by a plaintiff, including whether there is substantial support relating to whether the defendant "was aware that she was binding herself to more than an offer of services or goods in exchange for money," whether the design of the website makes the contract terms obviously available, whether "the importance of the details of the contract [were] obscured or minimized by the physical manifestation of assent expected of a consumer seeking to purchase or subscribe to a service or product," and whether the merchant "clearly dr[ew] the consumer's attention to material terms that would alter what a reasonable consumer would understand to be her default rights." *Berkson* at 403 (E.D.N.Y. 2015).

On a motion to dismiss, the *Berkson* court held that Mr. Berkson had not been put on "inquiry notice" of the particular terms at issue because, among other things, the plaintiff "did not have a practice of emailing or mailing the contents of the purported contract to its customers," "Gogo did not make an effort to draw Berkson's attention to the specific terms, including their importance, of the purported contract, noting that the hyperlink . . . was not in large font, all caps, or in bold . . . [n]or was it accessible from multiple locations on the webpage." *Berskon* at 403-404 (E.D.N.Y. 2015).  The court further held that "[w]here the seller has reason to believe that the buyer

manifesting assent would not do so if he knew that the writing contained a particular term, the term

is not part of the agreement." *Berkson* at 404 (E.D.N.Y. 2015) (citations and quotes omitted).

All GateGuard alleges is that the customer inquiry form that Taub allegedly filled out

contained one single reference to GateGuard's "terms and conditions," which was not in all caps,

large font, or bold.  GateGuard does not allege that after allegedly filling out this form, Taub would

have been able to later access the "terms and conditions," or that GateGuard emailed Taub a copy of

this purported agreement.  GateGuard never advised Taub that the "terms and conditions" contained

anything that would have altered what he would have believed were his "default rights."  Moreover,

in virtually every case involving clickwrap or sign-in wrap agreements, like here, the facts involved

an actual transaction of some sort, whether a purchase or access to additional content, or some sort

of subscription – the defendant knew and intended to do some sort of business with the plaintiff

trying to enforce the contract.

Here, Taub did nothing more than fill out an inquiry form requesting that GateGuard contact

him – something that GateGuard could choose to do or not do at its discretion.  Taub also had no

reason to suspect that Ari Teman would, as is alleged here, disclose all of GateGuard's confidential

and proprietary information during one initial intake call.  All a reasonable person would have

reason to know when they filled out the form was that GateGuard now had their phone number and

may, or may not, choose to call them.  There is nothing in this interaction that would possibly put a

reasonable person on notice that they would be giving up, among other things, their right to pursue

their profession – for life.  As such, the purported GateGuard "Terms of Service" cannot be

enforced against Taub, and GateGuard's breach of contract claim must be dismissed.

### B.    BUSINESS-RELATED TRADE SECRETS, UNFAIR COMPETITION, AND TORTIOUS INTERFERENCE CLAIMS

In its January 16, 2020 Order, which incorporated the argument and rulings of the January

15, 2020 hearing on the defendants' prior motion to dismiss, the Court dismissed all of the

Plaintiff's claims that were based on its alleged proprietary and confidential business information (as opposed to its technical information), including the Plaintiff's trade secrets, unfair competition, and tortious interference claims.  MTD Hrg. Tran at p.6, 8-9.  Specifically, the Court noted that "Plaintiff has not asserted when or how defendants used its customer lists or pricing information. Without details such as how the defendants allegedly misused the customer list or identifying any customers who were supposedly contacted or solicited, this claim is too conclusory to withstand defendants' motion."  *Id.* at 6.

In the Third Amended Complaint, the Plaintiff does not fix any of these core problems.  *See,* TAC ¶¶ 158-182.  In the First Amended Complaint (the version subject to the Court's January decision), the Plaintiff followed its conclusory allegation that "Taub and MVI's actions have caused irreparable harm to GateGuard" with the allegation that "[f]or example, as a direct result of Taub and MVI's actions, GateGuard has lost numerous key customers."  FAC ¶¶ 146-147.  The Court dismissed GateGuard's trade secrets, unfair competition, and tortious interference claims insofar as they arose from the Defendants' alleged use of GateGuard's "business" trade secrets and confidential information on the ground that they were all too vague and conclusory.

In drafting the Third Amended Complaint, after Plaintiff was put on notice that it needed to add detail and specificity to its claims, and was given leave to do so, the Plaintiff essentially just name-dropped a few customers that happen to be listed on Defendant MVI's website (TAC Exh. F) and then re-pled the same boilerplate language, except with even more vague and speculative language:  "For example, as a direct result of Taub and MVI's actions, GateGuard has lost numerous key customers *including Parkoff, ABJ, E&M, Medallion, and others*."  TAC ¶ 168 (italics indicate newly added language).

First, adding a reference to *other* unnamed customers and prospective customers only serves to show that GateGuard has no basis for alleging any lost business, and is merely speculating in the

hope that it will be allowed to misuse the discovery process to unearth some as yet unknown claims against the Defendants.  Second, simply adding a few names of a few publicly known MVI customers does not in any way rectify the shortcomings the Court identified in the First Amended Complaint – GateGuard still does not allege "when or how defendants used its customer lists or pricing information."  MTD Hrg. Tran at p.6.

Here, it remains the case that the essence of what Plaintiff has alleged is nothing more than that Mr. Teman discussed purportedly confidential information regarding certain then-GateGuard customers and prospects with Defendants, and some of those former GateGuard customers and prospects are now Defendants' customers.  TAC ¶¶ 158-166.  This falls far short of satisfying the "plausibility standard."  *See, Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.") (internal quotes and citations omitted).

While these circumstances may have been enough to pique GateGuard's curiosity and motivate it to engage in some follow-up investigation, which it clearly has not done, the Plaintiff does not allege concrete facts sufficient to "nudge" its claims of unfair competition and the like "across the line from conceivable to plausible."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In fact, GateGuard does not even allege the amount of fees it charged the few customers it has identified nor what fees the Defendants charged those same customers, and does not identify a single individual at any of the identified companies to whom the Defendants may have spoken to;

13

rather, GateGuard simply glosses over this absent factual predicate by stating that the Defendants "undercut" GateGuard's pricing.[4]

Moreover, even if the Defendants did "undercut" GateGuard's pricing, there are no factual allegations to support the necessary inference they did so unlawfully. There is nothing in the Third Amended Complaint to suggest that the identified GateGuard customers and/or prospects – as opposed to GateGuard - viewed the price they were paying to GateGuard, out of their own pockets, as "confidential information" they could not readily and freely share, and did not simply disclose that information to the Defendants as part of a perfectly ordinary sales process. The Plaintiff allege no facts to "nudge" the Court away from the perfectly plausible scenario where a GateGuard customer or prospect says to the Defendants "GateGuard is charging (or offering us) us $X/month – can you beat that?" Nor does GateGuard allege any concrete facts to undermine the perfectly reasonable possibility that, as a new company, the Defendants offered extremely attractive pricing to secure their first clients. *See,* TAC ¶ 127 and Exh. E (alleging that MVIS had not yet started selling the intercoms at issue here as of 2017). The "plausibility standard" enunciated in *Ashcroft* and *Twombly* is designed to keep exactly these type of claims from proceeding past the pleading stage. Without this important gatekeeping function, any business that saw its customers switch to another provider would be able to use the formidable tools available in Federal Court discovery to harass and intimidate their competitors, which is precisely what is happening here. This Court should not allow these claims – now in their fourth iteration – to proceed, and should dismiss them with prejudice.

---

[4] It is noteworthy that this entire section of GateGuard's complaint was previously pled "on information and belief." *See,* SAC (Dkt. #51) at ¶¶ 150-161. In response to the Defendants' motion to dismiss the SAC (Dkt. #73), which pointed out the insufficiency of such allegations, Plaintiff simply deleted the term "upon information and belief" throughout this section. While it is true that GateGuard was given leave to amend its complaint, this discrepancy highlights the fact that GateGuard does not, in fact, ever plead any facts that might provide a basis for its "belief" in the conclusions alleged, and that even its Third Amended Complaint merely describes GateGuard's suspicions.

These claims in the Third Amended Complaint suffer from the same deficiencies as they did in the First Amended Complaint, and they should suffer the same fate and be dismissed.

## III.    PATENT CLAIMS

### A.    Complete Substitution of Inventors Is Only Available in Cases of "Collaboration"

Section 256 is not intended to resolve disputes where one party allegedly misappropriates a patent from an unrelated party, as is the case here.  Rather, Section 256 is intended to resolve disputes *among and between collaborators* – and thus potential co-inventors – about which of them should be listed as "named inventors," and its scope and effect is limited by its intended purpose.

While Section 256 is a remedial statute that grants the District Courts the power to "correct" the named inventors on an issued patent, this power is limited to cases where the two potential inventors (or teams of inventors) engaged in "collaboration" regarding the subject matter of the technology covered by the patent.  *See, Rubin v. Gen. Hosp. Corp.*, 523 F. App'x 719, 722 (Fed. Cir. 2013) (upholding lower court decision where the district court had held that "the inventorship could not be changed under § 256 because there was no 'collaboration' between these teams of scientists."); *see also, Red Carpet Studios v. Midwest Trading Grp., Inc.*, No. 1:12CV501, 2016 WL 5661681, at *4 (S.D. Ohio Sept. 30, 2016) (granting motion to dismiss Section 256, agreeing with other courts that have routinely dismissed such claims "where the parties have not collaborated on the subject matter."); *Rawlplug Co. v. Hilti Aktiengesellschaft*, 777 F. Supp. 240, 242 (S.D.N.Y. 1991) (granting motion to dismiss after agreeing with the movant's position that "Section 256 should not be interpreted to create an independent private right of action to correct sole inventorship.").

15

As the District Court in *Rubin* explained, Section 256 is "intended to encourage collaboration between and among inventors and correct the named inventors without the need to invalidate the patent." *Rubin v. Gen. Hosp. Corp.*, No. CIV.A. 09-10040-DJC, 2011 WL 1625024, at *10 (D. Mass. Apr. 28, 2011), aff'd, 523 F. App'x 719 (Fed. Cir. 2013). This "savings" provision was needed because, "[p]rior to its enactment, if an inventor was erroneously named or excluded in an issued patent, the only mechanism to correct the error was to invalidate the patent." Id. at *4. This savings provision promotes collaboration among and between inventors because it is not always perfectly clear which members of a joint effort qualify as inventors who should be named and which members do not, and if the risk of being over- or under-inclusive in the patent application process spells death for the patent, that risk creates a strong disincentive for people or teams to work together.

GateGuard does not allege that Teman ever "collaborated" with Taub or anyone at MVIS – in fact GateGuard expressly disavows any collaboration – and does not allege any facts that might lead a reasonable person to infer such a relationship. Rather, GateGuard alleges:

> Taub has certified to the United States Patent and Trademark Office ("USPTO") – under penalty of perjury – that he (Taub) believes himself to be the sole inventor of GateGuard's video intercom technology. TAC ¶ 18.

> Like his interactions with GateGuard and Teman, Taub's actions and representations to the USPTO were knowingly false. In fact, effectively all the subject matter disclosed in Taub and MVI's patent filings was disclosed by Teman to Taub *seven months prior* to Taub's initial submission. TAC ¶ 19.

Similarly, GateGuard alleges, in its patent cause of action, that:

> Ari Teman is and believes himself to be the first, true, and original inventor of each the systems claimed in the Intercom Patents. Teman conceived of the inventions and had a definite and permanent idea of the complete and operative inventions claimed in the Intercom Patents, as they were thereafter to be applied in practice, prior to the filing date(s) of the Intercom Patents. TAC ¶ 265.

Conversely, "Taub did not conceive of or otherwise contribute to the conception of the inventions claimed in the Intercom Patents." TAC ¶ 268.

16

It is clear from these passages and from the TAC as a whole that GateGuard's theory is that Teman is the first and sole inventor of the subject matter of the patents at issue (the "MVII Patents"), and that Taub had absolutely nothing whatsoever to do with any of it.  In *Rubin*, the two plaintiffs contended that they "were the first persons to conceive the subject matter described and claimed" in the MVII Patents and that they were the "true and only" inventors of the inventions at issue.  *Rubin*, 2011 WL 1625024, at *10.  Here, GateGuard uses the exact same language and alleges that Teman was the "first, true, and original inventor" of the inventions at issue.  TAC ¶ 265. Section 256 simply does not cover this kind of claim and, like the District Court did in *Rubin*, this Court should dismiss these claims as it does not have the authority to order the USPTO to "correct" the MVII Patents.  *See, Rubin*, 2011 WL 1625024, at *10 ("This claim concerns priority of invention.  As the Defendant argues and as discussed above, section 256 is not intended to resolve disputes concerning priority of invention.").

### B.     GateGuard Has Not Met the High Bar for Pleading a Claim for Correction of Inventorship and Fails to Allege "Corroboration"

Despite being well over 50 pages long, GateGuard's TAC never goes beyond parroting its own publicly available marketing materials when describing the technology that Teman allegedly invented, never alleges anything to corroborate its bare claim that Teman invented everything covered by the MVII Patents, and only vaguely references the actual "claims" that were allowed under the two patents, instead pointing only to the descriptive language that accompanies the claims language.  As explained below, these deficiencies are fatal to GateGuard's patent claims, which therefore must be dismissed.

#### 1.     Correction of Inventorship Under Section 256 Is Not an Available Remedy Unless the Plaintiff is the Inventor of Every Single Claim Set Forth in the Issued Patent

A plaintiff seeking correction of inventorship under Section 256, like GateGuard does here, must establish (a) that they invented the subject matter of *every claim* covered by the subject patent

and (b) that the named inventor did not invent or make any non-insignificant contribution to any of the subject matter of *any of the claims* covered by the subject patent. *See, Ferring B.V. v. Allergan, Inc.*, 166 F. Supp. 3d 415, 424 (S.D.N.Y. 2016) ("Because a claim of sole inventorship necessitates that the proposed inventor conceived of the total patented invention, assuming arguendo that Fein contributed a patentable invention of sublingual administration, the fact that a specific range of doses appears [in the patent at issue] and Fein does not contend to have contributed these doses precludes the possibility that Fein is the sole inventor."); *Univ. of Pittsburg of Commonwealth Sys. of Higher Educ. v. Hedrick*, No. CV04-9014 CBM AJWX, 2008 WL 8627085, at *7 (C.D. Cal. June 9, 2008) (*citing Eli Lilly and Co. v. Aradigm Corp.*, 376 F.3d 1352, 1358–59 (Fed.Cir.2004)) ("Plaintiffs must show that they conceived of *every claim* of the patent and that any contribution by defendants to the conception of *each and every claim* was insignificant.") (emphases added).

The MVII Patents include 38 allowed claims (the "Claims") (TAC Exh. A, pages 15-16, columns 8-10; Exh. B, pages 15-16, columns 8-10). GateGuard does not specifically allege that Teman invented any of the subject matter of any of these specific Claims, and instead simply alleges in cursory and conclusory fashion that Teman invented them all. TAC ¶ 130 ("Every claim of the '831 Patent encompasses proprietary technology developed by GateGuard"); TAC ¶ 137 ("Every claim of the '664 Patent encompasses proprietary technology developed by GateGuard").

Rather than referring to the actual Claims at issue, GateGuard instead makes various references to other parts of the MVII Patents, none of which define what the actual inventions are. TAC ¶ 147 (cutting and pasting language from "Column 1" of each patent, which is simply the "Background of the Invention," and which describes what the "present invention is generally directed to"); TAC ¶¶ 153, 156 (cutting and pasting language from "Column 5" and "Column 7" of each patent, which are both taken from the Detailed Description of the patent, not the Claims). These allegations are not only vague and conclusory on their face, and refer to non-controlling

portions of the MVII Patents, they simply describe the problems that the inventions were intended to resolve, as well as the basic and generally-described features that the entryway kiosks include. Moreover, many of them are pled "on information and belief," which further belies GateGuard's claim to inventorship.  TAC ¶¶ 122, 124-126, 144-145, 268, and 270.

The MVII Patents do not provide the named inventor with the exclusive right to manufacture and sell "an automated, smart . . . doorman-like system" (TAC ¶ 147), or a system that "may" include "several other cameras . . . interspersed in front of the main entrance door" (TAC ¶ 153), or a system that "stops illegal subletting and illegal Airbnb use" (TAC ¶ 156).  Rather, the MVII Patents give the named inventor the exclusive right to prevent others from manufacturing or selling the specific inventions set forth *in the Claims* which, again, are *never* specifically referenced in the Third Amended Complaint.

Conversely, it is also true that several of the MVII Patent Claims are not referenced – directly, indirectly, or otherwise – in the TAC, which *ispo facto* precludes any possibility of Teman being named the sole inventor of the entire patents at issue.  *See, supra, Ferring B.V.,* 166 F. Supp. 3d at 424 (S.D.N.Y. 2016) (holding that a plaintiff cannot succeed on a Section 256 claim if the patent includes even one claim that the plaintiff did not invent).  The many examples of Claims listed in the MVII Patents that the TAC does not allege were invented by Teman include:

- Claim 4 of the MII Patents, which cover "[t]he kiosk-like communication system of claim 1, wherein said CUP and software algorithms are cloud-based."  TAC Exh. A, p. 16, column 9; Exh. B, p. 16, column 9.  GateGuard makes no reference to its alleged system being "cloud-based" in the TAC.
- Claim 6 of the MVII Patents, which cover "the kiosk-like communication system of claim 1, including a facility for counting the number of persons entering or leaving the MAB over given time periods."  TAC Exh. A, p. 16, column 9; Exh. B, p. 16, column 9.  GateGuard makes no reference to its system counting persons over a given time period.
- Claim 9 of the MVII Patents, which cover "the kiosk-like communication system of claim 1, wherein the camera system includes multiple cameras located at the entranceway at different levels."  TAC Exh. A, p. 16, column 9; Exh. B, p. 16, column 9.  GateGuard makes no reference to its system having multiple cameras of placing them at multiple levels.

19

- Claim 10 of the MVII Patents, which cover "the kiosk-like communication system of claim 1, including an electronic eye system to sense each person crossing the entranceway into said at least one door." TAC Exh. A, p. 16, column 9; Exh. B, p. 16, column 9. GateGuard makes no reference to its system having an electronic eye sensor that detects each person entering into the building doors, whether or not they choose to interact with the kiosk.

- Claim 11 of the MVII Patents, which cover "the kiosk-like communication system of claim 1, including a human interaction facility that allows management personnel located remotely from the MAB to communicate with persons located adjacent the housing, either by audio or by video communications." TAC Exh. A, p. 16, column 9; Exh. B, p. 16, columns 9-10. GateGuard makes no reference to its system giving management the ability to communicate directly, in real time, with people trying to enter the building.

- Claim 12 of the MVII Patents, which cover "The kiosk-like communication system of claim 1, including a facility for displaying advertising content on the display," and Claim 13, which cover "The kiosk-like communication system of claim 12, including a facility that allows local merchants to display advertising copy directly on the display of the MAB." TAC Exh. A, p. 16, column 10; Exh. B, p. 16, column 10. GateGuard makes no reference to its system giving management the ability to include advertising on the kiosk, including the ability to offer micro-targeted advertising to local merchants.

- Claim 15 of the MVII Patents, which cover "The kiosk-like communication system of claim 1, including movement detectors located at a variety of locations in the MAB and said detectors communicating with said electronic circuits and providing indications to management of movements of humans at said variety of locations based on pre-determined criteria." TAC Exh. A, p. 16, column 10; Exh. B, p. 16, column 10. GateGuard makes no reference to its system integrating such capabilities.

- Claim 16 of the MVII Patents, which cover "The kiosk-like communication system of claim 1, including door ajar reports." TAC Exh. A, p. 16, column 10; Exh. B, p. 16, column 10. GateGuard makes no reference to providing management with "door ajar" reports.

- Claim 17 of the MVII Patents, which cover "The kiosk-like communication system of claim 1, the camera system including cameras located in elevators of the MAB." TAC Exh. A, p. 16, column 10; Exh. B, p. 16, column 10. GateGuard makes no reference to its system including integrated elevator cameras.

- Claim 19 of the MVII Patents, which cover "The kiosk-like communication system of claim 1, wherein the camera system includes cameras located in hallways of the MAB and in the entranceway of the MAB and allowing tenants to track the movements of children from individual tenant apartments through the entranceway and onto a street on which the entranceway is located." TAC Exh. A, p. 16, column 10; Exh. B, p. 16, column 10. While GateGuard does reference its system being able to allow in specific individuals, including children, GateGuard makes no reference to its system including interior hallway cameras that would allow tenants to track their children's movements throughout the building, including *exiting* the building.

Because GateGuard never specifically claims Teman's inventorship of the majority of the Claims covered by the MVII Patents – 22 out of 38 (11 for each Patent) – Teman and/or GateGuard cannot be substituted in as the sole inventor of the MVII Patents, and GateGuard's Section 256 claims must be dismissed. *See, supra, Eli Lilly and Co.,* 376 F.3d at 1358–59 (Fed.Cir.2004).

## 2. The Plaintiff Must Allege "Corroboration" to Survive a Motion to Dismiss

In order to succeed on a Section 256 claim, the plaintiff must clear a very high bar, and GateGuard has failed to do so here. First, there is a strong presumption that a named inventor on a patent is in fact the true inventor. *Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 980 (Fed.Cir.1997). In order to overcome this presumption, a Section 256 plaintiff must present clear and convincing evidence in support of their claim. *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1358 (Fed. Cir. 2004). This heightened standard necessitates the corollary requirement that a Section 256 plaintiff cannot rely on their word alone, but must provide "corroboration" for their claim of inventorship. *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1461 (Fed. Cir. 1998) (requiring Section 256 plaintiffs to advance "corroboration" of their inventorship claims). This requirement ensures that patent holders cannot have their rights stripped away based on nothing more than one person's testimony, especially given that all patents are publicly available, including to unscrupulous competitors. *Ethicon, Inc. v. U.S. Surgical Corp.*, 937 F. Supp. 1015, 1034 (D. Conn. 1996) ("A party seeking to prove conception may not rely solely on the oral testimony of the alleged inventor. Because conception is a mental act, some form of corroborating evidence – i.e., evidence in addition to the inventor's oral testimony – is required. If the alleged inventor's oral testimony is not corroborated, it cannot be credited.") (citations omitted). In addition to preventing intentional malfeasance, corroboration also prevents deprivation of hard-fought patent rights as a result of faulty memories, as well as the natural tendency for people to remember events in a light favorable to them. *Blue Gentian v. Tristar Prod., Inc.*, No. CV 13-1758 (NLH/AMD), 2020 WL

21

241345, at *8 (D.N.J. Jan. 16, 2020) (holding that as part of the presumption of correct inventorship, "courts have also recognized the 'temptation for even honest witnesses to reconstruct, in a manner favorable to their own position, what their state of mind may have been years earlier," and that "[t]o satisfy this standard, a claimed inventor must provide evidence corroborating his testimony concerning conception of the invention.") (citations omitted).

Since corroboration is required to ultimately succeed on a claim under Section 256, corroboration must be alleged at the pleading stage in order to survive a motion to dismiss. *Opternative, Inc. v. JAND, Inc.*, No. 17 CIV. 6936 (JFK), 2019 WL 624853, at *8 (S.D.N.Y. Feb. 13, 2019) (holding that "an inventor must allege facts that 'corroborate conception of the invention.'") (*citing, Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1229 (Fed. Cir. 1994)).  In other words, if the plaintiff does not plead corroboration, and corroboration is required to succeed on the claim, it cannot be said that the plaintiff will win if they are able to prove the truth of all of the allegations in the complaint, which is of course the essence of what a motion to dismiss is designed to test.  GateGuard has utterly failed to allege any corroboration of its claim to inventorship, and instead relies only on its own promotional materials and a brief news posting that itself relied entirely on Ari Teman's own self-serving statements.

While GateGuard peppers the TAC with references to the non-disclosure agreements it allegedly required other parties to sign, most if not all of these allegations do not include any specific reference to the MVII Patent Claims, or the subject matter thereof.  TAC ¶ 54 (setting forth the vague allegation that others had to consent to GateGuard's "sole ownership of the trade secrets, agree to maintain the confidentiality of the trade secrets, and agree not to copy, reverse engineer, or create derivative works based on the trade secrets.").  GateGuard also fails to reference a single person with whom Teman may have shared any of his alleged inventions, including specifically any of the technology covered by the Claims at issue here, other than, of course, Taub.  Given that

GateGuard alleges that Teman shared virtually *all* of his technical and design inventions, *all* of GateGuard's alleged proprietary business information, and virtually every shred of GateGuard's alleged confidential and proprietary information with Taub (a stranger), it is inconceivable that if any of this were true, GateGuard would not be able to identify one single person other than Taub to whom GateGuard divulged some or all of this information to corroborate its Section 256 claims. Nor does GateGuard allege that any of these secrets were reduced to writing, such as technical drawings or the like, or that they were contemporaneously shared with anyone.

All GateGuard alleges, in conclusory fashion, is that Ari Teman "believes himself to be the first, true, and original inventor of each [of] the systems claimed in the Intercom Patents." TAC ¶ 265. These allegations are not enough to survive a motion to dismiss, and GateGuard's patent claims must be dismissed. *Opternative, Inc. v. JAND, Inc.*, No. 17 CIV. 6936 (JFK), 2018 WL 3747171, at *9 (S.D.N.Y. Aug. 7, 2018) (granting motion to dismiss because "[b]eyond these conclusory and vague statements, the complaint does not include any specific allegations that Dr. Lee conceived of the total patented invention and that any contribution by the named inventors in the 709 Patent was insignificant."). The *Opternative* court went on to describe the particular holes in the plaintiff's allegations, including that "Opternative has failed to provide sufficient corroborating evidence of Dr. Lee's inventorship. Opternative claims that Dr. Lee relayed the invention of the patent over a teleconference, but fails to provide any further corroborating details . . . including . . . Dr. Lee's specific contribution." *Opternative, Inc.,* at *9 (*citing, Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1295-96 (Fed. Cir. 2008), affirming district court's holding that day-planner entry confirming telephone call related to the disputed patent was insufficient as corroborating evidence of co-inventorship because it failed to identify the alleged co-inventor's contribution.).

GateGuard's apparent reliance on its own website to support its claims of Teman's inventorship is misguided. First, the website is, like most websites, public-facing, and any information publicly disclosed on a company's website cannot possibly support a claim of inventorship. Second, since all of the statements and claims on GateGuard's website were authored by GateGuard, they cannot be considered as "corroborative" of the very same statements and claims that GateGuard set forth as allegations in the TAC. GateGuard cannot corroborate itself.

The same is true of the "Real Deal" article that GateGuard attached to the TAC. First, the author of the article does not claim to have any firsthand knowledge of any of the information in the article (which is far closer to being "click-bait" than investigative journalism). In fact, the author expresses quite the opposite – in language that seems intended to distance him from making any judgment regarding the veracity of Teman's claims – stating that "[s]o far, *Teman claims* he has sold GateGuard to 24 buildings." (TAC Exh. C at p.2) (emphasis added). In a similar vein, the article goes on to quote two landlords, one of whom says nothing more than that he is "seriously considering" using the system, and another who says he "plans to install" the system because one of its purported features seems interesting. *Id.* The TAC never alleges that either of these two potential customers had actually seen a demo from GateGuard, nor that either of them ever became customers. The Real Deal article does not lend any support for any conclusion other than that Mr. Teman was promoting some sort of entry system that allegedly included facial recognition. It does not show that GateGuard had such a system in operation, and it does not show that Teman had invented and reduced to practice any technology or process or system covered by the 38 Claims at issue here. As such, Plaintiff's patent claims must be dismissed.

C.    **GateGuard's Newly Pled Theory of "Joint Inventorship" Is Flatly Contradicted by the Factual Allegations in the Third Amended Complaint.**

In each of the three previous versions of its complaint, GateGuard took the unwavering position that the Defendants had no knowledge or skill whatsoever relating to the subject matter of the patents at issue here, and that Ari Teman was the sole inventor of every single aspect of the subject inventions.  In fact, as set forth below, GateGuard's factual allegations in its Third Amended Complaint continue to support this – and only this – position.  Notwithstanding this record and GateGuard's current version of what allegedly happened, GateGuard now asserts that – "in the alternative" – Mr. Teman was a "co-inventor" with Mr. Taub.  TAC ¶ 271.  Because this new legal theory flies in the face of the facts alleged by Plaintiff, this theory must be rejected and Plaintiff's patent claims must be dismissed to the extent that they are based on this contradictory legal theory.

It is now well settled that "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.  Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotes and citations omitted).  Moreover, while a plaintiff is permitted to plead alternative legal theories that are each sufficiently supported by factual allegations, a plaintiff cannot proceed with a legal theory that is not only unsupported by factual allegations, but directly contradicted by the plaintiff's own factual allegations.  *See, e.g., Uddoh v. United Healthcare*, 254 F. Supp. 3d 424, 429 (E.D.N.Y. 2017) ("Even if plaintiffs were permitted to change the allegations in their amended complaint, they cannot walk away from the other facts that they have alleged.  The reason they referred to United's pre-approval letter as a 'blunder,' rather than an intentional consent to cover surrogacy services, was that based upon all of the facts they allege and the documents upon which they expressly rely, the characterization as a blunder is so obviously correct."); *In re Enron Corp.*, No. 01-16034(AJG), 2006 WL 2385194, at *2 (Bankr. S.D.N.Y. June 2, 2006) ("where more

25

specific allegations of the complaint contradict such legal conclusions, general, conclusory
allegations need not be credited.") (quotes and citations omitted).

Here, it is impossible to read the Third Amended Complaint and not understand that the
Plaintiff's story is that Ari Teman was the sole inventor of each and every aspect of the subject
matter of the patents at issue here, that Defendant Taub did not have even the germ of an idea
relating to this technology, and that the only way that Taub came to possess even an inkling of what
the relevant technology was or how it worked was, exclusively, by talking to Mr. Teman.  *See,* TAC
¶ 19 ("all the subject matter disclosed in Taub and MVI's patent filings was disclosed by Teman to
Taub *seven months prior* to Taub's initial submission") (emphasis in original); TAC ¶ 51 ("Teman
believed GateGuard's proprietary technologies would not or could not be independently and
lawfully developed or discovered by another individual or entity."); TAC ¶ 101 ("Taub
acknowledged the confidential, proprietary nature of GateGuard's trade secrets, and represented to
Teman that he (Taub) had no background in technology nor any interest in developing technology
products."); TAC ¶ 111 ("Each of the referenced technical trade secrets was developed by
GateGuard and was not known to the public."); TAC ¶ 124 ("MVI's products, services,
applications, and other offerings unlawfully incorporate GateGuard's proprietary technologies.");
TAC ¶ 125 ("details of these technologies were not known to the public and were disclosed by
GateGuard and Teman to Taub in strict confidence."); TAC ¶ 130 ("Every claim of the '831 Patent
encompasses proprietary technology developed by GateGuard and disclosed confidentially to
Taub."); TAC ¶ 137 ("Every claim of the '664 Patent encompasses proprietary technology
developed by GateGuard and disclosed confidentially to Taub."); TAC ¶ 144 ("Taub intentionally
filed the Intercom Applications despite knowing each of the Intercom Applications disclosed and
claimed GateGuard's technical trade secrets."); TAC ¶ 154 ("the referenced technologies were
GateGuard's proprietary trade secrets and were confidentially disclosed by Teman to Taub under

26

the terms of GateGuard's ToS and based on Taub's further representations and assurances. Nevertheless, months later, Taub falsely claimed these technologies as his own and improperly disclosed them in the Intercom Patents."); TAC ¶ 265 ("Ari Teman is and believes himself to be the first, true, and original inventor of each of the systems claimed in the Intercom Patents."); TAC ¶ 268 ("Taub did not conceive of or otherwise contribute to the conception of each of the inventions claimed in the Intercom Patents.").

Conversely, there are no allegations in any iteration of the Plaintiff's four complaints that would suggest that Mr. Taub and Mr. Teman worked together on any of the technology at issue. For this reason, Plaintiff's patent claims must be dismissed insofar at they are based on the unsupported and contradicted legal theory of "joint inventorship."

### D.     Motion to Dismiss as a Prophylactic Against Discovery Abuse

Putting the two requirements together – namely that a plaintiff must plead (1) "corroboration" and (2) complete inventorship of all the Claims allowed in a particular patent – it becomes clear that GateGuard's correction of inventorship claims must be dismissed.  It would be inconsistent with the applicable legal standard to allow GateGuard's vague inventorship claims to move forward, and it would be highly inequitable and counterproductive to force the moving Defendants to engage in invasive and far-ranging patent discovery without first requiring GateGuard to support its patent claims at the outset.  *See, Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007) (explaining that groundless complex cases cannot be "weeded out early in the discovery process through 'careful case management' given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side," and calling for scrupulous enforcement of applicable pleading standards.); *Yahusz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003) ("The very purpose of Fed.R.Civ.P. 12(b)(6) is to enable defendants to challenge the legal sufficiency of complaints without subjecting themselves to discovery.") (citations omitted).

In addition to all of the above arguments regarding the deficiencies in the Third Amended Complaint, this case involves one competitor suing another over alleged theft of trade secrets relating to virtually every aspect of MVIS's business and technology, as well as patentable technology, which will surely entail invasive and expensive discovery.  This is a burden MVIS and Taub should not have bear unless and until GateGuard adequately pleads its case.  GateGuard should not be able to use this trade secret misappropriation case to, in effect, misappropriate MVIS's trade secrets and other confidential and proprietary information.

### E.    MVIS and Taub Are Not Proper Defendants Because Neither Has a Financial Interest in the MVII Patents

In addition to the statutory and pleading shortcomings of GateGuard's patent claims, they should be dismissed as against MVIS and Taub because neither of these parties have a financial interest in the MVII Patents.  The only proper parties to a Section 256 claim are those with a "concrete financial interest" in the outcome of the dispute.  *Chou v. Univ. of Chicago*, 254 F.3d 1347, 1359 (Fed. Cir. 2001) ("We therefore conclude that parties with an economic stake in a patent's validity may be subject to a § 256 suit."); *Larson v. Correct Craft, Inc.*, 569 F.3d 1319, 1326 (Fed. Cir. 2009) (holding that only parties with a "concrete financial interest" in the patent are proper parties.).  As GateGuard alleges in the Third Amended Complaint, the "assets transferred to MVII under the [asset purchase] Agreement include the Intercom Patents."  TAC ¶ 191.  Because both MVIS and Taub have no direct and concrete financial interest in the MVII Patents, this cause of action must be dismissed as against them.

## IV.    PLAINTIFF'S TECHNICAL TRADE SECRETS CLAIMS

GateGuard's "technical trade secrets" claims (Counts I and II) cover the identical subject matter as that of the MVII Patents (no more, no less), turn on the same issue of inventorship central to its Section 256 claims (Count III), and include requests for relief that are impermissibly "patent-like," including a request that the Court bar the Defendants from using the very technology over

28

which the United States Patent & Trademark Office affirmatively granted them exclusive rights. For these reasons, GateGuard's "technical trade secrets" claims must be dismissed.

Under controlling Federal Circuit precedent, any state law claim that turns on a determination of inventorship or that seeks "patent-like" rights is preempted by federal patent law and must be dismissed at the pleading stage. *See, Speedfit LLC v. Woodway USA, Inc.*, 226 F. Supp. 3d 149, 159–60 (E.D.N.Y. 2016) ("Whether a state law claim is preempted by federal patent law is governed by the law of the Federal Circuit [which] has held that 'the field of federal patent law preempts any state law that purports to define rights based on inventorship' [and] a state law claim that either seeks 'patent-like' protections not provided by federal patent law, or turns on a determination of inventorship, is preempted by federal patent law.") (*citing, HIF Bio, Inc. v. Yung Shin Pharm. Indus. Co., Ltd.*, 600 F.3d 1347, 1353 (Fed. Cir. 2010)); *see also, HIF Bio, Inc.* at 1353 (Fed. Cir. 2010) (holding state law claim preempted by federal patent law because the subject matter of the plaintiff's state law claims was the same as the subject matter of the patent at issue, and because as a practical matter the plaintiff's state law claim turned on question of inventorship).

Here, GateGuard makes clear in the Third Amended Complaint that there is complete overlap between its purported technical trade secrets and the subject matter of the MVII Patents, and that it is seeking the right to exclude the Defendants from using the technology covered by those patents, which is the core and exclusive right granted to patent holders under federal patent law:

> Taub and MVI have gone so far as to apply for . . . patents that are fundamentally – if not exclusively – based on GateGuard's proprietary technologies.  TAC ¶ 17.

> In fact, effectively all the subject matter disclosed in Taub and MVI's patent filings was disclosed by Teman to Taub.  TAC ¶ 19.

> GateGuard now seeks to hold Defendants accountable [and] stop them from further exploiting GateGuard's trade secrets.  TAC ¶ 22.

29

Teman recognized that the substantial body of proprietary technologies developed by GateGuard could undoubtedly be protected via one or more patent(s), (TAC ¶ 46), but he "elected not to file patent application(s) on GateGuard's proprietary technologies" (TAC ¶ 52) because of the "cutthroat nature of many individuals . . . within the real-estate industry" (TAC ¶ 48).[5]

The subject matter encompassed by the specification and claims of the '502 Application [for the '831 patent] is substantially identical to GateGuard's video intercom device, applications, management platforms, and other proprietary technologies.  TAC ¶ 129; see also TAC ¶ 146.

Every claim of the '831 Patent [and '664 Patent] encompasses proprietary technology developed by GateGuard and disclosed confidentially to Taub.  TAC ¶¶ 130, 137.

Taub and MVI filed the '546 Application in order to further exploit GateGuard's technical trade secrets for the benefit of MVI.  TAC ¶ 136; see also TAC ¶ 146.

GateGuard seeks . . . a temporary, preliminary, and permanent injunctive relief to protect its trade secrets as well as GateGuard's legitimate business interests.  TAC ¶ 248 (DTSA Claim); TAC ¶ 262 (common law trade secrets claim).

Granting . . . [a] permanent injunction against Defendants, enjoining them from . . . using . . . Plaintiff's trade secrets and from any further infringement of Plaintiff's intellectual property.  TAC Demand for Relief (b).

GateGuard's theory of the case for its technical trade secrets claims is that GateGuard invented a suite of technical products and services, that GateGuard then disclosed all of this technology to Defendant Taub, and that Taub then turned around and essentially "cut and pasted" all of that technical information and data into patent applications that eventually matured into the MVII Patents.  It is beyond dispute that GateGuard's technical trade secrets claims necessarily require a determination of inventorship of the same exact inventions covered by the MVII Patents, which is the exclusive province of federal law.

Applying Federal Circuit law, the *Speedfit* court found that a state law claim materially identical to GateGuard's technical trade secrets claims was impermissibly "patent-like" in nature

---

[5]  This is especially ironic given that GateGuard's TAC does not contain any more detail than any person off the street could have pled after simply reading the publicly available MVII Patents.

and turned on a determination of inventorship, and dismissed it as preempted.  First, the plaintiffs

asserted a claim of conversion – alongside their Section 256 claim – arising out of the defendant's

alleged theft of the plaintiffs' information regarding a proprietary treadmill design.  *Speedfit*, 226 F.

Supp. 3d at 159-160.  The court noted specifically that the intellectual property allegedly converted

was the same as that covered by "the subject matter of the [patents] at issue," and reasoned that the

claim therefore turned on a determination of inventorship.  *Id.*  Second, the court held that the

plaintiffs' claim was "patent-like" in nature because the remedy the plaintiffs sought was essentially

the same as that granted exclusively under patent law, namely the right to exclude.  *Id.* (ruling that

"the damages that plaintiffs assert . . . essentially restate the infringement claim for which patent

law would provide a remedy if warranted" and dismissing as preempted); *Inventio Ag v. Otis*

*Elevator Co.*, No. 06 CIV. 5377 CM, 2011 WL 3480946, at *1 (S.D.N.Y. Aug. 4, 2011) ("The most

fundamental right secured by a patent is the right to exclude others from making, using, [or] selling

. . . the invention claimed in the patent; that is 'the principal value of a patent.'") (citation omitted).

      Here, GateGuard's TAC in general, and its technical trade secrets claims in particular,

necessarily require a determination of who came up with the ideas that GateGuard allegedly opted

to protect only as trade secrets and that the Defendants obtained a patent on.  GateGuard's technical

trade secrets claim also suffers from the same additional flaw as the plaintiffs' claim in *Speedfit*,

namely that GateGuard is asking this Court to grant it the right to exclude others from using the

technology at issue.  *See, supra,* TAC ¶ 248 (DTSA Claim); TAC ¶ 262 (common law trade secrets

claim); TAC Demand for Relief (b) (all asserting the right to permanent injunctive relief forbidding

the Defendants from using the technology that the USPTO gave them the exclusive right to use).

      In addition to the controlling case law discussed above, GateGuard's Section 256 and

technical trade secrets claims create the real risk of inconsistent and contradictory results that would

frustrate Congress's intent to preempt the field as well as the USPTO's inventorship determination

and grant of exclusive rights under the MVII Patents. As discussed above in Section III.B.2. above (Patents – Corroboration), GateGuard must prove its Section 256 claim by "clear and convincing evidence," a very high bar. *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1358 (Fed. Cir. 2004). In contrast, GateGuard need only prove its technical trade secrets claims by a preponderance of the evidence. It is therefore quite possible that a jury in this case could find that GateGuard has failed to carry its "clear and convincing" burden on its Section 256 claim, but that it did establish its technical trade secrets claim by a preponderance of the evidence, which would give the parties competing claims to the identical technology, which result is hopelessly at odds with Congress's intent to preempt the field.

And, as noted above, GateGuard is seeking the remedy of a permanent injunction barring the Defendants from using its purported trade secrets. This would create the untenable result that MVII would retain its affirmative grant of exclusivity from the USPTO under the MVII Patents while GateGuard would be the owner of trade secrets that cover the same exact subject matter. Assuming that GateGuard began using the technology at issue (its stated desire), and that MVII continued to use it, MVII could then sue GateGuard for patent infringement and GateGuard could sue MVII for trade secret misappropriation, with each having perfectly valid claims. This is precisely the absurd result that the Federal Circuit's preemption doctrine is designed to avoid, and GateGuard's technical trade secret claim must be dismissed.

## V.    FRAUDULENT CONVEYANCE CLAIMS

Defendants MVIS and Taub hereby incorporate by reference the arguments set forth by co-Defendant MVII, regarding GateGuard's two fraudulent conveyance claims, in its Motion to Dismiss, to be filed on May 22, 2020. The movants here would also add that the MVII Patents, including their value, are legally irrelevant to GateGuard's fraudulent conveyance claims. As discussed above, any person that has a concrete financial interest in a patent is an appropriate

defendant in a Section 256 claim.  Claims under Section 256 cannot be extinguished or altered in any way simply by transferring them from one patent holder to another, in any manner whatsoever, whether by gift, by will, or by sale, fraudulent or not.  Section 256 claims follow the patent, and a Section 256 plaintiff does not have to plead or prove anything regarding how the current holder of the patent came to possess it.  There is no analysis of "*bona fide*" sellers and purchasers.  In other words, if the asset sale at issue here were designed to frustrate GateGuard's ability to pursue its rights in the MVII Patents, it failed miserably as a matter of law.

The moving Defendants also note that GateGuard never puts a value on its claims in the TAC, including the non-patent claims relevant to the Court's fraudulent conveyance analysis, which fatally undermines an essential element of its claims.  In its "Demand for Relief," GateGuard prays for the Court to "[a]ward[] damages as described in each of the above claims, in favor of Plaintiff and against Defendants *in amounts to be proven at trial*."  TAC at p. 57 (emphasis added).  The damages "as described in each of the above claims" are equally devoid of any indication of even GateGuard's view of the value of its own claims.

While this vague language is typical of complaints, and for the most part acceptable, a plaintiff is required to provide a "computation of damages" in its Rule 26 Initial Disclosures. GateGuard provided the following in its Initial Disclosures on July 3, 2019 (emphasis added):

> Without waiving its right to supplement this disclosure during discovery, and subject to expert testimony, **the damages known to date are those asserted and detailed in GateGuard's First Amended Complaint**, including compensatory damages, in addition to any damages allowed by law, including without limitation exemplary damages, punitive damages, civil penalties, and fees, costs, and disbursements, including reasonable attorneys' fees; permanent or temporary injunctive relief and declaratory relief; and other, further, or different relief as the Court deems just and reasonable.  Engel Decl. Exh. C at p.5.

As set forth in MVII's motion papers, one of the core elements of fraudulent conveyance claims is that the seller "intends or believes that he will incur debts beyond his ability to pay as they mature."  *Ray v. Ray*, 799 F. App'x 29, 30-31 (2nd Cir. 2020).  Unless the seller becomes unable to

pay creditors as debts become due or mature, or is otherwise rendered insolvent, such creditors cannot state a claim for fraudulent conveyance.

Here, GateGuard asserts that the asset purchase transaction was not entered into in good faith because MVIS and MVII knew and intended that "the conveyance was made to . . . avoid debts to potential creditors, including GateGuard," (TAC ¶ 311), but Plaintiff's Initial Disclosures do not contain any damages calculation, and the Plaintiff has refused to update the despite due demand (Dkt. #114). As such, GateGuard has taken the inconsistent and untenable position that even though GateGuard has no idea what its claims are worth, MVIS and MVII should have known, and should have ensured that MVIS retained enough capital to pay GateGuard's claims if and when they matured into real obligations. On this ground alone, GateGuard's fraudulent conveyance claims should be dismissed.

While it is unclear if GateGuard intended to assert its fraudulent conveyance claims against Taub, it is clear that Taub is not a proper party to these claims because GateGuard does not allege that he owned any of the assets at issue in his personal capacity at the time of the asset purchase.

## CONCLUSION

For the reasons set forth herein, the moving Defendants respectfully request that all of GateGuard's claims against them be dismissed with prejudice.

Dated: Bondville, Vermont
         October 16, 2020

THE ENGEL LAW GROUP, PLLC

By: _____
              Adam E. Engel

280 Madison Avenue – Suite 705
New York, NY  10016
(212) 665-8095

*Counsel for MVI Systems and Taub*

34