**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

GATEGUARD, INC.,

        *Plaintiff*,

   v.

MVI SYSTEMS LLC;
SAMUEL TAUB;
MVI INDUSTRIES, LLC,

        *Defendants*.

Civil Action No.  1:19-cv-02472- JPC-DCF

**PLAINTIFF GATEGUARD, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO:**
**(I) DEFENDANTS MVI SYSTEMS LLC'S AND SAMUEL TAUB'S MOTION TO**
**COMPEL ARBITRATION OR, IN THE ALTERNATIVE, DISMISS GATEGUARD'S**
**CLAIMS ON SUBSTANTIVE GROUNDS, AND**
**(II) DEFENDANT MVI INDUSTRIES, LLC'S MOTION TO DISMISS GATEGUARD'S**
**COMPLAINT OR COMPEL ARBITRATION**

Ariel Reinitz
FisherBroyles, LLP
445 Park Avenue, Ninth Floor
New York, NY 10022
(646)494-6909
Ariel.Reinitz@FisherBroyles.com
*Attorneys for Plaintiff*
*GateGuard*

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... I

TABLE OF AUTHORITIES .............................................................................................. III

PRELIMINARY STATEMENT ........................................................................................... 1

RELEVANT FACTS AND PROCEDURAL HISTORY .......................................................... 2

STANDARD OF REVIEW .................................................................................................. 4

ARGUMENT ..................................................................................................................... 6

   I.    MVIS AND TAUB CANNOT MOVE TO DISMISS AFTER THEIR PRIOR MOTION WAS
UNSUCCESSFUL ............................................................................................................... 6

     A.  MVIS and Taub's Motion is Precluded Under Rule 12(g)(2) ......................... 6

     B.  Under the 'Law of the Case' All Pleading Deficiencies Have Been Resolved ...... 7

  II.   THE TAC STATES A CLAIM FOR BREACH OF CONTRACT, MISAPPROPRIATION OF BUSINESS
TRADE SECRETS, TORTIOUS INTERFERENCE, AND UNFAIR COMPETITION ................................... 8

     A.  Taub Rehashes the Same Unsuccessful Arguments Against the Breach of Contract
Claim ........................................................................................................ 9

        1.  As Judge Abrams Ruled, the Complaint Sufficiently Alleges Taub Was on Inquiry
Notice of the Terms He Accepted ............................................................... 10

        2.  Taub Fails to Address That He Reconfirmed His Acceptance of the Terms ............ 13

        3.  There Was Sufficient Consideration and Performance ............................... 14

        4.  There is Only One Contract ........................................................................ 15

     B.  GateGuard's Business Trade Secret Claims are Sufficiently Pled; Any Alleged
Deficiencies Have Been Resolved ............................................................... 16

     C.  GateGuard's Tortious Interference Claim is Sufficiently Pled; Any Alleged
Deficiencies Have Been Resolved ............................................................... 20

     D.  Judge Abrams Did Not Dismiss the Unfair Competition Claim; Defendants
Misleadingly Suggest Otherwise ................................................................. 23

  III.  GATEGUARD'S CORRECTION OF PATENT INVENTORSHIP CLAIMS (35 U.S.C. § 256) ARE
SUFFICIENTLY PLED ...................................................................................................... 23

     A.  Complete Substitution of Inventors Is Possible Because the Complaint Describes
Substantive Communications Between Teman and Taub .................................... 24

     B.  The Complaint Sufficiently Pleads That Teman is An Inventor of Every Claim ......... 26

     C.  The Complaint Sufficiently "Corroborates" Teman's Inventorship; Defendants Invoke
This Issue Prematurely ............................................................................... 28

     D.  GateGuard Has Always Maintained Teman is the Sole Inventor or, Alternatively, a
Joint Inventor ........................................................................................... 31

     E.  The Communications Between Teman and Taub Are Sufficient "Collaboration" for
Joint Inventorship ..................................................................................... 31

IV.  Judge Abrams Already Found GateGuard's Technical Trade Secrets Claims Sufficiently Pled; These Claims Are Not – and Cannot Be – "Preempted" ................. 33

    A.  Defendants' Authority Does Not Support Their Conclusion ........................................... 33

    B.  GateGuard's Correction of Inventorship Claim Does Not "Preempt" Its Trade Secret Misappropriation Claim .................................................................................................. 34

V.  All of GateGuard's Claims Against MVII Are Sufficiently Pled ........................ 36

    A.  The Trade Secret Misappropriation Claims are Sufficiently Pled Against MVII Because MVII Knowingly Obtained GateGuard's Trade Secrets From Taub and MVIS and Used The Trade Secrets ............................................................................................................ 36

    B.  The Complaint's Detailed Description of MVII's Acquisition and Use of GateGuard's Trade Secrets is Not "Conclusory" ................................................................................. 38

VI.  The Fraudulent Conveyance Claims Are Sufficiently Pled .................................. 39

    A.  The Complaint Describes Defendants' Scheme With Particularity; Taub's Own Words Evince Clear Intend to Defraud .................................................................................... 39

    B.  The Complaint Also Sufficiently Pleads Alter Ego or Successor Liability .................. 40

VII.  Defendants' Motions to Compel Arbitration Must Be Denied Because GateGuard's "Dispute Resolution" Terms Explicitly Exclude This Case From Arbitration ...................................................................................................................... 41

    A.  Actions Involving Injunctive Relief to Prevent Violations of Trade Secret and Patent Rights Are Explicitly "Carved Out" ........................................................................... 41

    B.  Defendants' Suggestion That "The Entirety of This Case" Must Be Arbitrated is Baseless ....................................................................................................................... 43

    C.  Defendants Misread Henry Schein and Mistakenly Conclude That The Arbitrability of This Case "Must Be" Resolved By The Arbitrator ................................................... 45

    D.  The Fifth Circuit Concludes Schein's Carve-Out Provision Demonstrates the Parties Did Not Intend to Delegate Arbitrability .................................................................... 46

    E.  GateGuard's Carve-Out Provision – Like Schein's – Demonstrates the Parties Did Not Intend to Delegate Arbitrability ................................................................................... 46

    F.  The Second Circuit in NASDAQ Distinguished Defendant's Authority (Contec) Which Found Arbitrability Was Delegated Only Because No Carve-Out Provision Was Present .. 47

CONCLUSION ................................................................................................................... 49

# **TABLE OF AUTHORITIES**

**Cases**

*Ali v. Mukasey*, 529 F.3d 478, 490 (2d Cir. 2008) ......................................................... 8

*Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) ............ 5, 21, 29, 39

*Archer & White Sales, Inc. v. Henry Schein, Inc.*, 935 F.3d 274, 278 (5th Cir. 2019) ..... 46, 47, 48

*Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) ................................. 6

*Ashcroft v. Iqbal*, 556 U.S. 662, 667 (2009) ................................................................. 4

*AT&T Techs. v. Communs. Workers of Am.*, 475 U.S. 643, 649 (1986) .......................... 39, 41, 49

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ................................................. 4

*Bonito Boats v. Thunder Craft Boats*, 489 U.S. 141, 166, 109 S. Ct. 971, 985 (1989) ............... 35

*Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1227 (Fed. Cir. 1994) .................... 32

*BWP Media USA Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp. 3d 342, 352 (S.D.N.Y. 2014) .. 5

*City of N.Y. v. BP P.L.C.*, 325 F. Supp. 3d 466, 470 (S.D.N.Y. 2018) ........................................ 4

*Contec Corp v. Remote Solution Co.*, 398 F.3d 205 (2d Cir. 2005) ........................................ 47, 48

*Dana-Farber Cancer Inst., Inc. v. Ono Pharm. Co.*, 379 F. Supp. 3d 53, 87 (D. Mass. 2019) ... 25

*Dandong v. Pinnacle Performance Ltd.*, 966 F. Supp. 2d 374, 385 (S.D.N.Y. 2013) .................. 8

*DiLaura v. Power Auth. of N.Y.*, 982 F.2d 73, 76 (2d Cir. 1992) ................................................ 8

*Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1359 (Fed. Cir. 2004) .................................... 32

*Erickson v. Pardus*, 551 U.S. 89, 93 (2007) ................................................................. 5

*Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1461 (Fed. Cir. 1998) .............................. 28

*Falcon v. City Univ. of New York*, 2016 U.S. Dist. LEXIS 92396, 2016 WL 3920223, at *13
    (E.D.N.Y. July 15, 2016) ................................................................. 7

*Ferring B.V. v. Allergan, Inc.*, 166 F. Supp. 3d 415, 418 (S.D.N.Y. 2016) ................................ 31

*Gentian v. Tristar Prods.*, 434 F. Supp. 3d 203, 206 (D.N.J. 2020) ................................ 28, 29, 32

*Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524 (2019) ...................... 45

*Hess v. Advanced Cardiovascular Sys.*, 106 F.3d 976, 979 (Fed. Cir. 1997) .............................. 28

*HIF Bio, Inc. v. Yung Shin Pharm. Indus. Co.*, 600 F.3d 1347 (Fed. Cir. 2010) ......................... 35

*Jasco Tools, Inc. v. Dana Corp. (In re Dana Corp.)*, 574 F.3d 129, 152 (2d Cir. 2009) ............ 17

*Jensen v. Cablevision Sys. Corp.*, No. 2:17-cv-00100 (ADS)(AKT), 2017 U.S. Dist. LEXIS
    158872, at *5 (E.D.N.Y. Sep. 27, 2017) ................................................................. 15, 16

*Kewanee v. Bicron*, 416 U.S. 470, 492, 94 S. Ct. 1879, 1891 (1974) .................................... 33, 34

*Kimberly-Clark Corp. v. P&G Distrib.*, 973 F.2d 911, 917 (Fed. Cir. 1992) .............................. 32

*Lefkowitz v. McGraw-Hill Glob. Educ. Holdings, LLC*, 23 F. Supp. 3d 344, 353 (S.D.N.Y. 2014)
    ................................................................. 5

*Meyer v. Uber Techs., Inc.*, 868 F.3d 66 (2d Cir. 2017) ................................................. 11, 12, 13

*NASDAQ OMX Grp., Inc. v. UBS, Sec., LLC*, 770 F.3d 1010 (2d Cir. 2014) ...................... 47, 48

*North Atlantic Instruments v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999) ...................................... 16

*Opternative, Inc. v. JAND, Inc.*, 2018 U.S. Dist. LEXIS 132827, at *30 (S.D.N.Y. Aug. 7, 2018)
    ................................................................. 30

*Pacelli v. Augustus Intelligence, Inc.*, 459 F. Supp. 3d 597, 611 (S.D.N.Y. 2020)...................... 48

*Price v. Symsek*, 988 F.2d 1187, 1196 (Fed. Cir. 1993) ............................................................. 29

*Rawlplug Co., Inc. V. Hilti Aktiengesellschaft*, 777 F. Supp. 240, 242-43 (S.D.N.Y. 1991) ....... 25

*Red Carpet Studios v. Midwest Trading Grp., Inc.*, No. 1:12cv501, 2016 U.S. Dist. LEXIS 135755, at *11 (S.D. Ohio Sep. 30, 2016) ........................................................................... 25

*Rubin v. Gen. Hosp. Corp.*, Civil Action No. 09-10040-DJC, 2011 U.S. Dist. LEXIS 45859, at *6-7 (D. Mass. Apr. 28, 2011) .................................................................................. 24

*Runs Like Butter Inc. v. MVI Systems LLC and Samuel Taub*, No. 1:19-cv-02432 (E.D.N.Y. Apr. 25, 2019)............................................................................................................................ 39

*Scottish Air Int'l v. British Caledonian Grp., PLC.*, 152 F.R.D. 18, 24-25 (S.D.N.Y. 1993)......... 8

*Spectrum Dynamics Med., Ltd. v. GE*, No. 18-cv-11386 (VSB), 2020 U.S. Dist. LEXIS 102660, at *30-31 (S.D.N.Y. June 1, 2020)................................................................................... 35

*Speedfit LLC v. Woodway USA, Inc.*, 226 F. Supp. 3d 149 (E.D.N.Y. 2016) ....................... 33, 34

*Tsirelman v. Daines*, 794 F.3d 310, 313 (2d Cir. 2015) ............................................. 4, 11, 26, 33

*Utex Indus. v. Wiegand,* No. H-18-1254, 2020 U.S. Dist. LEXIS 29791, at *29-30 (S.D. Tex. Feb. 21, 2020)..................................................................................................................... 35

*Wright v. Cayan*, 817 F.2d 999, 1002 n.3 (2d Cir. 1987) ........................................................... 8

## Statutes

18 U.S.C. § 1836 ........................................................................................................................ 33

18 U.S.C. § 1839 ................................................................................................................... 37, 38

35 U.S.C. § 116 .......................................................................................................................... 32

35 U.S.C. § 256 ............................................................................................................... 23, 24, 44

Fed. R. Civ. P. 12(b)(6) ................................................................................................................. 5

Fed. R. Civ. P. 12(g)(2) .......................................................................................................... 6, 7, 10

Fed. R. Civ. P. 8 ........................................................................................................................... 4

Plaintiff GateGuard, Inc. ("GateGuard") respectfully submits this Memorandum of Law in Opposition to: (I) Defendants MVI Systems LLC's and Samuel Taub's Motion to Compel Arbitration or, in the Alternative, Dismiss GateGuard's Claims on Substantive Grounds (ECF Nos. 119-121), and (II) Defendant MVI Industries, LLC's Motion to Dismiss GateGuard's Complaint or Compel Arbitration (ECF No. 118).

## PRELIMINARY STATEMENT

*It's Déjà Vu All Over Again.*

– Lawrence Peter "Yogi" Berra

Almost eighteen months ago, Defendants MVIS and Taub filed a motion seeking to have this case dismissed. But that wasn't all they were doing at the time to stop GateGuard from litigating its claims. In parallel with their motion to dismiss, MVIS and Taub formed a new entity (MVII) and fraudulently conveyed MVIS' assets to it, in an effort to frustrate this litigation and prevent GateGuard from pursuing its claims. Presumably, this enabled the defendants to "hedge their bets" if their motion to dismiss was unsuccessful.

Perhaps as anticipated, MVIS and Taub's motion did *not* succeed. Almost a year ago, Judge Abrams denied their motion as to several claims in this case, including trade secret misappropriation, correction of patent inventorship, breach of contract, and unfair competition.

Having since discovered defendants' scheme, GateGuard joined MVII as a defendant, and amended its complaint to add claims for fraudulent conveyance (and to otherwise resolve pleading deficiencies highlighted by Judge Abrams).

In their present motions, defendants try to relitigate most (if not all) the issues Judge Abrams decided. In doing so, they ignore the fact that the Federal Rules of Civil Procedure explicitly precludes this practice (as does the doctrine of the 'law of the case'). This Court need not endeavor to reconsider issues Judge Abrams already decided.

Substantively, defendants' arguments fare no better the second time around. On many issues they ignore sections of GateGuard's complaint that rebut their positions. In other instances, they cite authorities that do not support the propositions they advance. And on several significant issues, defendants propose novel legal theories that lack any basis or are contradicted by controlling decisions from higher courts.

Despite arguing, on the one hand, that GateGuard does not have a viable breach of contract claim, Defendants simultaneously seek to enforce the same contract by moving to compel arbitration. This argument also fails because the arbitration clause at issue expressly "carves out" the subject matter of this case from arbitration.

For these reasons, and others presented below, defendants' motions to dismiss and to compel arbitration must be denied.

## RELEVANT FACTS AND PROCEDURAL HISTORY

GateGuard is a technology startup company that began developing technologies for multi-tenant apartment buildings in 2014. In 2016, GateGuard released its first set of products including an artificial intelligence ("AI") video intercom device.

After GateGuard's launch, Defendant Samuel Taub ("Taub") accessed GateGuard's website, was presented with GateGuard's Terms of Service ("ToS"), and completed an interactive form indicating his acceptance of the ToS. In doing so, Taub (a) acknowledged

GateGuard's ownership of all intellectual property rights associated with GateGuard's technology and (b) agreed to protect the confidentiality GateGuard's proprietary information.

Over several communications between Taub and GateGuard's founder, Ari Teman ("Teman"), Taub represented himself as a security integrator interested in serving as a reseller for GateGuard. Upon confirming Taub's acceptance of the ToS and confirming Taub's acknowledgement that the confidentiality of GateGuard's proprietary information would be maintained, Teman disclosed various technical and business trade secrets to Taub. These trade secrets included proprietary technical designs, architectures, and algorithms, as well as confidential customer lists, pricing information, sales strategies, and other materials.

Rather than serve as a reseller for GateGuard, Taub utilized the trade secrets he obtained as the technical and business foundation for Defendant MVI Systems LLC ("MVIS"), a company offering products nearly identical to GateGuard's. Defendants also used GateGuard's trade secrets to "poach" GateGuard's existing and prospective customers, causing GateGuard tremendous losses and business disruption.

In addition to using GateGuard's trade secrets to build a competing company, Defendants applied for and received two U.S. patents based largely, if not exclusively, on GateGuard's technology. These patent filings include a sworn statement by Taub in which he falsely identifies himself as the sole, original inventor of GateGuard's technology. Taub signed this statement and filed the patents despite knowing they claimed GateGuard's technology, which Teman had confidentially disclosed to Taub *seven months prior*.

GateGuard commenced this action against MVIS and Taub in March 2019. Months later, facing the threat of GateGuard's legal claims and those brought by another intercom competitor in an unrelated case, Taub formed a new entity, MVI Industries, LLC (MVII). Unbeknownst to

GateGuard at the time, Taub then "liquidated" MVIS, transferring its assets (including the patents at issue) to MVII.

After MVIS and Taub moved to dismiss GateGuard's complaint, Judge Abrams denied their motion with respect to misappropriation of GateGuard's technical trade secrets (under federal and state law), correction of patent inventorship, breach of contract, and unfair competition claims. Judge Abrams also granted GateGuard leave to amend its misappropriation of business trade secrets and tortious interference claims, identifying how these claims should be amended.

GateGuard then joined MVII as a defendant and amended its complaint, adding claims for fraudulent conveyance and otherwise resolving the pleading deficiencies highlighted by Judge Abrams.

MVIS, Taub, and MVII now move again to dismiss all of GateGuard's claims, including those Judge Abrams ruled were not subject to dismissal.

## STANDARD OF REVIEW

On a motion to dismiss, "a court must accept the factual allegations in the complaint as true and draw reasonable inferences in the plaintiff's favor." *City of N.Y. v. BP P.L.C.*, 325 F. Supp. 3d 466, 470 (S.D.N.Y. 2018) (quoting *Tsirelman v. Daines*, 794 F.3d 310, 313 (2d Cir. 2015)).

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 667 (2009). This rule "does not require 'detailed factual allegations.'" *Id.* (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Under Rule 8, "[s]pecific facts are not

necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Lefkowitz v. McGraw-Hill Glob. Educ. Holdings, LLC*, 23 F. Supp. 3d 344, 353 (S.D.N.Y. 2014) (*quoting Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quotation omitted).

To survive dismissal, a complaint need only allege a plausible set of facts sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. In other words, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (*quoting Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *BWP Media USA Inc. v. Hollywood Fan Sites, LLC,* 69 F. Supp. 3d 342, 352 (S.D.N.Y. 2014) (*quoting Iqbal*, 556 U.S. at 678).

The "plausibility standard is not akin to a 'probability requirement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). Rather, Plaintiffs need only "nudge[] their claims across the line from conceivable to plausible." *See Twombly*, 550 U.S. at 570.

"The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion…" *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012). "A court ruling on such a motion may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible." *Id.*

Notably, the *Twombly* plausibility standard "does not prevent a plaintiff from pleading facts alleged 'upon information and belief' where the facts are peculiarly within the possession and control of the defendant[,] or where the belief is based on factual information that makes the

inference of culpability plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678) (quotations & other citations omitted).

## ARGUMENT

### I.    MVIS and Taub Cannot Move to Dismiss After Their Prior Motion Was Unsuccessful

Judge Abrams denied MVIS and Taub's prior motion to dismiss with respect to GateGuard's misappropriation of technical trade secrets, correction of inventorship, breach of contract, and unfair competition claims. ECF No. 45. Under Rule 12(g)(2), these defendants are precluded from moving again to dismiss these claims.

Moreover, the doctrine of the "law of the case" dictates that rulings made at one stage of a litigation constitute precedent binding on later stages of the case. And in ruling on defendants' previous motion, Judge Abrams identified specific pleading deficiencies with respect to GateGuard's misappropriation of business trade secrets and tortious interference claims. ECF No. 58 at 6, 9-10. As described below, any such deficiencies are cured in GateGuard's current complaint. Though Defendants now urge a different standard, under the law of the case their arguments should be denied because GateGuard's pleadings meet the standard set by Judge Abrams in her prior ruling.

For these reasons, and others detailed below, MVIS and Taub's motion should be denied.

### A.    MVIS and Taub's Motion is Precluded Under Rule 12(g)(2)

Under Fed. R. Civ. P. 12(g)(2), "a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion."

MVIS and Taub already moved to dismiss GateGuard's prior complaint. ECF Nos. 24-28. Judge Abrams denied their motion with respect to GateGuard's claims for misappropriation of technical trade secrets under federal and state law, correction of inventorship under 35 U.S.C. § 256, breach of contract, and unfair competition. ECF No. 45. Under Rule 12(g)(2), MVIS and Taub "must not" move again to dismiss – as they have – at least with respect to these claims.

"[T]he filing of an amended complaint 'does not automatically revive the defenses and objections a defendant waived in its first motion to dismiss, nor does it allow a defendant to advance arguments that could have been made in the first motion to dismiss.'" *Falcon v. City Univ. of New York*, 2016 U.S. Dist. LEXIS 92396, 2016 WL 3920223, at *13 (E.D.N.Y. July 15, 2016) (holding, based on Rule 12(g)(2), that arguments not raised in a first motion to dismiss can be presented in a motion for summary judgment or at trial, but *not* in a second motion to dismiss).

Because MVIS and Taub seek to raise new grounds to dismiss claims on which this Court already denied their first motion to dismiss – a procedure explicitly proscribed under Rule 12(g)(2) – their motion should be denied on this basis alone with respect to GateGuard's misappropriation of technical trade secrets, correction of inventorship, breach of contract, and unfair competition claims. The Court need not reach the merits of their arguments which can be raised on summary judgement or at trial.

In any event, MVIS and Taub's new arguments fare no better substantively, as addressed below.

**B.    Under the 'Law of the Case' All Pleading Deficiencies Have Been Resolved**

With respect to GateGuard's misappropriation of business trade secrets and tortious interference claims (which GateGuard was granted leave to amend), the deficiencies identified by Judge Abrams have been remedied. For example, GateGuard's current complaint identifies

specific customers with whom defendants and further describes how defendants used GateGuard's business trade secrets.

Defendants ask this Court to reconsider Judge Abrams' ruling and apply different standards to these claims. Under the 'law of the case,' this Court should decline to do so.

"According to the doctrine of "law of the case," a decision regarding an issue of law made at one stage of a litigation becomes binding precedent, to be followed in subsequent stages of the same litigation. *Scottish Air Int'l v. British Caledonian Grp., PLC.*, 152 F.R.D. 18, 24-25 (S.D.N.Y. 1993), quoting *DiLaura v. Power Auth. of N.Y.,* 982 F.2d 73, 76 (2d Cir. 1992).

"The law of the case doctrine… counsels a court against revisiting its prior rulings in subsequent stages of the same case absent 'cogent' and 'compelling' reasons such as an intervening change of controlling law, the availability of new evidence, or the need to… prevent manifest injustice." *Dandong v. Pinnacle Performance Ltd.*, 966 F. Supp. 2d 374, 385 (S.D.N.Y. 2013) (quoting *Ali v. Mukasey*, 529 F.3d 478, 490 (2d Cir. 2008) (quotations omitted). "*Even when cases are reassigned to a different judge*, the law of the case dictates a general practice of refusing to reopen what has been decided." *Dandong*, 966 F. Supp. 2d at 385 (quoting *Wright v. Cayan*, 817 F.2d 999, 1002 n.3 (2d Cir. 1987) (emphasis added).

Because all the deficiencies in GateGuard's misappropriation of business trade secrets and tortious interference claims identified by Judge Abrams have been remedied, defendants' motion to dismiss these claims should be denied. Defendants' arguments to the contrary (which are also substantively unavailing, as detailed below), necessarily ask this court to revisit Judge Abrams' ruling, in violation of the 'law of the case.' This Court should decline to do so.


II.    **The TAC States a Claim for Breach of Contract, Misappropriation of Business Trade Secrets, Tortious Interference, and Unfair Competition**

Judge Abrams denied MVIS and Taub's prior motion to dismiss with respect to GateGuard's breach of contract and unfair competition claims. ECF No. 45 ("Defendants' motion is denied as to…: breach of contract… and unfair competition"). Because Rule 12(g)(2) precludes these defendants from moving again to dismiss these claims, the Court need not reach the merits of defendants' arguments. In any event, these arguments fare no better the second time around, and fail substantively.

As for GateGuard's misappropriation of business trade secrets and unfair competition claims, any alleged pleading deficiencies are remedied in GateGuard's current complaint. Because these claims are sufficiently pled, defendants' motion should be denied.

## A.  Taub Rehashes the Same Unsuccessful Arguments Against the Breach of Contract Claim

GateGuard's breach of contract claim is asserted solely against Taub. TAC ¶¶ 278-285. Taub argues his agreement with GateGuard lacked consideration and that he had insufficient notice of GateGuard's terms. MVIS Br. at 8-11. Notably, Taub advanced these same arguments in his prior motion to dismiss. *See* ECF No. 25 at 11-14 ("Taub received no "consideration"…" "Taub never saw or read any ToS of GateGuard…").

Judge Abrams considered these arguments but denied Taub's motion to dismiss the contract claim: "[A]t this stage, accepting plaintiff's allegations that Taub had notice of the terms when he… filled out the contact form in a manner that could manifest assent to contract terms, [the breach of contract] claim survives." ECF No. 58 at 8. Judge Abrams also found that "the complaint sufficiently alleges that Taub was presented with and indicated his acceptance of the terms…. create[ing] a factual dispute as to whether Taub was a reasonably prudent user on inquiry notice of the terms of the contract on the website..." *Id.* at 5-6.

Taub did not seek reconsideration of Judge Abrams' ruling. He did not pursue an interlocutory appeal. Instead, almost one year later, Taub seeks to relitigate the issue in a successive motion to dismiss. Rule 12(g)(2) explicitly proscribes this practice. The Court therefore need not reach the merits of Taub's arguments (which, in any event, are substantively unavailing).

### 1. As Judge Abrams Ruled, the Complaint Sufficiently Alleges Taub Was on Inquiry Notice of the Terms He Accepted

Regarding Taub's notice and acceptance of GateGuard's terms, the complaint (ECF No. 104) ("TAC") describes:

> 81. On or about November 16, 2016, Taub accessed GateGuard's website.
>
> 82. While navigating the website, Taub further accessed an interactive form.
>
> 83. The referenced form included numerous fields into which identifying information was to be provided, including email address, first name, last name, company name, phone number, etc.
>
> 84. The referenced form further included the following text, immediately below the referenced fields: "By submitting form [*sic*] you accept our terms and conditions."
>
> 85. The text "terms and conditions" referenced above contained a hyperlink to GateGuard's Terms of Service ("ToS"). **The text "terms and conditions" was further highlighted (in blue) and underlined**, further reflecting it being a hyperlink.
>
> 86. Within the referenced form, immediately below the text "By submitting form [*sic*] you accept our terms and conditions." was a large button containing the text "Submit."
>
> 87. Having been presented with the from which included a direct link to GateGuard's ToS, Taub proceeded to complete the referenced form by providing his name, phone number, email address, and other information.
>
> 88. Taub then proceeded to select the "Submit" button, thereby submitting his completed form and indicating his acceptance of the ToS.

Taub argues he did not have "sufficient notice" of GateGuard's terms. MVIS Br. at 9-11. As noted above, Judge Abrams already found GateGuard's complaint sufficient on this issue, creating, at minimum, a factual dispute regarding the notice provided to Taub. Taub's arguments regarding the sufficiency of this notice are therefore factual questions which are premature. At

this juncture – on a motion to dismiss – all factual questions must be resolved in GateGuard's favor. *Tsirelman*, 794 F.3d at 313.

Moreover, the Second Circuit has found circumstances like Taub's notice of GateGuard's terms sufficient to uphold underlying contractual provisions. In *Meyer v. Uber Techs., Inc.*, 868 F.3d 66 (2d Cir. 2017), the Second Circuit found an online sign-up form which included a hyperlink to underlying terms (including an arbitration clause) *was* sufficient notice, even though a plaintiff asserted he was unaware of and did not agree to the terms.

Despite plaintiff's claim, the Second Circuit in *Meyer* found the online interface presented a hyperlink to the operative terms in a "reasonably conspicuous" manner. *Id.* at 79. This presentation placed plaintiff on inquiry notice of the terms and, by, by clicking "Register" plaintiff manifested his assent to the agreement. *Id.* at 80. "As long as the hyperlinked text was itself reasonably conspicuous… a reasonably prudent… user would have constructive notice of the terms. While it may be the case that many users will not bother reading the additional terms, that is the choice the user makes; the user is still on inquiry notice." *Id.* at 79.

The Second Circuit also included a screenshot of the interface at issue (*id.,* Addendum A):



There is little distinction between the interface in *Meyer* (above) and the one presented to Taub. The Second Circuit found the hyperlink shown above (in blue text) *was* sufficient notice to compel arbitration based on the terms in the underlying hyperlink.[1]

GateGuard's complaint describes that "[t]he text "terms and conditions" was further highlighted (in blue) and underlined" (TAC ¶ 85) and "immediately below the text "By submitting form [*sic*] you accept our terms and conditions." was a large button containing the text "Submit."" (¶ 86). Taub "complete[d] the referenced form…[and] select[ed] the "Submit" button…indicating his acceptance of the ToS." (¶¶ 87-88).

---

[1] Notably, Taub's motion also seeks to compel arbitration. MVIS Mot. at 2-5. In doing so, Taub maintains he "clearly and unmistakably" intended to arbitrate this dispute. *Id.* Taub thereby implicitly concedes that GateGuard's terms – of which the arbitration clause (which Taub seeks to enforce) is a part – are binding on him. As a result, Taub's attempt to compel arbitration discredits his argument here that he lacked sufficient notice of GateGuard's terms. By moving to compel arbitration based on GateGuard's terms, Taub demonstrates he *was* on notice of the terms and *did* accept them.

Like *Meyer*, GateGuard's interface presented a hyperlink to the operative terms in a "reasonably conspicuous" manner, constituting sufficient notice to Taub of the underlying terms. As noted above, Judge Abrams already found that the complaint, at minimum, created a factual dispute regarding the notice provided to Taub, sufficient to defeat dismissal. Taub's arguments regarding the sufficiency of his notice are therefore factual questions which are premature.

### 2.  Taub Fails to Address That He Reconfirmed His Acceptance of the Terms

GateGuard's complaint also describes that after Taub accepted the terms, Teman "engaged Taub in further discussions and communications[]" (ECF No. 104 ¶ 95). During these communications "Teman *re-confirmed* Taub's acceptance of the ToS" (*Id.*, ¶ 100, emphasis added). "Teman also reiterated the proprietary and confidential nature of GateGuard's…trade secrets[] which Taub acknowledged…" *Id.*, ¶ 101.

Taub's motion conspicuously avoids these claims. He has no explanation for the fact that *after* accepting GateGuard's terms, Teman *reconfirmed* this acceptance in subsequent communications and further notified Taub of the confidential nature of GateGuard's trade secrets.

During a colloquy with Taub's counsel on this issue, Judge Abrams specifically highlighted these claims as further basis demonstrating GateGuard's breach of contract claim *was* properly pled:

> MR. ENGEL:  As far as the breach of contract goes, I know that the complaint says that my client agreed to the terms of service on the website, but it never says how...
> THE COURT:  I thought it did say that he filled out the attached form and that he saw the terms.  Right?
> MR. ENGEL:  It says he saw the terms.
> THE COURT:  Yes.
> …
> THE COURT:  **There is also an allegation with respect to a phone call following**… Paragraph 89 of the complaint reads: "During the referenced

13

communications, Teman reconfirmed Taub's acceptance of the TOS, terms of service, including the confidentiality, nondisclosure, IP ownership, and other clauses referenced above."

…

THE COURT:  Look at paragraph 77: "Taub then proceeded to submit the completed form indicating his acceptance of the terms of service."  **And then you have the follow-up phone calls**.

ECF No. 58 at 13-15 (emphasis added).[2]

Taub fails confront the fact that the complaint describes not only his acceptance of the terms via GateGuard's website, but also that he *reconfirmed* this acceptance (and further acknowledged the confidentiality of GateGuard's trade secrets) in subsequent communications. For this reason as well, defendants' arguments for dismissal of GateGuard's breach of contract claim should be rejected.

### 3.  There *Was* Sufficient Consideration and Performance

Taub raised the issue of consideration in his prior motion to dismiss. *See* ECF No. 23 at 12-14 ("Taub received no "consideration" at all from GateGuard…"). Judge Abrams found this argument insufficient and denied Taub's motion to dismiss as to the breach of contract claim.[3]

Though the Court need not reach the issue, GateGuard's complaint *does* describe ample consideration Taub received, as well as GateGuard's performance. *See, e.g.*, TAC ¶¶ 81-88 (Taub gained access to GateGuard's website and affirmatively accepted the ToS), ¶¶ 95-99, 101 (Taub communicates with Teman to explore business opportunities), ¶¶ 102-121 (Taub gains

---

[2] During the same colloquy, Taub's counsel acknowledged there was no basis to dismiss GateGuard's breach of contract claim. *See* ECF No. 58 at 16-17 ("While I know your Honor is not going to dismiss [the breach of contract claim]…" and seeking clarification for purposes of discovery.). Having conceded dismissal is unwarranted, Taub cannot relitigate this issue.

[3] Judge Abrams also noted that Defendants' arguments on the issue of consideration were factual issues for discovery. *See, e.g.*, ECF No. 58 at 8 (finding GateGuard's breach of contract claim sufficiently pled despite Defendants' questions regarding consideration) and 17 (suggesting Defendants' questions regarding consideration could be "figure[d] out in discovery.").

access to GateGuard's trade secrets). Accordingly, as Judge Abrams found, there are no grounds to dismiss GateGuard's breach of contract claim.

### 4. There is Only One Contract

Taub advances a novel argument against GateGuard's breach of contract claim: that GateGuard is enforcing "the wrong contract." MVIS Br. at 6. Defendants derive this argument from a case of inapplicable to the facts here: *Jensen v. Cablevision Sys. Corp.*, No. 2:17-cv-00100 (ADS)(AKT), 2017 U.S. Dist. LEXIS 158872, at *5 (E.D.N.Y. Sep. 27, 2017). *Jensen* concerns the interplay between two undisputedly different sets of terms: a "Terms and Conditions" and a separate "Terms of Service": "In the event of any conflict between these Terms and Conditions below and the Terms of Service, the Terms of Service shall control." *Id.*

*Jensen* is inapplicable here. GateGuard's complaint describes that the text "terms and conditions" referenced on GateGuard's website corresponds to GateGuard's Terms of Service ("ToS"): "The text "terms and conditions"… contained a hyperlink to GateGuard's Terms of Service ("ToS")." ECF No. 104 ¶ 85.

Defendants' misleadingly quote the preceding paragraphs of GateGuard's complaint, but conspicuously fail to cite this one (presumably, because it undercuts their argument). *See* MVIS Br. at 7 (quoting ¶¶ 82-84 of the complaint and misleadingly suggesting GateGuard's "terms and conditions" are different from its "Terms of Service," ignoring ¶ 85 which demonstrates the text "terms and conditions" refers to "Terms of Service").

The text of GateGuard's Terms of Service – which Defendants maintain are "integral to the Complaint" [4] – confirms that "terms and conditions" refers to GateGuard's "Terms of Service." For example, the opening paragraphs of the document entitled "GateGuard Terms of

---

[4] *See, e.g.*, MVIS Mot. at n.1; MVII Mot. at n.4.

Service" indicate that "You may use the Site in accordance with the *terms and conditions* hereunder...By using the Site and/or the Services, you agree to comply with and be legally bound by *the terms and conditions of these Terms of Service ("Terms")*..." ECF No. 121, Exhibit A at GG000001 (emphasis added).

As such, GateGuard's complaint and the underlying terms demonstrate that the "terms and conditions" referenced in the form Taub completed on GateGuard's website refers to GateGuard's "Terms of Service." *Jensen* – involving the interplay between separate "Terms and Conditions" and "Terms of Service" – is inapplicable. Defendants' argument that GateGuard is enforcing the "wrong contract" is therefore moot.

### B. GateGuard's Business Trade Secret Claims are Sufficiently Pled; Any Alleged Deficiencies Have Been Resolved

"A customer list developed by a business through substantial effort and kept in confidence may be treated as a trade secret and protected at the owner's instance against disclosure to a competitor, provided the information it contains is not otherwise readily ascertainable." *North Atlantic Instruments v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999).

GateGuard's customer lists meet this standard. The complaint describes:

> 60. Over the course of the next year, GateGuard invested substantial efforts and resources to obtain and analyze large volumes of public and private real estate data.
>
> 61. Based on these efforts, GateGuard identified several proprietary criteria indicative of a property owner's expected interest in adopting GateGuard's technologies. Using these criteria, GateGuard then identified a small number of property owners in the New York Metropolitan area who were most likely to consider adopting GateGuard.
>
> 62. GateGuard then invested further efforts in initiating contacts and developing business relationships with such identified property owners.
>
> 63. This information was of immense value to GateGuard, as it enabled the company to focus its limited manpower and resources towards potential customers likely to be receptive to GateGuard's offerings.

TAC ¶¶ 60-63. The TAC further notes that "the identities of GateGuard's current and prospective customers were developed at substantial expense and are maintained confidentially and not disclosed or promoted publicly." *Id.* ¶ 69. Because GateGuard's customer lists were developed through substantial effort and were not otherwise readily ascertainable, they constitute protectible trade secrets.

GateGuard's pricing information and other business trade secrets also constitute protectible trade secrets.[5] "Confidential proprietary data relating to pricing, costs, systems, and methods are protected by trade secret law." *Jasco Tools, Inc. v. Dana Corp. (In re Dana Corp.)*, 574 F.3d 129, 152 (2d Cir. 2009).

In granting GateGuard leave to amend its business trade secret misappropriation claims, Judge Abrams identified the following pleading deficiencies: "Plaintiff has not asserted *when or how* defendants used its customer lists or pricing information. Without details such as *how the defendants allegedly misused the customer list or identifying any customers who were supposedly contacted or solicited*, this claim is too conclusory to withstand defendants' motion." ECF No, 58 at 6 (emphasis added).

GateGuard's current complaint (ECF No, 104, emphasis added) resolves the above-identified deficiencies:

> 161. For example, after feigning interest in selling GateGuard's products in order to learn of **GateGuard's sales pitches and proposals to Parkoff, ABJ, E&M, Medallion**, and others, **Taub proceeded to target such customers for MVI (and, later, MVII)**. In doing so, **Taub used information obtained from GateGuard to solicit and secure these customers**, at GateGuard's expense.

---

[5] *See, e.g.*, TAC ¶ 68 (GateGuard's proprietary business information includes…GateGuard's proprietary customer identification techniques, current and prospective customer contact lists, proprietary sales, marketing, and deployment strategies… sales and promotional materials, business plans, pricing insights, manufacturing and development strategies, and other confidential business information developed over years of effort and experience.").

162. For example, **on or around early 2018, representatives of MVI engaged representatives of ABJ in attempts to sell intercom devices and services to ABJ, using trade secrets and other information Taub improperly obtained from GateGuard in doing so**.

163. Among the information used by Taub and MVI was **GateGuard's proprietary business trade secrets, including insights GateGuard had learned regarding the specific needs of Parkoff, ABJ, E&M, Medallion, and other prospective customers, and aspects of the sales pitches and proposals made by GateGuard to such customers**. For example, **using confidential pricing information Teman conveyed to Taub regarding the manner in which GateGuard was pricing its devices and services for ABJ, in early 2018 Taub and MVI were able to 'undercut' GateGuard, by offering ABJ devices and services at prices Taub and MVI knew were lower than those GateGuard was charging ABJ**.

…

165. These (and other) business trade secrets were not known to the public and were confidentially disclosed by GateGuard and Teman to Taub, as outlined above.

GateGuard's complaint also identifies multiple apartment buildings owned or managed by ABJ at which GateGuard intercoms were removed and replaced with MVI intercoms – after MVI utilized GateGuard's business trade secrets in the manner outlined above. *See* TAC ¶¶ 169-177 and Exs. G-L (screenshots from Google Maps' "Street View" showing GateGuard intercom devices being replaced by MVI devices at multiple ABJ buildings after MVI utilized GateGuard's business trade secrets in early 2018, as described above).

Similarly, the TAC specifies *when* and *how* defendants misused GateGuard's business trade secrets with respect to other customers including Parkoff, E&M, and Medallion:

224. By way of further example, **MVII has used and continues to use GateGuard's confidential manufacturing and development insights and customer pricing/subscription information to 'undercut' GateGuard's agreements by offering such customers preferential or free pricing**. MVII knows such information was improperly obtained through misrepresentation and under circumstances requiring its confidentiality be maintained.

225. In **late 2019 and early 2020, MVII utilized GateGuard's trade secrets (including aspects of GateGuard's sales pitches and proposals to Parkoff and E&M) to solicit and secure business from these customers**, at GateGuard's expense.

18

226. For example, upon information and belief, **in late 2019, representatives of MVII engaged representatives of Parkoff regarding the sale of intercom devices and services, knowingly using trade secrets and other information improperly obtained from GateGuard in doing so**.

227. **Among the information used by MVII were GateGuard's proprietary business trade secrets, including insights GateGuard had learned regarding Parkoff's needs, as well as aspects of the sales pitches and proposals made by GateGuard to Parkoff.** Doing so provided MVII a considerable advantage in soliciting Parkoff's business, at GateGuard's expense.

228. Attached hereto and incorporated herein as Exhibit O is a true and accurate copy of a public post from MVII's Facebook page, dated **November 18, 2019**, promoting the installation of an MVII intercom device for Parkoff. As noted, **MVII improperly used GateGuard's trade secrets in securing this order**.

229. Similarly, upon information and belief, **during the same period representatives of MVII engaged representatives of E&M regarding the sale of intercom devices and services, knowingly using trade secrets and other information improperly obtained from GateGuard in doing so**.

230. Among the information used by MVII **were GateGuard's proprietary business trade secrets, including insights GateGuard had learned regarding E&M's needs, as well as aspects of the sales pitches and proposals made by GateGuard to E&M**. Doing so provided MVII a considerable advantage in soliciting E&M's business, at GateGuard's expense.

231. Attached hereto and incorporated herein as Exhibit P is a true and accurate copy of a public post from MVII's Facebook page, dated **January 23, 2020**, promoting the installation of an MVII intercom device for E&M. Also attached hereto and incorporated herein as Exhibit Q is a true and accurate copy of a public post from MVII's Facebook page, dated **January 28, 2020**, promoting the installation of another MVII intercom device for E&M. As noted, **MVII improperly used GateGuard's trade secrets in securing this order**.

TAC ¶¶ 224-231 (emphasis added).

In their motion, defendants argue that "simply adding a few names of… MVI customers does not… rectify the shortcomings" identified by Judge Abrams. MVIS Br. at 13. In so arguing, these defendants ignore that the TAC does *not* "simply add[] a few names." As outlined above, it provides precisely the additional detail suggested by Judge Abrams: *when* and *how* defendants misused GateGuard's business trade secrets, including by specifying specific customers and documenting this conduct with content from third party sources and defendants themselves.

Accordingly, any previously perceived pleading deficiencies have been resolved and GateGuard's complaint sufficiently pleads misappropriation of business trade secrets under federal and state law. Defendants' motions to dismiss should therefore be denied with respect to these claims.

### C.  GateGuard's Tortious Interference Claim is Sufficiently Pled; Any Alleged Deficiencies Have Been Resolved

As noted above, in dismissing GateGuard's tortious interference claim, Judge Abrams noted that "the complaint does not demonstrate interference with specified business relationships with a third party." ECF No. 58 at 9.  GateGuard's current complaint remedies this deficiency. For example:

> 77. As noted, throughout 2016, GateGuard representatives engaged with numerous prospective customers via phone calls, emails, and in-person meetings. During these interactions, GateGuard collected significant information regarding the needs and challenges of these property owners and managers. Based on this information, GateGuard prepared sales pitches, offering GateGuard products and services directed to such needs.
>
> 78. For example, **in late 2015 and early 2016, GateGuard representatives met and communicated with representatives of The Parkoff Organization ("Parkoff") on multiple occasions. During these interactions, GateGuard learned of Parkoff's intercom and security needs, challenges, current intercom/security options, and other aspects of Parkoff's business. Based on this information, GateGuard prepared and presented detailed sales pitches to Parkoff for GateGuard's products and services**.
>
> 79. By way of further example, **in early November 2016, GateGuard engaged with representatives of ABJ Properties ("ABJ"). During this time, representatives of GateGuard and ABJ communicated regarding ABJ's intercom and security needs, challenges, and other aspects of ABJ's business. Based on this information, GateGuard prepared and presented detailed sales pitches to ABJ for GateGuard's products and services**.
>
> 80. Yet other potential customers that GateGuard engaged with **during this period include E&M Management ("E&M") and Medallion Real Estate ("Medallion"). For example, in early November 2016, GateGuard engaged with representatives of E&M regarding its intercom and security needs, challenges, based upon which GateGuard prepared detailed sales pitches for GateGuard's products and services**.

TAC ¶¶ 77-80 (emphasis added).

As outlined above, the complaint further details how defendants interfered with these business relationships, including by targeting and soliciting these customers, utilizing GateGuard's trade secrets to do so. *See, e.g.*, TAC ¶¶ 161-165 (description of defendants targeting specific customers), ¶¶ 169-177 and Exs. G-L (documenting defendants' success in diverting business from these customers away from GateGuard to defendants).

Faced with these detailed claims and supporting evidence, defendants propose alternative "plausible" scenarios which may not involve tortious interference. *See* MVIS Br. at 14 (suggesting a "perfectly plausible scenario" where a GateGuard customer "says to the Defendants 'GateGuard is charging (or offering us) us $X/month – can you beat that?'"). But these arguments are premature. "The choice between two plausible inferences… is not a choice to be made by the court on a Rule 12(b)(6) motion." *Anderson News,* 680 F.3d at 185.

Accordingly, GateGuard's complaint sufficiently states a cause of action for tortious interference against MVIS and Taub.

As for MVII, the complaint similarly details their interference with GateGuard's business relationships:

> 222.    After knowingly acquiring assets from MVI incorporating or embodying GateGuard's trade secrets, MVII has unlawfully used and continues to use GateGuard's trade secrets to benefit MVII and harm GateGuard.
>
> 223.    For example **MVII has used and continues to use GateGuard's confidential customer and prospective customer information, as well as its proprietary sales, marketing, and deployment strategies to aggressively pursue GateGuard customers and prospective customers to choose MVII's offerings over GateGuard**. As outlined above, MVII knows such information was improperly obtained through misrepresentation and under circumstances requiring its confidentiality be maintained.
>
> 224.    By way of further example, **MVII has used and continues to use GateGuard's confidential manufacturing and development insights and customer pricing/subscription information to 'undercut' GateGuard's agreements by offering such customers preferential or free pricing**. MVII knows such information was improperly obtained through misrepresentation and under circumstances requiring its confidentiality be maintained.

225.    **In late 2019 and early 2020, MVII utilized GateGuard's trade secrets (including aspects of GateGuard's sales pitches and proposals to Parkoff and E&M) to solicit and secure business from these customers, at GateGuard's expense**.

226.    For example, upon information and belief, **in late 2019, representatives of MVII engaged representatives of Parkoff regarding the sale of intercom devices and services, knowingly using trade secrets and other information improperly obtained from GateGuard in doing so**.

227.    Among the information used by MVII were GateGuard's proprietary business trade secrets, including insights GateGuard had learned regarding Parkoff's needs, as well as aspects of the sales pitches and proposals made by GateGuard to Parkoff. Doing so provided MVII a considerable advantage in soliciting Parkoff's business, at GateGuard's expense.

228.    Attached hereto and incorporated herein as Exhibit O is a true and accurate copy of a public post from MVII's Facebook page, dated November 18, 2019, promoting the installation of an MVII intercom device for Parkoff. As noted, **MVII improperly used GateGuard's trade secrets in securing this order**.

229.    Similarly, upon information and belief, **during the same period representatives of MVII engaged representatives of E&M regarding the sale of intercom devices and services, knowingly using trade secrets and other information improperly obtained from GateGuard in doing so**.

230.    **Among the information used by MVII were GateGuard's proprietary business trade secrets, including insights GateGuard had learned regarding E&M's needs, as well as aspects of the sales pitches and proposals made by GateGuard to E&M. Doing so provided MVII a considerable advantage in soliciting E&M's business, at GateGuard's expense**.

231.    Attached hereto and incorporated herein as Exhibit P is a true and accurate copy of a public post from MVII's Facebook page, dated January 23, 2020, promoting the installation of an MVII intercom device for E&M. Also attached hereto and incorporated herein as Exhibit Q is a true and accurate copy of a public post from MVII's Facebook page, dated January 28, 2020, promoting the installation of another MVII intercom device for E&M. As noted, **MVII improperly used GateGuard's trade secrets in securing this order**.

232.    In addition, upon information and belief, **MVII has used and continues to use GateGuard's trade secrets in connection with its ongoing technical development and business activities, thereby causing further harm to GateGuard**.

TAC ¶¶ 222-232 (emphasis added).

MVII asserts that the TAC "does not contain one allegation of tortious or wrongful conduct by [MVII] directed toward a prospective customer." MVII Br. at 13. But, as demonstrated immediately above, MVII is *wrong*. The complaint includes several specific

examples of tortious conduct MVII directed towards specific prospective customers (*e.g.*,

Parkoff and E&M) within intention to harm GateGuard.[6]

Accordingly, GateGuard's complaint sufficiently states a claim for tortious interference

against MVII.

### D. Judge Abrams Did *Not* Dismiss the Unfair Competition Claim; Defendants Misleadingly Suggest Otherwise

Judge Abrams *denied* MVIS and Taub's prior motion to dismiss with respect to

GateGuard's unfair competition claim. *See* ECF No. 45 ("Defendants' motion is *denied* as to…

unfair competition (Count 10).") (emphasis added).

Defendants' misleadingly suggest that "[t]he Court dismissed GateGuard's… unfair

competition… claim[]."MVIS Br. at 12. But Judge Abrams' Order indicates otherwise. In any

event, any perceived deficiencies with respect to this claim are resolved on the same basis as the

business trade secret and tortious interference claims, as discussed above.

### III.    GateGuard's Correction of Patent Inventorship Claims (35 U.S.C. § 256) are Sufficiently Pled

The bulk of MVIS' and Taub's brief attempts to resurrect arguments for dismissal of

GateGuard's correction of patent inventorship claims under 35 U.S.C. § 256. Here, too, Judge

---

[6] Perhaps recognizing the TAC *does* identify specific conduct by MVII directed to specific customers, MVII suggests their conduct was not the "proximate cause" of these customers choosing MVIS or MVII over GateGuard. MVII Br. at 13-14. But as demonstrated above, the TAC details GateGuard's dealings with these specific customers (*e.g.*, ¶¶ 77-80), and further describes how MVII knowingly obtained and used GateGuard's trade secrets in securing business from the same customers (*e.g.*, ¶¶ 222-232). Because GateGuard's complaint plausibly pleads tortious interference against MVII, the issues defendants raise regarding "proximate cause" are factual questions which are premature at this juncture. "The choice between two plausible inferences… is not a choice to be made by the court on a Rule 12(b)(6) motion." Anderson News, 680 F.3d at 185.

Abrams denied defendants' prior motion with respect to these claims. ECF No. 45 ("Defendants' motion is denied as to… correction of inventorship under 35 U.S.C. § 256").

Because Rule 12(g)(2) precludes defendants from moving again to dismiss these claims, the Court need not reach the merits of their arguments. In any event, defendants' substantive arguments present no viable grounds for dismissal. Defendants' motions to dismiss GateGuard's 35 U.S.C. § 256 claims must therefore be denied.

### A. Complete Substitution of Inventors *Is* Possible Because the Complaint Describes Substantive Communications Between Teman and Taub

Defendants suggest that Teman cannot be substituted as the sole inventor of the Intercom Patents[7] because there is no suggestion that "Teman ever "collaborated" with Taub." MVIS Br. at 16. Here, too, defendants overlook relevant sections of GateGuard's complaint, which describe significant substantive communications between Teman and Taub regarding GateGuard's technology. *See, e.g.* TAC ¶¶ 95-99 (describing "discussions and communications" between Teman and Taub) and ¶¶ 102-116 (detailing technical trade secrets disclosed by Teman to Taub). These communications *are* sufficient to support GateGuard's claim for complete substitution of inventorship under 35 U.S.C. § 256.

Each of the authorities cited by defendants are not to the contrary. In *Rubin v. Gen. Hosp. Corp.*, Civil Action No. 09-10040-DJC, 2011 U.S. Dist. LEXIS 45859, at *6-7 (D. Mass. Apr. 28, 2011), there was "no suggestion in the record that the Plaintiffs [who sought to be substituted as sole inventors] conferred…or even consulted with the named inventors."

In *Rubin* – a case defendants rely heavily upon – the court granted summary judgement denying claims for substitution of inventorship because the plaintiffs "had not *even the most*

---

[7] U.S. Patent Nos. 10,158,831 and 10,560,664.

*minimal relationship or interaction* with the named inventors." *Id.* at *38-39 (emphasis added).[8]

The same cannot be said here. GateGuard's complaint describes its contractual relationship and direct, substantive communications with Taub (presently the only named inventor of the Intercom Patents), specifically regarding the subject matter of the patents.

The court in *Rubin* also cited to *Rawlplug Co., Inc. V. Hilti Aktiengesellschaft*, 777 F. Supp. 240, 242-43 (S.D.N.Y. 1991), another case defendants rely on. But Defendants overlook the fact that the *Rawplug* court denied plaintiff's claim for complete substitution because "plaintiff claimed to be the sole... inventor of a device later patented by another company *with whom plaintiff had no contact.*" *See Rubin* U.S. Dist. LEXIS 45859 at *38-39 (emphasis added). Here, defendants do not dispute that Taub was in contact with GateGuard regarding its technology.

Similarly, in *Red Carpet Studios v. Midwest Trading Grp., Inc.*, No. 1:12cv501, 2016 U.S. Dist. LEXIS 135755, at *11 (S.D. Ohio Sep. 30, 2016), the court denied a claim for complete substitution of inventorship when the "complaint does not speak to *any communication*" between the parties. *Id.* (emphasis added). This case – also cited by defendants – is inapposite. GateGuard's complaint describes significant communications between it and Taub. *See, e.g.* TAC ¶¶ 95-99 (describing "discussions and communications" between Teman and Taub) and ¶¶ 102-116 (detailing technical trade secrets disclosed by Teman to Taub).

Defendants' own authorities demonstrate that the communications between GateGuard and Taub *are* sufficient to support a claim for complete substitution of inventorship. In defendants' cases, courts only dismissed claims for complete substitution of inventorship when

---

[8] *See also Dana-Farber Cancer Inst., Inc. v. Ono Pharm. Co.*, 379 F. Supp. 3d 53, 87 (D. Mass. 2019) (distinguishing *Rubin* because "In *Rubin*, the putative joint inventors and named inventors *never had any direct communication*.") (emphasis added).

there was *no contact* between the plaintiff (seeking correction) and the named inventors. These cases are inapplicable to the facts here, where Taub undisputedly communicated with GateGuard regarding the technology at issue. *See, e.g.* TAC ¶¶ 95-99, 102-116.

Though defendants may dispute the substance of these communications, such factual challenges are premature and, at this juncture, must be resolved in GateGuard's favor. *Tsirelman*, 794 F.3d at 313. The communications between Teman and Taub as described in the complaint *are* sufficient to support a claim for complete substitution of inventors, as Judge Abrams previously concluded. ECF No. 45.

### B. The Complaint Sufficiently Pleads That Teman is An Inventor of Every Claim

Defendants assert that "GateGuard does not specifically allege that Teman invented any of the subject matter of any of [the] specific Claims[]" in the patents at issue. MVIS Br. at 18. Defendants are *wrong*:

> 129. The subject matter encompassed by the… **claims** of the [patent] is substantially identical to GateGuard's video intercom device, applications, management platforms, and other proprietary technologies, as developed beginning in 2014 and as confidentially disclosed to Taub in 2016.

> 130. …**Every claim** of the '831 Patent encompasses proprietary technology developed by GateGuard and disclosed confidentially to Taub.

> 131. For example, **claim 1 of the '831 patent – the sole independent claim – encompasses features including** "a housing comprising an interior… configured to hold electronic circuits associated with operational algorithms for functionalities involving a multi-apartment building (MAB)," "attachment hardware for mounting the housing…," "a display mounted at the front face of the housing…," "a camera system …," "door closing and opening hardware…," "a CPU… to… validat[e] the tenants… unlock[] the entrance door… prepar[e] reports… and visually identify[] the tenants…," "…including a facility for communicating with a mobile communication device…." **Each of these features were developed by GateGuard and disclosed confidentially to Taub** prior to the filing date of the '831 Patent, as described herein. **The same applies to each of the dependent claims in the '831 Patent**.

TAC ¶¶ 129-131 (emphasis added). Similarly:

137. …**Every claim** of the '664 Patent encompasses proprietary technology developed by GateGuard and disclosed confidentially to Taub.

138. For example, **claim 1 of the '664 patent – the sole independent claim – encompasses features including** "a housing comprising an interior… configured to hold electronic circuits associated with operational algorithms for functionalities involving a building," "attachment hardware for mounting the housing…," "a display mounted at the front face of the housing…," "a camera system …," "door closing and opening hardware…," "a CPU… to… validat[e] the tenants… unlock[] the entrance door… prepar[e] reports… and visually identify[] the tenants…," "…including a facility for communicating with a mobile communication device…." **Each of these features were developed by GateGuard and disclosed confidentially to Taub** prior to the effective filing date of the '664 Patent, as described herein. **The same applies to each of the dependent claims in the '664 Patent**.

TAC ¶¶ 137-138 (emphasis added).

Defendants conspicuously ignore these sections, and instead reference other parts of GateGuard's complaint. MVIS Br. at 18-19. This is a red herring. That GateGuard's complaint *also* highlights other sections of the patents does not mean the complaint does not address the claims (it *does*).

In addition to the passages cited immediately above, several other sections of the complaint address Teman's inventorship of each claim of the patents. *See, e.g.*, TAC ¶ 266 ("Teman confidentially disclosed to Taub the embodiments of each of claims 1-19 of the '831 Patent… [and] each of claims 1-19 of the '664 Patent") and ¶ 269 ("[E]ach and every limitation of claims 1-19 of the '831 Patent had been conceived of and reduced to practice by Teman…Teman had also confidentially demonstrated his reduction to practice of the claimed inventions... Similarly, each and every limitation of claims 1-19 of the '664 Patent had been conceived of and reduced to practice by Teman and confidentially disclosed to Taub.").

And the complaint's description of Teman's conception and reduction to practice of the features claimed in the Intercom Patents further bears this out. *See, e.g.*, TAC ¶¶ 35-42 (Teman

27

designed and engineered a unique intercom device that incorporated innovative features not found in previously available devices" and further detailing numerous features), ¶ 45 (describing further refinements), ¶¶ 103-112 (describing proprietary technologies disclosed to Taub). These sections – which correspond to the claims of the Intercom Patents – further demonstrate that GateGuard *has* plausibly pled that Teman invented the subject matter of each of the patents' claims.

Accordingly, the complaint is sufficient to support GateGuard's claim for complete substitution of inventors, as Judge Abrams previously concluded.

### C. The Complaint Sufficiently "Corroborates" Teman's Inventorship; Defendants Invoke This Issue Prematurely

Defendants misleadingly cite multiple cases that are procedurally inapplicable to this motion to dismiss. *See, e.g.*, *Hess v. Advanced Cardiovascular Sys.*, 106 F.3d 976, 979 (Fed. Cir. 1997) ("*After a bench trial*, the district court held that the evidence did not establish [plaintiff's] claim of co-inventorship...") (emphasis added). In *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1461 (Fed. Cir. 1998), the court *granted* plaintiff's correction of inventorship claim "after a lengthy evidentiary hearing." And in *Gentian v. Tristar Prods.*, 434 F. Supp. 3d 203, 206 (D.N.J. 2020), the court *granted* a correction of inventorship claim after holding "a multi-day hearing taking testimony and admitting certain documents and exhibits into evidence."

Corroboration is inherently an evidentiary question. Defendants' invocation of this issue is therefore premature. The only relevant question at this juncture is whether GateGuard has plausibly *pled* corroboration of its inventorship claim. It has.

For example, the TAC's Exhibit C (ECF No. 104-3) – an article dated *prior to* Taub's communications with Teman – describes and depicts GateGuard's technology, "demonstrat[ing] that Teman and GateGuard had developed the technology disclosed and claimed in the Intercom

Patents well before Taub and MVI filed it." TAC ¶ 149. Notably, the article names at least two people who were considering or planning to install GateGuard, and includes quotes from these individuals regarding *specific technical features* of GateGuard (including facial recognition and remote monitoring). *See* TAC, Ex. C at 3.[9]

Faced with this evidence, defendants dismiss the article as "click-bait." MVIS Br. at 24. But defendants' opinion of the journalistic quality of the article is irrelevant. The only question is whether GateGuard has plausibly *pled* corroboration. It has. Defendants may challenge the sufficiency of this evidence at a later stage, but not at this juncture. "The choice between two plausible inferences… is not a choice to be made by the court on a Rule 12(b)(6) motion." *Anderson News,* 680 F.3d at 185.

*Gentian*, 434 F. Supp. 3d at 220 – another case cited by defendants – further supports this conclusion. There, the court noted that "only the inventor's testimony must be corroborated... In contrast, *physical exhibits do not require corroboration*." (quoting *Price v. Symsek*, 988 F.2d 1187, 1196 (Fed. Cir. 1993) (emphasis added).

GateGuard's complaint contains substantial documentary evidence further corroborating Teman's inventorship of the subject matter of the Intercom Patents. For example, the TAC's Exhibit D (ECF No. 104-4) – GateGuard's website as of October 2016 – documents numerous technical features GateGuard developed *before* Taub's communications with Teman. This, too, demonstrates that GateGuard's complaint plausibly pleads corroboration. Defendants cannot ignore this evidence simply because the website belongs to GateGuard. *See* MVIS Br. at 22.

---

[9] This squarely rebuts defendants' assertion that "GateGuard… fails to reference a single person with whom Teman may have shared any of his alleged inventions…." MVIS Br. at 22. Defendants later reference the quotes from these individuals, but misleadingly omit the fact that both individuals described *specific technical features* (facial recognition and remote monitoring) that corroborate Teman's inventorship. *See* MVIS Br. at 24.

Though they may challenge the sufficiency of this evidence at a later stage, at this juncture, such challenges are premature.[10]

And materials originating from defendants themselves further corroborate GateGuard's inventorship claim. The TAC's Exhibit E (ECF No. 104-5) is an excerpt from a presentation Taub created for MVIS on or around March 2017 – *after* Taub's communications with Teman but *before* he first filed the patent application (in June 2017). In this presentation, Taub and MVIS identify GateGuard (Teman) *as their #1 competitor*. This, too, corroborates GateGuard's inventorship claim.

Defendants cite only one case regarding corroboration from a comparable procedural posture – *i.e.,* on a motion to dismiss. And that case is wholly inapposite. In *Opternative, Inc. v. JAND, Inc.*, 2018 U.S. Dist. LEXIS 132827, at *30 (S.D.N.Y. Aug. 7, 2018), plaintiffs only made "conclusory and vague statements" and included no "specific allegations" they conceived of the patented invention. Here, GateGuard's complaint details how Teman conceived of specific technical features and further reduced the subject matter of the Intercom Patents to practice.[11] And, as noted above, the complaint identifies multiple third parties (including specific GateGuard customers, journalists, *Taub himself*, and others) who were contemporaneously aware of and can corroborate these claims. Finally, the complaint incorporates documentation from multiple third-party sources (including defendants themselves) that further corroborates

---

[10] *See also* TAC Ex. G (ECF No. 104-7) (annotated screenshot from Google Maps' "Street View" dated on or about November 2017, showing a GateGuard intercom installation).

[11] *See, e.g.*, TAC ¶¶ 35-42 ("Teman designed and engineered a unique intercom device that incorporated innovative features not found in previously available devices" and further detailing numerous features), ¶ 45 (describing further refinements), ¶¶ 103-112 (describing proprietary technologies disclosed to Taub).

GateGuard's claims. As such, this case bears no resemblance to *Operative*'s lack of "specific allegations."

Moreover, as the authorities defendants rely on demonstrate, this issue is premature. The question of whether GateGuard has sufficient evidence to corroborate its inventorship claims is a question for summary judgement or trial – *not* dismissal.

### D.  GateGuard Has *Always* Maintained Teman is the Sole Inventor or, Alternatively, a Joint Inventor

In the complaint initiating this case, GateGuard asserted that Teman should be named the sole inventor of the patents at issue, or, *alternatively*, added as a joint inventor: "*In the alternative*, Teman contributed to the conception of *at least one of* the inventions claimed in the '831 Patent." ECF No. 1 ¶ 168 (emphasis added).

Defendants suggest this is a "new legal theory." MVIS Br. at 25. But, as demonstrated above, nothing here is "new." From the beginning of this case GateGuard has maintained that Teman should be the sole inventor or, *alternatively*, a joint inventor of the patents.

Moreover, pleading correction of inventorship claims in this manner – namely, that an unnamed inventor should be substituted or, *alternatively*, added as a joint inventor – is a common practice. And defendants' own authorities bear this out. *See, e.g., Ferring B.V. v. Allergan, Inc.*, 166 F. Supp. 3d 415, 418 (S.D.N.Y. 2016) ("Allergan… [sought] to correct the inventorship of the… patents to substitute Dr. Fein as the sole inventor, or *in the alternative*, to add Dr. Fein as a joint inventor.")(emphasis added).

Accordingly, there is no deficiency or contradiction in GateGuard pleading Teman is the sole inventor or, *alternatively*, a joint inventor of the Intercom Patents.

### E.  The Communications Between Teman and Taub Are Sufficient "Collaboration" for Joint Inventorship

"Joint inventorship… can only arise when collaboration or concerted effort occurs--that is, when the inventors have some open line of communication during or in temporal proximity to their inventive efforts[.]…[T]here must be some element of joint behavior, such as… one inventor seeing a relevant report and building upon it or hearing another's suggestion…" *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1359 (Fed. Cir. 2004) (quoting *Kimberly-Clark Corp. v. P&G Distrib.*, 973 F.2d 911, 917 (Fed. Cir. 1992)).

"People may be joint inventors even though they do not physically work on the invention together or at the same time, and even though each does not make the same type or amount of contribution." *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1227 (Fed. Cir. 1994). (citing to 35 U.S.C. § 116).

As noted above, the communications between Taub and Teman plausibly demonstrate collaboration sufficient to support GateGuard's claim to add Teman as a joint inventor. *See, e.g.* TAC ¶¶ 95-99 (describing "discussions and communications" between Teman and Taub), ¶¶ 102-116 (detailing technical trade secrets disclosed by Teman to Taub). These communications are more than sufficient to support GateGuard's claim seeking to add Teman as a joint inventor of the Intercom Patents.

Another case cited by defendants reinforces this conclusion. In *Gentian* 434 F. Supp. 3d 203, the court granted a correction of inventorship claim (adding a joint inventor) where "The bulk of the evidence relevant to determining inventorship [came] from *a single… meeting*…" *Id.* at 208 (emphasis added). The same holds here. The undisputed communications between Teman and Taub are sufficient to support GateGuard's claim for joint inventorship of the patents.[12]

---

[12] MVIS and Taub also argue they are not "proper parties" to the patent claims because – after fraudulently conveying the patents to MVII – they lack "concrete financial interest" in the patents. MVIS Br. at 28. This argument is unavailing. GateGuard's complaint demonstrates that

## IV.    Judge Abrams Already Found GateGuard's Technical Trade Secrets Claims Sufficiently Pled; These Claims Are Not – and Cannot Be – "Preempted"

Judge Abrams denied MVIS and Taub's prior motion to dismiss with respect to GateGuard's federal and state law claims for misappropriation of technical trade secrets. ECF No. 45 ("Defendants' motion is denied as to… misappropriation of… technical trade secrets under federal and state law…"). Because Rule 12(g)(2) precludes these defendants from moving again to dismiss these claims, the Court need not reach the merits of their arguments. In any event, the "preemption" argument Defendants advance was rejected by the Supreme Court almost fifty years ago in *Kewanee v. Bicron* (holding patent law does *not* preempt trade secret law).

### A.  Defendants' Authority Does Not Support Their Conclusion

Based on a single case – *Speedfit LLC v. Woodway USA, Inc.*, 226 F. Supp. 3d 149 (E.D.N.Y. 2016) – defendants suggest that GateGuard's technical trade secret claims are "preempted." MVIS Br. at 28-29.[13] Defendants, however, misread this case and, in doing so, arrive at an untenable and erroneous conclusion.

---

Taub and MVIS' assignment of the patents to MVII was fraudulent and seeks to have it set aside. *See, e.g.*, TAC ¶ 277 ("Taub and MVI have fraudulently conveyed the Intercom Patents… Accordingly… GateGuard asks this court to set aside the Patent Assignment."). Defendants' claim that MVIS and Taub have "no concrete financial interest" in the patents is thus premature. GateGuard has, at minimum, plausibly pled MVIS and Taub *do* have such an interest and *are* proper parties to this claim (because the purported assignment to MVII was fraudulent and must be set aside). This is a question of fact, which, at this juncture, must be resolved in GateGuard's favor. *Tsirelman*, 794 F.3d at 313.

[13] GateGuard brings two separate claims for trade secret misappropriation: one under federal law (18 U.S.C. § 1836 *et seq.* - the Defend Trade Secrets Act ("DTSA")) (TAC ¶¶ 233-248), the other under New York state law (TAC ¶¶ 249-262). Though Defendants' apparently direct their preemption argument to both federal and state claims – *see* MVIS Mot. at 28-29 – it is incongruous to suggest that one federal law (patent law) can preempt another (the DTSA). As such, GateGuard construes defendants' preemption arguments as directed only to GateGuard's state law trade secret misappropriation claim. Notably, the DTSA explicitly coexists with and does *not* preempt state trade secret misappropriation laws. *See* 18 U.S.C. § 1838.

The *Speedfit* plaintiffs brought claims for "correction of inventorship, [and] conversion." *Speedfit* 226 F. Supp. 3d at 152-153. The defendants moved to dismiss both claims. *Id.* The court denied dismissal of the correction of inventorship claim and dismissed the conversion claim which accused defendants of "refusing to name [plaintiffs] as either inventors or joint inventors [...] of the [patents]." *Id.* at 159-160.

Defendants overlook the fact that Judge Abrams reached *the same result* in her ruling. GateGuard's prior complaint brought claims for correction of inventorship and conversion. *See* ECF No. 20 ¶¶ 177-189, 205-210. And like the *Speedfit* court, Judge Abrams denied defendants' motion to dismiss GateGuard's correction of inventorship claim, while dismissing the conversion claim. *See* ECF No. 45 ("Defendants' motion is granted as to… conversion… [and] denied as to… correction of inventorship under 35 U.S.C. § 256[.]"

### B.  GateGuard's Correction of Inventorship Claim Does Not "Preempt" Its Trade Secret Misappropriation Claim

As noted, *Speedfit* dismissed a conversion claim premised on defendant's refusal "to name [plaintiffs] as either inventors or joint inventors [...] of the [patents]." *Id.* at 159-160. Based on *Speedfit*, defendants extrapolate that GateGuard's trade secret misappropriation claims should be "preempted," simply because this case also involves questions of patent inventorship.

Despite patent inventorship and trade secret misappropriation claims being frequently brought together (as evidenced in this lawsuit and several authorities cited by defendants), defendants cannot cite a single case supporting their assertion that patent law "preempts" trade secret misappropriation claims. For good reason:

**"[P]atent law does not pre-empt trade secret law."** *Kewanee v. Bicron*, 416 U.S. 470, 492, 94 S. Ct. 1879, 1891 (1974) (emphasis added). Noting that "[t]rade secret law and patent

law have co-existed in this country for over one hundred years[,]" the Supreme Court concluded

that a state's "trade secret law is not preempted by the federal patent law." *Id.* at 493.

"State trade secret laws and the federal patent laws have co-existed for many, many,

years. During this time, Congress has repeatedly demonstrated its full awareness of… the trade

secret system, without any indication of disapproval." *Bonito Boats v. Thunder Craft Boats*, 489

U.S. 141, 166, 109 S. Ct. 971, 985 (1989) (citing to *Kewanee*). "The case for federal pre-emption

is particularly weak where Congress has indicated its awareness of the operation of state law in a

field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate

whatever tension there [is] between them." *Id.* (quotations omitted).

Other district courts cite *Kewanee* in rejecting the preemption arguments defendants

advance. *See, e.g., Utex Indus. v. Wiegand,* No. H-18-1254, 2020 U.S. Dist. LEXIS 29791, at

*29-30 (S.D. Tex. Feb. 21, 2020) ("Nor does federal patent law preempt state law claims based

on…trade secrets… [Plaintiff's] state law claims for… misappropriation of trade secrets… are

not preempted by federal patent law.") (citing *Kewanee*).

Courts in this District also reject defendants' preemption arguments. *See, e.g., Spectrum

Dynamics Med., Ltd. v. GE*, No. 18-cv-11386 (VSB), 2020 U.S. Dist. LEXIS 102660, at *30-31

(S.D.N.Y. June 1, 2020) (holding "misappropriation of trade secrets claims are not preempted by

federal patent law[]" because "Plaintiff s allegations that it owned and possessed certain trade

secrets… stand separate and apart from allegations purport[ing] to define rights based on

inventorship.") (citations omitted).[14]

---

[14] Notably, the court in *Spectrum Dynamics* analyzed many of defendants' authorities at length – including *Speedfit* and *HIF Bio, Inc. v. Yung Shin Pharm. Indus. Co.*, 600 F.3d 1347 (Fed. Cir. 2010) –in reaching this conclusion. *Id.* at *26-31. The court found that the plaintiff's <u>conversion</u> claim *was* preempted by patent law, while its <u>trade secret misappropriation</u> claim was *not*. *Id.* ("Although I agree with Defendants that preemption is warranted with respect to Plaintiffs

Because "patent law does not pre-empt trade secret law," defendants' arguments for dismissal of GateGuard's technical trade secrets must be denied. *Kewanee,* 416 U.S. at 492.[15]

## V.    All of GateGuard's Claims Against MVII Are Sufficiently Pled

GateGuard's complaint describes how, after this case commenced, Tab and MVIS formed a new entity (MVII) and fraudulently conveyed MVIS' assets to it in an effort to frustrate GateGuard's claims in this case. TAC ¶¶ 181-221. And after knowingly obtaining GateGuard's trade secrets from MVIS and Taub, MVII used these trade secrets in connection with its ongoing technical and business activities. *Id.* ¶¶ 222-232.

### A.  The Trade Secret Misappropriation Claims are Sufficiently Pled Against MVII Because MVII Knowingly Obtained GateGuard's Trade Secrets From Taub and MVIS and Used The Trade Secrets

The DTSA defines trade secret misappropriation as the:

(A) **acquisition** of a trade secret of another **by a person who knows or has reason to know that the trade secret was acquired by improper means**; or
(B) disclosure or **use** of a trade secret of another without express or implied consent by a person who -
  (i) **used improper means to acquire knowledge of the trade secret**;
  (ii) **at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was —**
    (I) **derived from or through a person who had used improper means to acquire the trade secret**;
    (II) **acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret**; or

---

conversion… claim[], I find that Plaintiffs other state law claims are not preempted."). As noted above, Judge Abrams reached the same conclusion here (dismissing GateGuard's conversion claim and denying dismissal of its trade secret misappropriation claims). ECF No. 45.

[15] Defendants also cite in passing to *HIF Bio*, 600 F.3d at 1352, but that case is also unavailing. In *HIF Bio*, the Federal Circuit found that a claim for "declaratory judgment…of inventorship under state common law" was the "functional equivalent[]" of a correction of inventorship action under 35 U.S.C. § 256 (and thus preempted by federal law). *Id.* This case is inapplicable to GateGuard's trade secret misappropriation claims which, under *Kewanee* are not preempted by patent law.

> (III) **derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret**; or
>
> (iii) before a material change of the position of the person, knew or had reason to know that —
>
> > (I) the trade secret was a trade secret; and
> >
> > (II) knowledge of the trade secret had been acquired by accident or mistake.

18 U.S.C. § 1839(5) (emphasis added).

GateGuard's trade secret misappropriation claims against MVII meet this statutory definition for several reasons.

*First*, the complaint describes that MVII *acquired* GateGuard's trade secrets with knowledge the trade secrets had been obtained (by Taub) via improper means. 18 U.S.C. § 1839(5)(A). *See* TAC ¶¶ 196-197 (acquisition of assets including trade secrets), ¶¶ 198-200 (knowledge the trade secrets were improperly obtained, in connection with GateGuard's claims against MVIS and Taub in this lawsuit).

*Second*, the complaint describes that MVII *used* GateGuard's trade secrets and used improper means to acquire knowledge of the trade secrets. 18 U.S.C. § 1839(5)(B)(i). *See* TAC ¶¶ 198-200, 222-232 (use of GateGuard's trade secrets to benefit MVII's technical and business activities, using 'improper means' – including the described fraudulent conveyance whereby MVII induced Taub to breach his duty to maintain the secrecy of the trade secrets[16]).

*Third*, the complaint describes that MVII *used* GateGuard's trade secrets while knowing the trade secrets were obtained from Taub (who used improper means to acquire them). 18 U.S.C. § 1839(5)(B)(ii)(I). *See* TAC ¶¶ 198-200, 222-232 (use of GateGuard's trade secrets to benefit MVII's technical and business activities, with knowledge the trade secrets were

---

[16] *See* 18 U.S.C. § 1839(6) ("the term "improper means"… includes… misrepresentation… or inducement of a breach of a duty to maintain secrecy…").

improperly obtained, in connection with GateGuard's claims against MVIS and Taub in this lawsuit).

*Fourth*, the complaint describes that MVII *used* GateGuard's trade secrets while knowing the trade secrets were acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets or limit their use. 18 U.S.C. § 1839(5)(B)(ii)(II). *See* TAC ¶¶ 81-88, 91-92, 100-101, 117-118, 198-200, 222-232 (use of GateGuard's trade secrets to benefit MVII's technical and business activities, with knowledge the trade secrets were acquired from Taub under circumstances giving rise to a duty to maintain the secrecy of the trade secrets or limit their use, in connection with GateGuard's claims against MVIS and Taub in this lawsuit).

*Fifth*, the complaint describes that MVII *used* GateGuard's trade secrets while knowing the trade secrets were derived through Taub, who owed a duty to GateGuard to maintain the secrecy of the trade secrets or limit their use. 18 U.S.C. § 1839(5)(B)(ii)(III). *See* TAC ¶¶ 81-88, 91-92, 100-101, 117-118, 198-200, 222-232 (use of GateGuard's trade secrets to benefit MVII's technical and business activities, with knowledge the trade secrets were acquired from Taub who owed a duty to GateGuard to maintain the secrecy of the trade secrets or limit their use, in connection with GateGuard's claims against MVIS and Taub in this lawsuit).

### B. The Complaint's Detailed Description of MVII's Acquisition and Use of GateGuard's Trade Secrets is Not "Conclusory"

Faced with the complaint's description of MVII's knowing acquisition and use of GateGuard's trade secrets, MVII dismisses these claims as "conclusory." MVII Br. at 9. But, as detailed above, the complaint describes specific conduct that satisfies multiple prongs of the DTSA. *See, e.g.,* TAC ¶¶ 222-232 (detailing specific uses of GateGuard's trade secrets by MVII). And though MVII offers its own "side of the story" (suggesting, despite knowledge of the claims against Taub and MVIS in this lawsuit, it may not have known of "wrongdoing" – see

MVII Br. at 9-10), such arguments are premature. "The choice between two plausible inferences… is not a choice to be made by the court on a Rule 12(b)(6) motion." *Anderson News,* 680 F.3d at 185.

Accordingly, the complaint's claims of federal and state trade secret misappropriation (Counts I and II) and unfair competition (Count VI) are sufficiently pled. MVII's motion must therefore be denied with respect to these claims.

## VI.    The Fraudulent Conveyance Claims Are Sufficiently Pled

After this case began, MVIS and Taub were sued by another competing intercom company for infringing various intellectual property rights and unfair competition.[17] Facing claims of no less than $1,000,000 in that suit, and no less than $25,000,000 in this case, Taub and MVIS formed MVII and transferred MVIS' assets to it (including the patents at issue this case). This scheme was designed to prevent GateGuard from litigating its claims or collecting judgements related to this case.

Notably, Taub himself described this transaction as the "liquidat[ion]" of MVIS, after which there would be "nothing left" in the company.

### A.  The Complaint Describes Defendants' Scheme With Particularity; Taub's Own Words Evince Clear Intend to Defraud

All the above facts are pled with particularity in the TAC and are a "textbook" example of fraudulent conveyance. *See, e.g.*, ¶¶ 190-194, 200 (formation of MVII and liquidation of MVIS to prevent GateGuard from litigating its claims or collecting judgements), ¶ 219 (liquidation of MVIS designed to avoid liability by MVIS and MVII for GateGuard's claim of no

---

[17] *Runs Like Butter Inc. v. MVI Systems LLC and Samuel Taub*, No. 1:19-cv-02432 (E.D.N.Y. Apr. 25, 2019).

less than $25,000,000 in damages).[18]

These claims are not "conclusive" or "speculative." But any such doubts are resolved by *Taub's own words*, which are included as an exhibit in GateGuard's complaint. *See* TAC, Ex. M (ECF No. 104-13) (Taub: "We are liquidating [MVIS]… there will be nothing left."). This evinces actual intent to defraud. As promised, Taub liquidated MVIS and fraudulently conveyed its assets to MVII. As their respective briefs reflect, defendants' now seek to leverage this sham "transaction" to prevent GateGuard from pursuing its claims in this case.[19]

Because GateGuard's fraudulent conveyance claims are sufficiently pled, defendants' motions to dismiss these claims must be denied.

### B. The Complaint Also Sufficiently Pleads Alter Ego or Successor Liability

MVII argues that GateGuard's complaint does not sufficiently plead alter ego or successor liability. Notably, this information is uniquely in the possession of defendants. At this juncture, GateGuard has sufficiently pled alter ego and successor liability in view of the facts described in the complaint and outlined above with respect to the fraudulent conveyance

---

[18] Defendants misleadingly assert that "GateGuard never puts a value on its claims" and argue this is a deficiency in the fraudulent conveyance claims. MVIS Br. at 33. Defendants are simply wrong, as the TAC provides such a value in several places. *See, e.g.*, TAC ¶¶ 219, 311, 320 (noting MVIS and MVII effected the fraudulent conveyance "knowing that the conveyance was made to…avoid debts to potential creditors, including GateGuard (which, through this lawsuit, sought *no less than $25,000,000 in damages*…)") (emphasis added).

[19] Defendants also repeatedly raise the fact that GateGuard previously pled certain facts "on information and belief" and (inexplicably) suggest pleading in such a manner renders GateGuard's claims "inherently incredible and… implausible." MVII Br. at 18. Defendants cite no authority supporting this (untenable) proposition. As noted in the 'Standard of Review' section (above), the *Twombly* plausibility standard "does not prevent a plaintiff from pleading facts alleged 'upon information and belief.'"

Notably, defendants already raised this argument with Judge Freeman who found it without merit. *See* ECF No. 131 at 17-18:

> MR. STEIN: …[T]hose claims that are based on fraud went… from being alleged entirely on information and belief to being alleged outright…
>
> THE COURT: Why would that be a futile amendment?... [T]hat's a discovery issue.

orchestrated by Taub, MVIS, and MVII. In view of the facts pled, the complaint plausibly described grounds for alter ego and successor liability (under the "mere continuation" and "de facto merger" exceptions). MVII's motion should therefore be denied on these issues as well.

VII.    **Defendants' Motions to Compel Arbitration Must Be Denied Because GateGuard's "Dispute Resolution" Terms Explicitly Exclude This Case From Arbitration**

Though Plaintiff's "Governing Law and Dispute Resolution" terms include an arbitration clause, this clause's "carve-out" provision *excludes* actions involving injunctive relief to prevent violations of trade secret and patent rights – issues at the heart of this case. This carve-out provision demonstrates the parties to the agreement – GateGuard and Taub – did *not* "clearly and unmistakably" intend to arbitrate this dispute.

For the same reason, the parties also did *not* intend to delegate questions of arbitrability to an arbitrator. "Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT&T Techs. v. Communs. Workers of Am.*, 475 U.S. 643, 649 (1986).

Because the arbitration clause's carve-out provision excludes this dispute, defendants' motions to compel arbitration must be denied.

A.    **Actions Involving Injunctive Relief to Prevent Violations of Trade Secret and Patent Rights Are Explicitly "Carved Out"**

The arbitration clause at issue provides in pertinent part:

> Jurisdiction - You and we agree to submit to the personal jurisdiction of a state court located in Delaware, USA or a United States District Court located in Delaware **for any actions for which the parties retain the right to seek injunctive or other equitable relief in a court of competent jurisdiction to prevent the actual or threatened infringement, misappropriation or violation of a party's copyrights, trademarks, trade secrets, patents, or other Intellectual Property rights**. You agree that in the event we have prior agreements, which may or may not specify

41

a different jurisdiction, the terms of this agreement override those agreements and terms.

Arbitration - Notwithstanding anything to the contrary contained herein, you and GateGuard agree that any dispute, claim or controversy arising out of or relating to the Terms or the breach, termination, enforcement, interpretation or validity thereof, or to the use of the Site will be settled by binding arbitration, **except that GateGuard alone retains the right to seek injunctive or other equitable relief in a court of competent jurisdiction to prevent the actual or threatened infringement, misappropriation or violation of a its copyrights, trademarks, trade secrets, patents, or other Intellectual Property rights. GateGuard may refuse arbitration at any point and demand a trial**... **If this specific paragraph is held unenforceable, then the entirety of this "Dispute Resolution" section will be deemed void**. Except as provided in the preceding sentence, this "Dispute Resolution" section will survive any termination of the Terms.

*See* ECF No. 121, Exhibit A (GateGuard "Governing Law and Dispute Resolution" terms) at

GG000024 (emphasis added).[20]

The plain language of these clauses directs that:

1. The parties agree that "any actions for which the parties retain the right to seek

   injunctive or other equitable relief… to prevent the actual or threatened

   infringement, misappropriation or violation of a party's…trade secrets, patents, or

   other Intellectual Property rights" are to be brought *in a District Court*.

2. Disputes arising out of or relating to the Terms will be settled by binding

   arbitration, ***except that*** GateGuard retains the right to seek injunctive or equitable

   relief in a court "to prevent the actual or threatened infringement,

---

[20] As Defendants note, GateGuard's dispute resolution terms also reference the American Arbitration Association ("AAA") Rules. MVIS Br. at 4. However, Defendants overlook that GateGuard subjected any such incorporation to the following exception: "except as modified by this "Dispute Resolution" section." *See* ECF No. 121, Exhibit A (GateGuard "Dispute Resolution" terms) at GG000024. As explained below, this exception further undermines Defendants' assertion that all claims in this case are to be arbitrated.

misappropriation or violation of a its… trade secrets, patents, or other Intellectual

Property rights."

3. GateGuard may refuse arbitration at any point and demand a trial.

Here, GateGuard undisputedly seeks to "prevent the actual or threatened infringement,

misappropriation or violation of [its]…trade secrets, patents, or other Intellectual Property

rights." *See, e.g.*, GateGuard's Complaint (ECF No. 104) ("TAC") ¶¶ 233-262 (trade secret

misappropriation claims), ¶¶ 263-277 (patent correction of inventorship claims), ¶ 288 (tortious

interference claims involving use of trade secrets), and ¶¶ 299-300 (unfair competition claims

involving use of trade secrets).

GateGuard also seeks "injunctive or other equitable relief." *See, e.g.,* TAC ¶¶ 248, 262

(seeking injunctive relief for trade secret misappropriation), ¶ 304 (injunctive relief for tortious

interference), ¶¶ 313, 322 (equitable relief for fraudulent conveyance claims).

Because this case concerns the misappropriation and violation of GateGuard's trade

secret and patent rights, and because GateGuard seeks injunctive relief, the arbitration clause's

"carve-out" provision demonstrates the parties intended to *exclude* the subject matter of this case

from arbitration. This is underscored by the "Jurisdiction" paragraph immediately preceding the

arbitration clause, which specifies that actions involving injunctive relief to prevent infringement

or misappropriation of trade secret or patent rights are to be brought in a *District Court*.

**B. Defendants' Suggestion That "The Entirety of This Case" Must Be Arbitrated is Baseless**

Defendants' motion rests on the premise that that "the entirety of this case must be sent to

[arbitration]." MVIS Br. at 4. This premise is *false*.

As discussed above, this case includes claims for trade secret misappropriation,

correction of patent inventorship, tortious interference, and unfair competition against all

defendants. It also includes claims for fraudulent conveyance against two corporate defendants (MVIS and MVII), neither of whom are a party to GateGuards's terms or the arbitration clause. And it includes a breach of contract claim solely against Taub. *See* TAC ¶¶ 233-322.

At best, the arbitration clause at issue concerns a *single* claim in this case (breach of contract) against a single defendant (Taub).[21] MVIS and MVII were never parties to the agreement at issue.[22]

Contrary to the position taken in their briefs, Defendants previously conceded that all the claims in this case are *not* arbitrable: In response to questioning by Judge Freeman during a conference, regarding whether "all of the claims in the case would belong in arbitration," Defendants' counsel conceded that "It's probably true that the patent claims wouldn't [belong in arbitration]" (while expressing uncertainty regarding the fraudulent conveyance claims). ECF No. 131 at 36-37.

As to the patent claims, Defendants' position (as expressed during the referenced conference) is correct. Irrespective of the terms of any agreement between GateGuard and Taub, GateGuard seeks to correct the inventorship of two U.S. Patents under 35 U.S.C. § 256. The terms the agreement between GateGuard and Taub change nothing with respect to these claims – as Defendants concede.

The same holds with respect GateGuard's fraudulent conveyance claims. These claims

---

[21] Notably, with respect to the breach of contract claim, Taub maintains he "did not assent… to be bound by [GateGuard's] "Terms of Service." MVIS Br. at 7. He also argues at length that he was not on inquiry notice of the terms. *Id.* at 9-11. If so, it is unclear how Taub can move to compel arbitration, as the arbitration clause at issue is part of the referenced "Terms of Service." At minimum, Taub's position regarding GateGuard's breach of contract claim cannot be reconciled with his assertion that he "clearly and unmistakably" intended to arbitrate this dispute.
[22] MVII admits it did not exist until years after the agreement between GateGuard and Taub was executed. *See, e.g.*, MVII Br. at 9 ("[MVII] did not even exist in 2016") and ECF No. 118-5 (Certificate of Formation of MVII).

concern conduct between MVIS and MVII – *neither* a party to the agreement at issue – that occurred years after the agreement between GateGuard and Taub was executed.

As such, Defendants' assertion that "the entirety of this case must be [arbitrated]" is baseless. On the contrary – other than the breach of contract claim against Taub, the other claims in this case have no connection whatsoever to arbitration – as Defendants themselves concede.[23]

### C. Defendants Misread *Henry Schein* and Mistakenly Conclude That The Arbitrability of This Case "Must Be" Resolved By The Arbitrator

Defendants further suggest that "arbitrability of the claims in this case… must be resolved by the [arbitrator], not this Court[.]" MVIS Br. at 4-5. They cite to *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524 (2019), but – critically – ignore the case's subsequent history: In *Henry Schein* the Supreme Court remanded the case to the Fifth Circuit to "address the question whether the contract at issue in fact delegated the arbitrability question to an arbitrator[.]" *Id.* at 527.

The arbitration clause at issue in *Henry Schein* is illustrative:

> Disputes. This Agreement shall be governed by the laws of the State of North Carolina. Any dispute arising under or related to this Agreement (**except for actions seeking injunctive relief and disputes related to trademarks, trade secrets, or other intellectual property of [Schein]**), shall be resolved by binding arbitration in accordance with the arbitration rules of the American Arbitration Association [(AAA)]. The place of arbitration shall be in Charlotte, North Carolina.

*Id.* at 528 (emphasis added).

---

[23] In addition to the carve-out provision which excludes this dispute from arbitration, the arbitration clause further provides that "GateGuard may refuse arbitration at any point and demand a trial." ECF No. 121, Exhibit A (GateGuard "Dispute Resolution" terms) at GG000024. As GateGuard has previously advised Defendants – and hereby confirms again – though this litigation it has exercised its right to "refuse arbitration" and "demand a trial." For this reason as well, Defendants' arguments to compel arbitration of *any* claims in this case fail. At minimum, this "opt out" provision (which GateGuard has exercised) further establishes that the parties did *not* "clearly and unmistakably" intend to arbitrate, nor to delegate arbitrability, of this dispute.

In its ruling, the Supreme Court "express[ed] no view about whether the contract… in fact delegated the arbitrability question to an arbitrator[,]" warning that "courts should not assume that the parties agreed to arbitrate arbitrability *unless there is clear and unmistakable evidence that they did so*." *Id.* at 531 (quotations omitted, emphasis added).

### D.  The Fifth Circuit Concludes *Schein*'s Carve-Out Provision Demonstrates the Parties Did *Not* Intend to Delegate Arbitrability

On remand, the Fifth Circuit concluded that the pertinent arbitration clause did *not* "clearly and unmistakably delegate[] the question of arbitrability to an arbitrator" and confirmed that "the district court had the power to decide arbitrability… [and] correctly determined that this case is not subject to the arbitration clause." *Archer & White Sales, Inc. v. Henry Schein, Inc.*, 935 F.3d 274, 278 (5th Cir. 2019) ("*Schein II*").

Specifically, the *Schein II* court concluded that "the arbitration clause at issue here states that any dispute, except actions seeking injunctive relief, shall be resolved in arbitration in accordance with the AAA rules. The plain language incorporates the AAA rules—and therefore delegates arbitrability—for all disputes *except those under the carve-out*. Given that carve-out, we cannot say that the Dealer Agreement evinces a "clear and unmistakable" intent to delegate arbitrability." *Id.* at 281-82 (emphasis added).

### E.  GateGuard's Carve-Out Provision – Like *Schein*'s – Demonstrates the Parties Did *Not* Intend to Delegate Arbitrability

The arbitration clause at issue here is strikingly similar to that in *Schein*. Like *Schein*, GateGuard's arbitration clause contains a carve-out provision excluding this dispute – involving injunctive relief to prevent violations of trade secret and patent rights – from arbitration. As the *Schein II* court explains, questions as to arbitrability are also thereby excluded and *not* delegated to the arbitrator under the AAA rules. At minimum, the carve-out provision rebuts Defendants'

suggestion that GateGuard and Taub "clearly and unmistakably" intended to delegate the arbitrability of this dispute.[24]

The *Schein II* court looked to the Second Circuit's decision in *NASDAQ OMX Grp., Inc. v. UBS, Sec., LLC*, 770 F.3d 1010 (2d Cir. 2014) regarding "an arbitration clause that incorporated the AAA rules and exempted certain claims from arbitration." *Schein II* at 281.

Like this case, the agreement in *NASDAQ* incorporated the AAA rules (providing arbitrability be decided by the arbitrator) and "carve[d] out certain issues from arbitration." *NASDAQ* 770 F.3d at 1032. Based on this carve out, the Second Circuit found that the underlying agreement "does not clearly and unmistakably direct that questions of arbitrability be decided by AAA rules; rather, it provides for AAA rules to apply to such arbitrations as may arise under the Agreement[,]" and concluded that the district court – *not* the arbitrator – had the authority to determine the arbitrability of the claims at issue. *Id.*

## F. The Second Circuit in *NASDAQ* Distinguished Defendant's Authority (*Contec*) Which Found Arbitrability Was Delegated Only Because No Carve-Out Provision Was Present

In *NASDAQ*, the Second Circuit also distinguished cases like this one – where the arbitration clause contains a carve-out provision – from those lacking a carve out. Specifically, the *NASDAQ* court distinguished its earlier decision in *Contec Corp v. Remote Solution Co.*, 398 F.3d 205 (2d Cir. 2005) which held that incorporation of the AAA rules constituted clear and unmistakable evidence of the parties' intent to delegate arbitrability to the arbitrator. *See NASDAQ* 770 F.3d at 1032 ("this case is not akin to… *Contec*…"). The difference is that the

---

[24] Similarly, the section of GateGuard's terms that references the AAA Rules further specifies that such rules are subject to the following exception: "except as modified by this "Dispute Resolution" section." *See* n.20, above. For this reason as well, there is no "clear and unmistakable" intent by the parties to delegate all questions of arbitrability as Defendants suggest.

agreement in *Contec* contained no carve-out provision, as found both in *NASDAQ* and the present case.

Defendants rely heavily on *Contec* to suggest GateGuard and Taub "unmistakably" intended to arbitrate "the entirety of this case" and to delegate questions of arbitrability to the arbitrator. MVIS Br. at 5-6; MVII Br. at 26. But Defendants ignore the fact that *Contec* contained *no carve-out provision*, as found here. As the *NASDAQ* court explained, *Contec* is inapplicable to an arbitration clause with a carve-out provision, because such a carve out demonstrates the parties did *not* "clearly and unmistakably" intend to delegate questions of arbitrability.

Other courts in this District have reached the same conclusion based on *Schein II*, *NASDAQ*, and *Contec* – namely, that the arbitrability of an arbitration clause containing a carve-out provision is an issue for *the court* to decide, despite incorporation of the AAA rules delegating arbitrability. *See, e.g., Pacelli v. Augustus Intelligence, Inc.*, 459 F. Supp. 3d 597, 611 (S.D.N.Y. 2020) (finding arbitrability was for the arbitrator to decide only because the arbitration clause at issue did <u>not</u> contain a carve out as found in *NASDAQ*, *Schein*, and the present case).

In *Pacelli*, the court explicitly noted with approval the Fifth Circuit's *Schein II* decision: "[C]iting *NASDAQ*, the Fifth Circuit concluded that "[t]he plain language [of the contract] incorporate[d] the AAA rules—and therefore delegate[d] arbitrability—for all disputes except those under the carve-out" and that, "[g]iven that carve-out," the court could not say that the agreement "evidence[d] a 'clear and unmistakable' intent to delegate arbitrability." *Id.* at n.9.

Contrary to Defendants' assertion, incorporation of the AAA Rules is not, alone, dispositive of the issue of arbitrability. *Schein II*, *NASDAQ*, *Contec*, and *Pacelli* direct that a

carve out provision – as present here – demonstrates the parties did *not* "clearly and unmistakably" intend to delegate arbitrability.  And because the parties did not "clearly and unmistakably" intend to delegate arbitrability, the issue remains with the district court to decide. *See AT&T Techs.*, 475 U.S. at 649 ("Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.").

Accordingly, Defendants' motions to compel arbitration – which are premised on the (erroneous) assertion that the parties unmistakably intended to arbitrate "the entirety of this case" and delegate all questions of arbitrability – must be denied. As detailed above, the carve-out provision – bearing *directly* on the claims of this case – demonstrates GateGuard and Taub did *not* "clearly and unmistakably" intend to arbitrate, nor to delegate arbitrability.[25]

## **CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' Motions to Dismiss/Compel Arbitration in their entirety.

In the alternative, should the Court decide to grant part or all of the Motions, GateGuard requests leave to amend its pleadings.

With respect to any of the claims on which Judge Abrams previously ruled, should the Court arrive at a different conclusion, GateGuard submits it should be granted an opportunity to resolve any perceived defects via amendment.

---

[25] As noted above (n.23), GateGuard has also exercised the arbitration clause's "opt out" provision ("GateGuard may refuse arbitration at any point and demand a trial."). This, at minimum, further demonstrates the parties did *not* "clearly and unmistakably" intend to arbitrate, nor to delegate arbitrability.

With respect to any claims not considered by Judge Abrams (including GateGuard's claims against MVII and the newly pled fraudulent conveyance claims), GateGuard submits it should be granted an opportunity to resolve any perceived defects via amendment after the Court renders a ruling – for the first time – on such issues.[26]

RESPECTFULLY SUBMITTED,

New York, NY
December 29, 2020

*/s/ Ariel Reinitz*
Ariel Reinitz
FISHERBROYLES, LLP
445 Park Avenue, Ninth Floor
New York, NY 10022
(646)494-6909
Ariel.Reinitz@FisherBroyles.com
*Attorneys for Plaintiff*
*GateGuard*

---

[26] *See, e.g., Cresci v. Mohawk Valley Cmty. Coll.*, 693 F. App'x 21, 25 (2d Cir. 2017). ("The proper time for a plaintiff to move to amend the complaint is when the plaintiff learns from the District Court in what respect the complaint is deficient. Before learning from the court what are its deficiencies, the plaintiff cannot know whether he is capable of amending the complaint efficaciously.").