UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GATEGUARD, INC.,<br><br>                        Plaintiff,<br><br>        - against -<br><br>MVI SYSTEMS LLC; SAMUEL TAUB; and MVI INDUSTRIES, LLC<br><br>                   Defendants. | Civil Action No.:  19-cv-02472 (JPC)(DCF)<br><br><br>[CORRECTED COPY WITH TOC & TOA]<br><br><br>ORAL ARGUMENT REQUESTED |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ALL DEFENDANTS' MOTIONS TO COMPEL ARBITRATION OR, IN THE ALTERNATIVE, DISMISS PLAINTIFF'S CLAIMS ON SUBSTANTIVE GROUNDS**

**THE ENGEL LAW GROUP, PLLC**
280 Madison Avenue – Suite 705
New York, NY  10016
(212) 665-8095
aee@elgpllc.com

*Counsel for Defendants MVI Systems,*
*MVI Industries, and Samuel Taub*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 2

   I.    ARBITRATION MUST BE COMPELLED ................................................... 2

      A.   THE ARBITRATION PROVISION ENCOMPASSES EACH AND EVERY ONE OF PLAINTIFF'S CLAIMS ........................................ 2

      B.   THE ARBITRATION PROVISION DELEGATES AUTHORITY OVER ISSUES OF ARBITRABILITY TO THE ARBITRATOR ................................. 7

      C.   THERE IS NO "CARVE-OUT" IN THE ARBITRATION SECTION AND *SCHEIN* AND *NASDAQ* DO NOT APPLY ......................................... 8

      D.   EVEN IF THE COURT WERE TO READ THE LANGUAGE OF THE ARBITRATION SECTION TO CONTAIN A CARVE-OUT, IT IS ONE-SIDED ON ITS FACE AND UNCONSCIONABLE UNDER DELAWARE LAW ....... 11

      E.   GATEGUARD SHOULD BE JUDICIALLY ESTOPPED FROM TAKING THE POSITION THAT NOT ALL OF ITS CLAIMS ARE ARBITRABLE, OR THAT THE COURT SHOULD DECIDE ARBITRABILITY, OR THAT ITS DISPUTE RESOLUTION POLICY HAS A CARVE-OUT FOR CASES INVOLVING INJUNCTIVE RELIEF. ........................................................... 13

   II.   RULE 12(g)(2) DOES NOT BAR ANY ASPECT OF DEFENDANTS' MOTIONS . 16

   III.  EACH OF PLAINTIFF'S CLAIMS FAILS AS A MATTER OF LAW ..................... 22

      A.   CONTRACT CLAIM ........................................................................ 23

      B.   BUSINESS TRADE SECRETS, TORTIOUS INTERFERENCE, AND UNFAIR COMPETITION CLAIMS ...................................................... 24

      C.   PATENT AND TECHNICAL TRADE SECRET CLAIMS .............................. 25

      D.   FRAUDULENT CONVEYANCE AND ALTER EGO/SUCCESSOR LIABILITY/DE FACTO MERGER THEORIES ................................................. 28

CONCLUSION ................................................................................................................. 30

## TABLE OF AUTHORITIES

**Cases**

*Am. Soc. of Composers, Authors, & Publishers by Bergman v. Pataki*, 930 F. Supp. 873, 880 (S.D.N.Y. 1996) ............................................................................................................................. 5

*Artists Rights Enf't Corp. v. Estate of King,* 224 F. Supp. 3d 231, 233 (S.D.N.Y. 2016) ................. 3

*Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1229 (Fed. Cir. 1994) ........................ 27

*Clark St. Wine & Spirits v. Emporos Sys. Corp.*, 754 F. Supp. 2d 474, 479–80 (E.D.N.Y. 2010).... 22

*Credit Alliance v. Crook*, 567 F. Supp. 1462, 1465 (S.D.N.Y.1983) ................................................... 9

*Danisco A/S v. Novo Nordisk A/S*, 2003 WL 282391, at *3 (S.D.N.Y. Feb. 10, 2003) ...................... 6

*Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1359 (Fed.Cir.2004) .......................................... 26

*Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1459 (Fed. Cir. 1998) .................................... 26

*Gen. Mills, Inc. v. Champion Petfoods USA, Inc.*, No. 20-CV-181 (KMK), 2020 WL 915824, at *3 (S.D.N.Y. Feb. 26, 2020) ..................................................................................................... 4

*Gen. Mills, Inc. v. Champion Petfoods USA, Inc., No. 20-CV-181 (KMK), 2020 WL 915824, at *6 (S.D.N.Y. Feb. 26, 2020)* ................................................................................................. 4

*Genesis II Hair Replacement Studio, Ltd. v. Vallar*, 251 A.D.2d 1082, 1082 (1998) ....................... 3

*Gluco Perfect, LLC v. Perfect Gluco Prod., Inc.*, No. 14-CV-1678 KAM RER, 2014 WL 4966102, at *17 (E.D.N.Y. Oct. 3, 2014) ..................................................................................... 3

*Jenkins v. Nat'l Grid USA*, No. 15-CV-1219(JS)(GRB), 2017 WL 1208445, at *9 (E.D.N.Y. Mar. 31, 2017) ............................................................................................................................... 22

*Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 398 (S.D.N.Y. 2007) ................................................... 16

*Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*, No. 12 CIV. 3419 (GBD), 2017 WL 1113080, at *3 (S.D.N.Y. Mar. 10, 2017) ............................................................................................... 21

*New Hampshire v. Maine*, 532 U.S. 742, 749–51 (2001) ........................................................... 13, 14

*Opternative, Inc. v. JAND, Inc.*, 2018 WL 3747171, at *9 (S.D.N.Y. Aug. 7, 2018) ...................... 27

*Opternative, Inc. v. JAND, Inc.*, 2019 WL 624853, at *8 (S.D.N.Y. Feb. 13, 2019) ....................... 27

*Orix Credit All., Inc. v. Mid-S. Materials Corp.*, 816 F. Supp. 230, 233 (S.D.N.Y. 1993) ............... 9

*PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 12 F. Supp. 2d 69, 85 (D. Mass. 1998).... 26

*Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 71-73 (2010) .......................................................... 12

*Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 73 (2010) ............................................................... 12

*Rubin v. Gen. Hosp. Corp.*, 2011 WL 1625024, at *6 (D. Mass. Apr. 28, 2011) ............................. 26

*SEB S.A. v. Montgomery Ward & Co.*, 137 F. Supp. 2d 285, 289 (S.D.N.Y. 2001) .......................... 5

*Sharma v. Skaarup Ship Mgmt. Corp.*, 699 F. Supp. 440, 444 (S.D.N.Y. 1988) ............................ 22

*Worldwide Ins. Grp. v. Klopp*, 603 A.2d 788, 792 (Del. 1992) ........................................................ 11

**Statutes**

35 U.S.C.A. § 256 ......................................................................................................................... 6, 26

35 U.S.C.A. § 294(a) .......................................................................................................................... 6

35 U.S.C.A. § 294(d) .......................................................................................................................... 6

**Rules**

Fed. R. Civ. P. 12(c) ......................................................................................................................... 22

Fed. R. Civ. P. 12(g)(2) .................................................................................................. 16, 17, 19, 21, 22

Fed. R. Civ. P. 7(a) ........................................................................................................................... 22

Defendants MVI Systems, MVI Industries, and Samuel Taub hereby submit this reply in further support of their respective motions to compel arbitration or, in the alternative, dismiss each of Plaintiff's claims on substantive grounds.  At the time the Defendants' respective motions were initially filed, the undersigned had not entered an appearance on behalf of MVI Industries, but has done so in the interim.  Therefore, this reply brief is in further support of all Defendants' Motions to Compel Arbitration/Dismiss (Dkt. ## 118, 119), and in response to Plaintiff's consolidated opposition brief (Dkt. #149).

## INTRODUCTION

*You've got to be very careful if you don't know where you are going,*
*because you might not get there.*

\- Yogi Berra

This case presents the unusual circumstance of a corporate entity going through the effort of drafting and imposing a pro-company arbitration clause through a click-wrap agreement, only to engage in linguistic gymnastics to avoid its clear mandate.  The Plaintiff is distorting the language of its own contract – the GateGuard Dispute Resolution Policy – to manufacture an arbitration "carve-out" where none exists.  Despite Plaintiff's creativity, this case must be sent to arbitration.  The arbitration section at issue calls for arbitration of *all claims* arising out of or related to the contract on which GateGuard relies in this case.  This includes such claims where GateGuard is seeking to "enforce" GateGuard's purported intellectual property rights – a clear reference to seeking injunctive relief – which is exactly what GateGuard is seeking to do here by seeking a permanent injunction against further alleged infringement.  Unsurprisingly, the arbitration clause also leaves open the opportunity to seek *interim* injunctive relief in a court of competent jurisdiction to "prevent" any such alleged infringement, which GateGuard has conspicuously not opted to do in the nearly two years that this case has been pending.

In addition, while the arbitration clause delegates to the American Arbitration Association ("AAA") all authority to determine the scope of arbitrable claims through incorporation of the AAA Commercial Arbitration Rules, which is sufficient on its own, the GateGuard Dispute Resolution Policy itself explicitly states that the AAA shall have sole authority over "interpretation" of the GateGuard Terms of Service ("ToS"), into which the GateGuard Dispute Resolution Policy is explicitly incorporated by reference, and into which the AAA Rules are similarly incorporated.  Even more telling, the GateGuard arbitration clause gives the AAA the sole authority to determine the "validity" of the contract at issue, namely the GateGuard ToS, including as applied here.  In sum, the GateGuard Dispute Resolution Policy and its arbitration clause delegate to the AAA the broadest possible powers to not only "enforce" GateGuard's purported intellectual property rights, but also to "interpret" the GateGuard ToS, and even to determine their "validity," and this Court must refer this case to arbitration.

In any event, despite the Plaintiff having four opportunities to plead, each and every one of its causes of action, against each of the Defendants, fails to state a claim for relief.  The Plaintiff has wasted enough of the Defendants' time and money on its entirely fabricated and anti-competitive lawsuit, and this case must be dismissed once and for all.

## ARGUMENT

### I.  ARBITRATION MUST BE COMPELLED

#### A.  THE ARBITRATION PROVISION ENCOMPASSES EACH AND EVERY ONE OF PLAINTIFF'S CLAIMS

The GateGuard Dispute Resolution Policy contains an arbitration section – clearly labeled as such – that mandates that all of Plaintiff's claims are arbitrable and that, in any event, determinations of arbitrability have been delegated to the arbitrator in the first instance.  The central portion of the GateGuard Dispute Resolution Policy arbitration section is as follows:

> Arbitration - *Notwithstanding anything to the contrary contained herein*, you and GateGuard agree that any dispute, claim or controversy arising out of or relating to the Terms or the breach, termination, *enforcement, interpretation or validity thereof*, or to the use of the Site will be settled by binding arbitration, except that GateGuard alone retains the right to seek injunctive or other equitable relief in a court of competent jurisdiction *to prevent* the actual or threatened infringement, misappropriation or violation of a its copyrights, trademarks, trade secrets, patents, or other Intellectual Property rights.

Engel Moving Decl. (Dkt. #121) Exh. A at p. GG000024 (emphases added).

As in initial matter, this extremely broad section provides for the arbitrability of every conceivable type of claim that has anything whatsoever to do with GateGuard and its products and services.  Moreover, it is equally broad in conferring all decisional authority relating to it to the arbitrator and away from the courts.  First, as this paragraph begins with the phrase "notwithstanding anything to the contrary contained herein," any language in the GateGuard Dispute Resolution Policy that conflicts with this sentence is explicitly overridden and this provision controls the scope of arbitrability.

Second, because of its reference to "enforcement" of the parties' rights, this section explicitly encompasses claims for injunctive relief.  For example, in *Genesis II Hair Replacement Studio*, the court referred to an injunction based on a restrictive covenant as "enforcing" the contract that contained the restrictive covenant.  *Genesis II Hair Replacement Studio, Ltd. v. Vallar*, 251 A.D.2d 1082, 1082 (1998) ("Plaintiff failed to meet its burden of demonstrating that *enforcement* of defendant's employment contract is 'necessary to protect trade secrets, confidential customer lists or good will'" and denying preliminary injunctive relief) (emphasis added); *see also Artists Rights Enf't Corp. v. Estate of King,* 224 F. Supp. 3d 231, 233 (S.D.N.Y. 2016) ("seeking declaratory and injunctive relief to enforce two contracts between AREC and the deceased, Ben E. King"); *Gluco Perfect, LLC v. Perfect Gluco Prod., Inc.*, No. 14-CV-1678 KAM RER, 2014 WL 4966102, at *17 (E.D.N.Y. Oct. 3, 2014) ("upholding the

district court's grant of a preliminary injunction in a contract enforcement case"). On its face, then, GateGuard's arbitration provision clearly provides for claims seeking injunctive relief to be arbitrated.

Third, the fact that GateGuard's arbitration provision permits GateGuard[1] to ask a court of competent jurisdiction "to prevent" any alleged infringement does not otherwise reverse the arbitration provision's mandate – in the very same sentence – that "enforcement" of the parties' intellectual property rights shall be arbitrated. Rather, the natural reading of this provision is that it allows GateGuard to seek preliminary injunctive relief from a court of competent jurisdiction if it believes it will suffer irreparable harm if it waits for an arbitrator to provide injunctive relief and then has to go through the process of getting such an award entered by a court that would have the power to enforce it. In fact, the Southern District has recently affirmed that it is black-letter law that the District Courts (of competent jurisdiction) always retain the power to grant preliminary injunctive relief in aid of arbitration, regardless of the arbitrability of the underlying claims. *Gen. Mills, Inc. v. Champion Petfoods USA, Inc.*, No. 20-CV-181 (KMK), 2020 WL 915824, at *3 (S.D.N.Y. Feb. 26, 2020) ("Defendants' argument is at odds with the black-letter law of the Circuit. The Second Circuit has repeatedly held that courts retain the power, and the responsibility, to consider applications for preliminary injunctions while a dispute is being arbitrated.").

The court went on to explain that provisions, such as the one here, that allow one or more parties to seek injunctive relief from a court are not at all in conflict with the otherwise arbitrable nature of those claims, and in fact merely memorialize the parties' rights, and the courts' powers, discussed above. *Id.* at *6 ("[A]s the Second Circuit has explained, such contractual provisions

4

simply confirm an already extant, independent legal rights . . . because courts do have the authority to consider the merits of requested injunctions pending arbitration, a contractual provision stating that plaintiffs may seek such relief in a court of competent jurisdiction amply reaffirms what the law already directs.") (quotes and citations omitted); *see also, Am. Soc. of Composers, Authors, & Publishers by Bergman v. Pataki*, 930 F. Supp. 873, 880 (S.D.N.Y. 1996) (in case involving arbitration clause, holding that "the linchpin of preliminary injunctive relief is that threatened irreparable harm will be prevented by that injunction.") (citation omitted); *SEB S.A. v. Montgomery Ward & Co.*, 137 F. Supp. 2d 285, 289 (S.D.N.Y. 2001) ("This Court has jurisdiction to enforce its preliminary injunction and to prevent further infringement."); *Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 334 (S.D.N.Y. 2011) ("a preliminary injunction is necessary to prevent irreparable injury.").  In other words, the provision that states that GateGuard may seek injunctive relief to "prevent" alleged infringement only reaffirms what the law already says, and does not change the fact that all claims arising under or related to the GateGuard ToS and its Dispute Resolution Policy are to be arbitrated.

Fourth, even if this provision were held to mean that claims for injunctive relief could only be brought in court – contrary to the explicit term calling for "enforcement" of rights to be arbitrated – Plaintiff does not offer any explanation why the remainder of the case is exempt from the broad mandate of the arbitration provision in GateGuard's own Dispute Resolution Policy.[2]  As an initial matter, it must be noted that GateGuard has never sought preliminary

---

[1]  As discussed below, the one-sided nature of this provision is likely unconscionable under Delaware law, under which this provision would likely be stricken.

[2]  As discussed more fully below, the basis of GateGuard's argument to the contrary is language found in an entirely separate section, titled "Jurisdiction."  That section, which is nothing more than a "permissive" choice of forum clause, addresses the jurisdiction of the state and federal courts in Delaware, and simply states that the parties both agree to litigate in Delaware if the other party chooses to initiate litigation there.

injunctive relief in this case, which has been pending for almost two years.  Rather, GateGuard has shown that it is willing to wait until after this case has been fully litigated to get the permanent injunctive relief it seeks in its Demand for Relief.  There is no reason – technically or practically – why this case should not be sent to arbitration, as directed by the Dispute Resolution Policy, while this Court retains jurisdiction over GateGuard's request for permanent injunctive relief, which could be granted consistent with the arbitrator's decision.  Additionally, even if GateGuard had sought preliminary injunctive relief, there is no reason that doing so would otherwise deprive the arbitrator of the powers granted by the GateGuard Dispute Resolution Policy.

Fifth, GateGuard makes the entirely disingenuous claim that Defendants "previously conceded" that GateGuard's patent claims would not be subject to arbitration.  Pl. Opp. (Dkt #149) at 44.  As Plaintiff is aware, this colloquy with Judge Freeman took place before Plaintiff had even provided the Defendants with a copy of the GateGuard Dispute Resolution Policy, and issues relating to the arbitrability of Plaintiff's claims under that as-yet-unseen document were in their infancy and no party had briefed any such issues.  In any event, as the Defendants later explained in their motion to stay discovery pending the Court's resolution of this Motion, Plaintiff's patent inventorship claims are both covered by the GateGuard Dispute Resolution Policy and amenable to resolution by the AAA.  *See*, 35 U.S.C.A. § 294(a) (explicitly permitting arbitrability of patent claims); 35 U.S.C.A. § 294(d) (explicitly permitting the Director of the USPTO to act on arbitral awards directly, without the need for such award to be confirmed by a court); *Danisco A/S v. Novo Nordisk A/S*, 2003 WL 282391, at *3 (S.D.N.Y. Feb. 10, 2003) (plaintiff's patent inventorship claim under 35 U.S.C.A. § 256 (relied on by Plaintiff here) appropriately compelled to arbitration, noting that "[t]he issues in the arbitration proceeding thus

clearly involve inventorship.").

Sixth, as Defendant MVI Industries explained in its initial moving papers (Def. MOL (Dkt. #118-6) at pp. 24-26), non-signatories such as MVI Systems and MVI Industries can invoke an arbitration agreement if the claims arise out of allegations of "interdependent and coordinated misconduct," which is surely the case with the Third Amended Complaint – in fact, Plaintiff argues that all three Defendants should be treated as one and the same under "alter ego" and "successor liability" theories. Pl. MOL (Dkt. #149) at pp. 40-41. Similarly, all of the Plaintiff's claims flow from its contract claim and the core allegation that Defendant Taub breached the GateGuard ToS by inducing GateGuard (through Ari Teman) to disclose its business and technological trade secrets to Taub, which proprietary information Taub then allegedly unlawfully misappropriated and shared with MVI Systems and MVI Industries (TAC COA I and II, against all Defendants), and used as the basis of MVI Industries' two patents (TAC COA III), and used to tortiously interfere with GateGuard's customer and other business relationships (TAC COA V), and used to unfairly compete with GateGuard (TAC COA VI), and then transferred all the fruits of his original sin of breaching the GateGuard ToS to MVI Industries. As the master of its own pleading, Plaintiff cannot be heard now to disavow the fact that each and every one of its claims arises from its breach of contract claim, and is therefore arbitrable.

## B. THE ARBITRATION PROVISION DELEGATES AUTHORITY OVER ISSUES OF ARBITRABILITY TO THE ARBITRATOR

As explained in the Defendants' initial moving papers, the GateGuard Dispute Resolution Policy explicitly incorporates by reference the AAA Rules, which state that the arbitrator shall determine the arbitrability of any claims brought before the AAA. The parties do not dispute that, putting aside for the moment any purported "carve-outs," such an incorporation is clear and

unmistakable evidence of the parties' intent to have the AAA determine issues of arbitrability. In addition to this default position, the GateGuard Dispute Resolution Policy arbitration clause states that it applies to all claims arising out of or relating to GateGuard's ToS, including the "*enforcement, interpretation or validity*" thereof.  As such, not only has the AAA been tasked with typical "arising under" issues, it has also been exclusively tasked with interpreting the GateGuard ToS and Dispute Resolution Policy, and even with deciding whether the GateGuard ToS and Dispute Resolution Policy in fact embody a valid and enforceable agreement.  And, as discussed above, there is nothing in the language of GateGuard's arbitration provision that would undermine the broad authority that the parties have delegated to the AAA.

### C.  THERE IS NO "CARVE-OUT" IN THE ARBITRATION SECTION AND *SCHEIN* AND *NASDAQ* DO NOT APPLY

GateGuard's focus on *Schein I* and *Schein II* and similar Second Circuit cases is a red herring based on a counterfactual that Plaintiff has manufactured through sleight of hand, as the GateGuard "Arbitration" does not contain any carve-out for cases involving requests for injunctive relief, but rather nothing more than an escape valve when emergency relief is needed that already exists under "black-letter law" in the Second Circuit.  Rather than face its own contractual language head-on, Plaintiff states in its opposition brief that "[t]he arbitration clause at issue provides in pertinent part," but then goes on to cite an entirely different section titled "Jurisdiction."  Pl. Opp. MOL at p. 41.  Plaintiff then goes on to argue that "the plain language of these clauses directs that: 1. The parties agree that 'any actions for which the parties retain the right to seek injunctive or other equitable relief' are to be brought *in a District Court*."  Pl. Opp. MOL at p. 42 (emphasis in original).

This claim is specious for several reasons.  First, the language regarding "any case" is found only in GateGuard's "Jurisdiction" section – not in GateGuard's "Arbitration" section –

and Plaintiff does not make any attempt to explain why this Court should conflate two distinct sections, dealing with two distinct legal issues, into one, and of course the Court should not do so. Second, this is not even what GateGuard's "Jurisdiction" section says, and Plaintiff's italicized claim is contrary to the text Plaintiff purports to cite, which instead says that the parties agree to submit to the jurisdiction of "a state court located in Delaware, USA or a United States District Court located in Delaware." As such, not only is it untrue that the "Arbitration" section contains the language quoted by Plaintiff, the wholly irrelevant "Jurisdiction" section does not even do so.

Rather, the "Jurisdiction" section addresses exactly – and only – that issue, and is nothing more than a "permissive" choice-of-forum clause whereby the parties agree to "submit to" jurisdiction in a Delaware Federal Court. *See, Orix Credit All., Inc. v. Mid-S. Materials Corp.*, 816 F. Supp. 230, 233 (S.D.N.Y. 1993) (where the clause at issue stated that "the undersigned do[es] hereby agree to the venue and jurisdiction of any court in the State and County of New York regarding any matter arising hereunder," the court held the clause permissive because "[t]he language in the Guaranties merely states that Pittman and Johnston agree to the jurisdiction of a court located in the state and county of New York, not such a court shall have jurisdiction nor that it would be the exclusive forum for all disputes arising out of this contract."); *see also, Credit Alliance v. Crook*, 567 F. Supp. 1462, 1465 (S.D.N.Y.1983) ("Cook declared nothing more than her consent to the venue and jurisdiction of a court which might otherwise not exist."). As with the language referencing injunctive relief in the "Arbitration" section discussed above, even if the language in the "Jurisdiction" section had any bearing on arbitration in this case, all that it does is ensure that the state or federal courts in Delaware are an agreeable forum if any party so chooses, and no party has done so.

Not only is this language irrelevant on its own, however, but Plaintiff's own actions show that it has no bearing on arbitrability.  It is beyond dispute that Plaintiff's Demand for Relief in the Third Amended Complaint seeks a permanent injunction as one component of relief, and that Plaintiff has argued that this choice of forum precludes arbitration because all cases involving injunctive relief are subject to this provision.  And yet it is also beyond dispute that this Court does not sit in Delaware.  If the interpretation that the Plaintiff urges upon this Court were adopted, then Plaintiff would be in violation of its own contract and this case would have to be transferred to Delaware, an outcome no party seeks.

Because most of the language Plaintiff relies on to support its "carve-out" argument is not in a relevant section of the GateGuard Dispute Resolution Policy, and is not mandatory in any event, and has been ignored by the Plaintiff in this litigation, Plaintiff's discussion of *Schein I* and *II* and *Nasdaq* is completely misplaced.  As Plaintiff correctly notes, the arbitration clause at issue in the *Schein* cases has typical "arising under or related" to language, but has a parenthetical that says "except for actions seeking injunctive relief and disputes related to trademarks, trade secrets, or other intellectual property."  Pl. Opp. MOL at p. 45.  Contrary to what Plaintiff asserts, however, the arbitration provisions at issue in the *Schein* cases are vastly different than the GateGuard arbitration provision at issue here.  As discussed above, while the *Schein* clause exempted "all *actions*" that include any claims of a certain type, the GateGuard arbitration provision refers instead to "claims," and Plaintiff has offered no argument for why this entire case would be subject to such a "carve-out" when the bulk of Plaintiff's case involves money damages rather than injunctive relief.  Similarly, while the *Schein* clause expressly *excludes* actions that involve any disputes related to trade secrets and other intellectual property, the GateGuard arbitration provision expressly *includes* claims relating to the "enforcement" of

10

Plaintiff's intellectual property rights  As discussed above, the reference to injunctive relief in the "Arbitration" section does nothing more than reiterate GateGuard's right to seek injunctive relief in aid of arbitration to "prevent" alleged infringement if it can otherwise meet the criteria for such relief.

     **D.**     **EVEN IF THE COURT WERE TO READ THE LANGUAGE OF THE ARBITRATION SECTION TO CONTAIN A CARVE-OUT, IT IS ONE-SIDED ON ITS FACE AND UNCONSCIONABLE UNDER DELAWARE LAW.**

While inexplicably ignored by GateGuard throughout the course of this litigation, including the entire time it had sole possession of the GateGuard ToS and incorporated Dispute Resolution Policy, the latter has a choice of law clause that states that the ToS "will be governed by and interpreted in accordance with the laws of Delaware."  Engel Moving Decl. Exh. A at GG000024.  Under Delaware law, one-sided opt-out provisions such as those Plaintiff relies on here have routinely been found to be unconscionable under Delaware law and stricken from the contract at issue.  For example, Plaintiff notes that the GateGuard arbitration provision states that "GateGuard may refuse arbitration at any point and demand a trial."  *Id.*  This unilateral opt-out provision in GateGuard's lopsided and self-serving adhesion contract is unconscionable and must be effectively stricken from the agreement, leaving both parties with the benefits of arbitration.  *See, e.g., Worldwide Ins. Grp. v. Klopp*, 603 A.2d 788, 792 (Del. 1992) (in post-arbitration litigation concerning confirmation of an arbitral award, the court held that one-sided provision that allowed the drafting party to effectively avoid the results of its own arbitration provision was properly stricken while the remainder of the contract was enforced.).  While the Defendants believe that this is a matter to be decided by the arbitrator under the parties' broad grant of authority, any tribunal applying Delaware law must strike the opt-out provision as unconscionable.

In any event, this is a matter for the arbitrator to decide.  As the Supreme Court has explained, an agreement to arbitrate is "severable" from the rest of the contract, such that if the arbitration terms delegate authority to an arbitrator, including authority to determine arbitrability, then any claims of unconscionability directed at the agreement as a whole or other specific terms do not displace that grant of authority to the arbitrator.  *See, Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 71-73 (2010) ("Thus, in an employment contract many elements of alleged unconscionability applicable to the entire contract (outrageously low wages, for example) would not affect the agreement to arbitrate alone.  But even where that is not the case . . . where the alleged fraud that induced the whole contract equally induced the agreement to arbitrate which was part of that contract – we nonetheless require the basis of challenge to be directed specifically to the agreement to arbitrate before the court will intervene.").  In fact, *Rent-A-Center* involved terms virtually identical to Plaintiff's interpretation of those present here, and involved one-sided provisions that split up which types of claims were arbitrable and which were not, with that split favoring the employer that drafted the terms.  *Id.* at 73 ("First, he argued that the Agreement's coverage was one sided in that it required arbitration of claims an employee was likely to bring – contract, tort, discrimination, and statutory claims – but did not require arbitration of claims Rent-A-Center was likely to bring – intellectual property, unfair competition, and trade secrets claims.  This one-sided-coverage argument clearly did not go to the validity of the delegation provision," and therefore questions regarding arbitrability remained as delegated to the arbitrator.).  This case is in a somewhat unusual posture in that the alleged customer, Defendant Taub and his MVI companies, is seeking arbitration while the drafter of the relevant arbitration clause is seeking to avoid its own Dispute Resolution Policy, but that only bolsters Defendants' argument, as their insistence on arbitration makes it a logical necessity that

they are not challenging the arbitration provision in and of itself.

E. **GATEGUARD SHOULD BE JUDICIALLY ESTOPPED FROM TAKING THE POSITION THAT NOT ALL OF ITS CLAIMS ARE ARBITRABLE, OR THAT THE COURT SHOULD DECIDE ARBITRABILITY, OR THAT ITS DISPUTE RESOLUTION POLICY HAS A CARVE-OUT FOR CASES INVOLVING INJUNCTIVE RELIEF.**

In addition to the shortcomings in Plaintiff's arguments laid out above, Plaintiff has taken the opposite position it takes here and successfully moved to compel arbitration against one of its customers in a case that involved claims for injunctive relief. Under the doctrine of judicial estoppel, Plaintiff should not be heard to claim that its own broadly drafted arbitration agreement does not, in fact, call for arbitration in this case. This doctrine is a flexible one based on the Court's discretion and is designed to protect the integrity of the judicial process and prevent the unfairness that would result from allowing a party to take diametrically opposed legal positions to suit its own interests at the expense of other parties and the courts. *See, New Hampshire v. Maine*, 532 U.S. 742, 749–51 (2001) (the purpose is "to protect the integrity of the judicial process" by "prohibiting parties from deliberately changing positions according to the exigencies of the moment" and "playing 'fast and loose with the courts", and it is therefore "an equitable doctrine invoked by a court at its discretion.") (quotes and citations omitted).

Like most equitable and discretionary powers, "[t]he circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle," but the Supreme Court has identified "several factors [that] typically inform the decision whether to apply the doctrine in a particular case: First, a party's later position must be 'clearly inconsistent' with its earlier position . . . Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that

13

either the first or the second court was misled' . . . [and a] third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* (quotes and citations omitted).

First, in other litigation brought against GateGuard by one of its former customers ("BCR"), BCR alleges that GateGuard trespassed on BCR's property and inflicted substantial damage to BCR's buildings and sought both money damages and injunctive relief. Engel Reply Decl. Exh. A at p. 2, *passim* (highlights added). While BCR has claimed that because its claims arise from property damage they do not arise under or relate to the GateGuard ToS, GateGuard has argued in response that because "BCR's claims in this action arise out of the same nucleus of operative facts [they] must be resolved in arbitration pursuant to the Terms [of Service]." Engel Reply Decl. Exh. B at ¶12. In its opposition to Defendants' Motion to Compel Arbitration in this case, GateGuard argues the opposite and that the vast majority of its claims are not covered by the GateGuard ToS or GateGuard Dispute Resolution Policy.

Second, in the same litigation, and even in the context of moving to compel arbitration against a plaintiff seeking injunctive relief, GateGuard successfully argued that the incorporation of the AAA Rules into the GateGuard Dispute Resolution Policy means that "no judicial determination of the scope of arbitrability is required, as the terms delegate questions of arbitrability to the arbitrator." Engel Reply Decl. Exh. B at ¶17 (highlights added).

Third, again in the same litigation, GateGuard (through the same counsel it employs here) argued in opposition to BCR's motion for injunctive relief that while "BCR now moves this Court to grant it a preliminary injunction against GateGuard," "GateGuard's terms – which BCR accepted – require disputes to be settled via arbitration. Accordingly, this Court is not the proper forum for BCR to seek relief." Engel Reply Decl. Exh. A at p.3. GateGuard then explained that

14

it "anticipate[d] filing a Motion to Compel Arbitration pursuant to CPLR § 7503 in due course. Whatever the outcome of such arbitration, *the merits of BCR's claims will not be heard in this Court.* Accordingly, Plaintiffs' preliminary injunction – which can only be granted when success on the merits is likely – must be denied." *Id.* at p. 9 (emphasis in original).

GateGuard did in fact file a motion to compel arbitration, and again argued that "the Terms accepted by BCR include a 'Governing Law and Dispute Resolution' section. This section provides that: '[Y]ou and GateGuard agree that any dispute, claim or controversy arising out of or relating to the Terms or the breach, termination, enforcement, interpretation or validity thereof, or to the use of the Site will be settled by binding arbitration…The arbitration will be administered by the American Arbitration Association ("AAA")." Engel Reply Decl. Exh. B at ¶9. On the basis of this submission, and without opposition, the court granted GateGuard's motion to compel arbitration. Engel Reply Decl. Exh. C.

This demonstrates that GateGuard has successfully sought to enforce the GateGuard Dispute Resolution Policy against another party by arguing that the scope of the arbitration clause encompassed all claims arising from the "same nucleus of facts" and that the incorporation of the AAA rules into the GateGuard Dispute Resolution Policy gave the arbitrator sole authority to determine arbitrability, all in a case that indisputably involved the opposing party seeking injunctive relief against GateGuard. Now that the shoe is on the other foot, GateGuard is taking precisely the opposite positions and seeking precisely the opposite outcome.

This conduct satisfies all three prongs of the Court's judicial estoppel analysis: (i) GateGuard's current position is "clearly inconsistent with its position in the BCR litigation (ii) GateGuard's motion to compel arbitration in the BCR litigation was granted, creating the risk of inconsistent rulings and undermining the integrity of the judicial system and (iii) allowing

GateGuard to proceed this way gives it an unfair advantage against the Defendants, on top of the unfair advantage GateGuard already gained by keeping the Dispute Resolution Policy hidden for over a year while this case was heavily litigated, because GateGuard should not be allowed to use its arbitration provisions as a cudgel, invoking it against parties who would prefer to proceed in court and resisting it against parties who would prefer to proceed in arbitration like the Defendants.

## II.   RULE 12(g)(2) DOES NOT BAR ANY ASPECT OF DEFENDANTS' MOTIONS

Plaintiff's argument that many of Defendant's grounds for dismissal are barred by Rule 12(g)(2) ignores the fact that Plaintiff has amended its complaint *twice* since the Court's decision regarding Plaintiff's First Amended Complaint more than a year ago – once based on Judge Abrams's leave to amend after dismissing several of Plaintiff's claims, and again entirely voluntarily in response to the Defendants' fully briefed motions to dismiss Plaintiff's Second Amended Complaint.  *See, Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 398 (S.D.N.Y. 2007) ("Because the SAC adds factual allegations to Count I which *further support* Plaintiff's claims against RDI, RDI must be permitted an opportunity to respond.  This is particularly so when the Plaintiff has generously been given *two opportunities to correct his Complaint*.") (emphases added).

Plaintiff also seems to take the backward position that the mere fact that Plaintiff amended its claims actually inoculates those claims from future motions to dismiss, claiming that "[b]ecause all the deficiencies in GateGuard's . . . claims identified by Judge Abrams have been remedied, defendants' motion to dismiss those claims should be denied."  This reasoning is fatally circular, as the precise issue on this motion is *whether* Plaintiff has in fact remedied the deficiencies Judge Abrams identified, and Defendants argue that Plaintiff has again failed to

adequately plead its claims. *See, e.g.* Def. MOL (Dkt. 120) at p.12 (discussing Plaintiff's alleged business trade secrets claims, arguing that "[i]n the Third Amended Complaint, the Plaintiff does not fix any of these problems [identified by Judge Abrams].").  What Plaintiff urges here would render all successful motions to dismiss nothing more than Pyrrhic victories, as all a *losing* plaintiff would have to do is amend their complaint, no matter how poorly, and the *winning* defendant would be barred from addressing those claims under Rule 12(g)(2).  In any event, as discussed below, several of Plaintiff's amendments make Plaintiff's claims *worse*, and it would be grossly unfair and unwise to use a procedural rule designed to promote the speedy and efficient resolution of cases to block Defendants from pointing out fatal flaws in Plaintiff's pleading that Plaintiff cannot fix and show that Plaintiff simply does not have any valid legal claims against any of the Defendants.

Plaintiff is trying have its cake and eat it too.  On the one hand, Plaintiff cannot dispute that it has amended its complaint twice since its First Amended Complaint was filed on June 11, 2019, and that it filed its Third Amended Complaint over Defendants' strong objections.  Dkt. #84, p.1.  Plaintiff also cannot dispute that it filed its Third Amended Complaint in response to the Defendants' fully briefed motions to dismiss the Second Amended Complaint.  Dkt. #73 (MTD SAC), Dkt. #85 at p.1 (Plaintiff explaining that TAC was in response to Defendants' motions).  As such, Plaintiff effectively concedes that it had to amend its First Amended Complaint once to cure deficiencies identified by the Court, and then again its Second Amended Complaint to cure deficiencies then identified by the Defendants, yet its Rule 12(g)(2) argument necessarily depends on the notion that these multiple amendments were insubstantial and that the Third Amended Complaint is materially the same as the First Amended Complaint.  And that position, in turn, undermines Plaintiff's claim that these multiple amendments have cured the

substantive deficiencies in Plaintiff's pleading, many of which the Court already deemed fatal.

For example, Plaintiff argues that its contract claim was not dismissed by Judge Abrams and therefore that claim is now unassailable, but this argument is faulty for several reasons. First, at the hearing on Defendants' motion to dismiss the First Amended Complaint, the undersigned accepted the Court's ruling declining to dismiss Plaintiff's contract claim, but suggested that said claim was based largely on legal conclusions regarding Defendant Taub's purported "acceptance" of GateGuard's ToS, and that Plaintiff should amend it to explain exactly *how* Taub manifested assent. Engel Moving Decl. Exh. B at pp. 12-17. The Court agreed and, at the Court's urging, the Plaintiff readily accepted the Defendants' and the Court's suggestion, and Plaintiff did in fact substantially amend its contract claim, including adding multiple factual allegations regarding Samuel Taub's alleged assent. Compare, FAC ¶¶74-77 with TAC ¶¶81-88. As such, regardless of whether the Court formally dismissed Plaintiff's contract claim, the Court clearly found it lacking and instructed Plaintiff to amend it[3], which the Plaintiff has now done – twice. Moreover, Defendants' argument on their current motions to dismiss clearly include arguments relating to "assent" and focus in great detail on exactly what was allegedly presented to Defendant Taub through GateGuard's website form and whether those newly pled facts support a finding of adequate "inquiry notice." Def's MOL (Dkt. #120) at pp. 6-11.

Second, while the Plaintiff's breach of contract claim has always relied on the specific terms of the alleged contract and quoted extensively from it, including in its original Complaint

---

[3] Judge Abrams also expressed her strong suspicion, based on the highly dubious nature of Plaintiff's allegations, that Plaintiff's claims are fabricated, and expressly warned Plaintiff and Plaintiff's counsel regarding sanctions, stating that "just the notion that he is going to disclose all of these secrets to a stranger seems somewhat hard to believe. Again, I'm taking the facts as alleged to be true. But I am skeptical, which is why I wanted to warn you with respect to sanctions. If this is a situation where you end up wasting counsel's time and the defendants' money, your client should be prepared to face sanctions." Engel Moving Decl. Exh. B at p. 17.

(FAC at ¶¶ 78-83), the Plaintiff refused to include a copy of the alleged contract as part of its pleading or to provide a copy to Defendants.  When this issue was finally addressed to the Court on August 4, 2020, Judge Freeman opined without hesitation or equivocation that the alleged contract was "integral" to Plaintiff's contract claim (and therefore ripe for inclusion in a motion to dismiss) and therefore should have been turned over long before as part of Plaintiff's initial disclosures, and ordered the Plaintiff to produce it to the Defendants immediately:

> THE COURT:  Okay.  I'm not quite sure I'm understanding this.  The Complaint – this Third Amended Complaint has in it a contract claim?
> MR. ENGEL:  Correct.
> THE COURT:  Okay.  And the contract claim is based on a defined contract which, because it is a contract claim, presumably is *integral to the Complaint*, if it's not incorporated by reference it's integral to the Complaint.  But it's not been attached to the Complaint?
> MR. REINITZ:  That's correct.
> THE COURT:  Hold on.  Your initial disclosures did not include the contract?  You're planning to bring a contract claim, you're basing it on a contract; on your initial Rule 26(a) disclosures you didn't produce the contract?
> MR. REINITZ: We didn't produce any --
> THE COURT:  Is it difficult to produce the contract?
> MR. REINITZ: It is not difficult to produce the contract, your Honor.
> THE COURT: Produce the contract.

Dkt. #140-1 at pp. 25-27 (edited for clarity and brevity) (emphasis added).

Approximately one month later, the Plaintiff finally did so.  Prior to this date, the Defendants did not have access to the allegedly breached contract, and therefore could not have made arguments regarding its terms, and therefore cannot be held to have waived such arguments under Rule 12(g)(2).  For example, Defendants argue that the document that GateGuard is trying to enforce is not even the document that was allegedly hyperlinked on GateGuard website, and this argument is based entirely on the title and text of the alleged contract documents that Defendants received six months after Judge Abrams's January 15, 2020 decision and Order.  Defs' MOL (Dkt. #120) at p.6-7.

The same is true of Plaintiff's trade secrets and common law intentional interference and other unfair competition claims.  First, as discussed above, each of these claims arises from and is integrally related to Plaintiff's breach of contract claim, which has itself undergone substantial changes.  Second, many of them were dismissed by the Court and are therefore subject to renewed motions to dismiss.  While Plaintiff argues that Judge Abrams's Order shows that Plaintiff's unfair competition claim was not dismissed, it is respectfully submitted that the Court intended only that Plaintiff's unfair competition claim as to its *technical* trade secrets was not dismissed, as opposed to its *business* trade secrets claims[4], which were all dismissed.  When reading her ruling aloud in court on January 15, 2020, Judge Abrams correctly stated that "[w]here an unfair competition claim and misappropriation claim arise from the same factual predicate, the two claims generally rise or fall together.  Accordingly, since the Court already concluded that plaintiff's federal and state trade secret misappropriation claims survive defendants' motion to dismiss, so too does plaintiff's unfair competition claim."  Engel Moving Decl. Exh. B at p.8-9.  Only moments before, however, Judge Abrams had ruled that "Plaintiff's claim that its business trade secrets, including prospective and current customer lists and proprietary sales and promotional sales, business plans, and pricing insights, were misappropriated, however, is not sufficiently pled" and gave Plaintiff leave to "amend its business trade secrets allegations, if it chooses to."  Because trade secret and unfair competition claims "rise or fall together" and the business trade secrets claims were dismissed, it is respectfully submitted that Judge Abrams dismissed all of Plaintiff's claims insofar as they were

---

[4]  The parties and the Court have distinguished between Plaintiff's alleged business trade secrets and related claims which concern customer data, marketing plans, and the like, and Plaintiff's alleged technical trade secrets and related claims, which concern and are coextensive with the subject matter of the two patents at issue and concern technology used on apartment building entryway kiosks.

predicted on Plaintiff's business information.  In any event, for the reasons set forth below, the Court should reach and decide each issue raised by the Defendants in the current motion, and should dismiss each of Plaintiff's claims.

In addition to the substantive amendments Plaintiff has made between its First and Third Amended Complaints, Defendant MVI Industries was not a party to the lawsuit when Judge Abrams granted in part the Defendants' earlier motion to dismiss, and is therefore not bound by any arguments raised by other parties prior to its entry into the case.  *See, Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*, No. 12 CIV. 3419 (GBD), 2017 WL 1113080, at *3 (S.D.N.Y. Mar. 10, 2017) (holding that "[b]ecause the New Defendants were not party to the case on March 11, 2016, nor party to the previously filed motions in this case, they did not waive any Rule 12(b)(2) personal jurisdiction defense.").  These include the Defendants' arguments relating to Plaintiff's patent claims and related trade secret, tortious interference, unfair competition, and fraudulent conveyance claims, which are each brought against all three defendants in one cause of action[5], and which are all based on Plaintiff's core argument that its technology was stolen by Taub, transferred to MVI Systems and incorporated into its patents, which patents were then transferred to MVI Industries which continues to deploy that technology in its current offerings.

In any event, the Court has considerable discretion under Rule 12(g)(2) to permit any grounds for dismissal that are not claimed for purposes of delay and that would not unduly prejudice any party, and the fact that MVI Industries has every right to move to dismiss on any grounds it chooses necessarily means that MVI Systems and Samuel Taub joining in those arguments cannot and will not delay this litigation.  *See, Clark St. Wine & Spirits v. Emporos*

---

[5]  What's more, Plaintiff argues for "alter ego" and "successor" liability on the theory that all three defendants have engaged in concerted action to deprive Plaintiff.  Pl. MOL (Dkt. #149) at pp.40-41.

*Sys. Corp.*, 754 F. Supp. 2d 474, 479–80 (E.D.N.Y. 2010) ("But successive 12(b)(6) motions may be allowed if the pending motion is not interposed for delay and its consideration will expedite the disposition of the case on the merits."); *Sharma v. Skaarup Ship Mgmt. Corp.*, 699 F. Supp. 440, 444 (S.D.N.Y. 1988) ("Rule 12 specifically allows for successive motions to dismiss for failure to state a claim.  Although defenses of lack of jurisdiction over the person, improper venue and insufficiency of process are waived if not raised in a party's first responsive pleading, a defense of failure to state a claim upon which relief can be granted . . . may be made in any pleading permitted or ordered under Rule 7(a), or by motion for judgment on the pleadings, or at the trial on the merits [citing Fed. R. Civ. P. 12(h)] . . . [and here,] defendants' motions are not frivolous.  Nor were they brought to delay the action . . . [i]n fact, the renewed motions have narrowed the issues before the court, and should lead to a shorter discovery period and trial."); *Jenkins v. Nat'l Grid USA*, No. 15-CV-1219(JS)(GRB), 2017 WL 1208445, at *9 (E.D.N.Y. Mar. 31, 2017) (After noting that even claims that may technically be subject to Rule 12(g)(2) are not waived and can be brought under Rule 12(c) the moment a defendant interposes and answer, "[t]he Court finds it prudent to address these issues now rather than delay resolution until Defendants' inevitable Rule 12(c) motion.").

## III.    EACH OF PLAINTIFF'S CLAIMS FAILS AS A MATTER OF LAW

While the Defendants believe this case should be sent to arbitration, even if this Court were to reach the merits of Plaintiff's Third Amended Complaint, it should dismiss this case in its entirety.  Moreover, Plaintiff has had four opportunities – all pre-discovery – to file a legally sufficient complaint, and its continued failure to do so is grounds for dismissing each of Plaintiff's claims with prejudice.

## A.  CONTRACT CLAIM

As the Defendants argued in their opening briefs, Plaintiff's breach of contract claim fails for several reasons.  The most glaring of which is that Plaintiff argues that Defendant Taub assented to contract entitled "Terms of Service" because he allegedly saw a hyperlink to a document entitled "Terms and Conditions" which, as Defendants explained, are vastly different things.  Def. MOL (Dkt. #120) at pp.6-7.  As such, regardless of whether Taub was on "inquiry notice" about GateGuard's Terms and Conditions, that fact cannot possibly bind him to a document entitled "Terms of Service," especially when GateGuard never performed any "services" for Taub and Taub never requested any.

Regarding inquiry notice, it became clear by the end of the hearing before Judge Abrams that the Court was not entirely comfortable with the level of factual detail that Plaintiff had provided to support the legal conclusion that Taub had assented to GateGuard's ToS, and in fact ordered Plaintiff to amend its contract claim, which Plaintiff did.  Plaintiff again puts the cart before the horse and argues that Judge Abrams "already found GateGuard Complaint sufficient on this issue," but cites to language in its Third Amended Complaint which came two iterations after the First Amended Complaint that Judge Abrams ruled on.  Pl. MOL at p.10.  Plaintiff also relies entirely on the trend toward general judicial acceptance of "click-wrap" agreements and the like, and utterly ignores the fact that any "inquiry notice" analysis must first focus on exactly what the allegedly assenting parties was put on notice of.  Despite the general trend toward acceptance, the courts still decline to enforce click-wrap agreements that alter a party's "default rights" with "adverse terms" that an unsuspecting customer has no reason to expect, unless the party trying to enforce such terms gave the other party "conspicuous notice" of the adverse terms themselves.  Def. MOL (Dkt. #120) at pp.9-11.  Plaintiff makes no effort whatsoever to argue that Samuel Taub was put on conspicuous notice that he would be receiving, as Plaintiff alleges,

the entire universe of Plaintiff's business and technical trade secrets in a single phone call and

that thereafter Taub would be barred from ever working in his chosen industry for the rest of his

life.  And this lack of conspicuous notice cannot be cured by the bare allegation that Taub later

orally "reconfirmed" his acceptance of terms he did not even know existed.

Plaintiff also fails – again – to explain the consideration that Taub received in a

bargained-for exchange for his lifetime ban from continuing to develop his company.  While

Plaintiff argues that Taub "gained access" to GateGuard's website, such access cannot possibly

qualify as consideration for a contract that Taub allegedly encountered only after he had already

accessed GateGuard's website.  Plaintiff also does not address the Defendants' argument that

GateGuard was not *obligated* under the alleged agreement to provide anything to Taub –

GateGuard had no obligation to speak with him or share information with him or provide him

with any services.  The fact that GateGuard voluntarily did so cannot and does not qualify as a

bargained-for exchange sufficient to support GateGuard's breach of contract claim.

## B.   BUSINESS TRADE SECRETS, TORTIOUS INTERFERENCE, AND UNFAIR COMPETITION CLAIMS

Judge Abrams dismissed all of Plaintiff's trade secrets, tortious interference, and unfair

competition claims to the extent that were based on Plaintiff's business trade secrets because

Plaintiff had not explained "when or how" the Defendants had allegedly used Plaintiff's

"business trade secrets, including prospective and current customer lists and proprietary sales

and promotional sales, business plans, and pricing insights."  As explained in the Defendants'

moving brief, Plaintiff has done nothing but name-drop a few companies that used to be

GateGuard customers that are now MVI Industries customers (all of which are listed on MVII's

website and available for anyone to see).  Plaintiff argues in its opposition that it has cured these

deficiencies through hollow allegations that the Defendants "engaged representatives of ABJ in

attempts to sell intercom devices and services to ABJ," which is of course perfectly lawful, "using trade secrets and other information Taub improperly obtained from GateGuard." Pl. MOL at pp.17-19, citing TAC ¶162.  In what looks like an attempt to add detail, GateGuard then does nothing more than re-cite the same old laundry list of generic terms that courts may have found to be trade secrets over the years, such as "insights," "aspects," and "confidential pricing." *Id.*  Despite Judge Abrams's admonition, Plaintiff still does not describe any actual information that Defendants used with any particular customer target – the "when and how" – and these claims continue to suffer this fatal deficiency.  No matter how many vague words Plaintiff uses, or how many pages Plaintiff adds to its already lengthy complaint, GateGuard still does not, because it cannot, identify a single piece of information that any of the Defendants allegedly used to unfairly compete with GateGuard, and all of its claims based on its alleged business trade secrets must be dismissed.

### C.   PATENT AND TECHNICAL TRADE SECRET CLAIMS

It has been and remains clear since the day GateGuard filed its first complaint that its theory of the case is that Taub, with no pre-existing knowledge of apartment entryway kiosk business or technology, misappropriated all of GateGuard's technology in a single phone call and then applied for and obtained patents for that technology and built the MVI business around it. *See*, FAC ¶90 ("Taub acknowledged the confidential, proprietary nature of GateGuard's trade secrets, and represented to Teman that he (Taub) had no background in technology nor any interest in developing technology products.); *compare* FAC ¶179 and TAC ¶265 (both allege that "Ari Teman is and believes himself to be the first, true, and original inventor of the system claimed in the" patents.  Teman conceived of the invention[s] and had a definite and permanent idea of the complete and operative invention claimed" as it was "thereafter to be applied in practice."); *compare* FAC ¶182 and TAC¶268 (both allege that "Taub did not conceive of or

25

otherwise contribute to the conception of the inventions" claimed in the patents.).

These specific allegations, and every version of Plaintiff's complaint taken as a whole, allege theft, not collaboration.  While it may be true that the facts in *Rubin*, relied on by Defendants in their opening brief, presented virtually no direct contact between the two competing camps, the law laid down in *Rubin* and the cases it cites make it clear that Section 256 can only be applied to situations where the two competing camps worked *together* on a single project with a shared goal.  *See, Rubin v. Gen. Hosp. Corp.*, 2011 WL 1625024, at *6 (D. Mass. Apr. 28, 2011) (Although there is no bright line standard to determine whether a person is a joint inventor . . . the Federal Circuit has made clear that 'his labors must be conjoined with the efforts of the named inventor because joint inventorship . . . can only arise when collaboration or concerted effort occurs – that is, when the inventors have the same open line of communication during or in temporal proximity to their inventive efforts.") (quoting *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1359 (Fed.Cir.2004) and citing *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1459 (Fed. Cir. 1998) (finding joint inventorship where unnamed inventor alleged he contributed certain features of a patented surgical instrument while collaborating with the named inventor for approximately eighteen months) and *PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 12 F. Supp. 2d 69, 85 (D. Mass. 1998) (finding joint inventorship where unnamed and named inventors conducted research together, shared research results, and shared ideas related to the patent).  Here, not only do Plaintiff's affirmative allegations refute any notion of collaboration between Ari Teman and Samuel Taub, the single phone call described by Plaintiff alleges a one-way flow of information from Teman to an otherwise ignorant Taub, leaving Plaintiff's "alternative" theory of co-inventorship wholly unsupported.  As such, Plaintiff's Section 256 claim must be dismissed.

26

The Third Amended Complaint also fails to allege, as it must, any corroboration of Plaintiff's bare and conclusory allegations that Teman is the sole inventor of every claim embodied in the two patents at issue here.  First, contrary to Plaintiff's insinuation that the Defendants attempted to mislead the Court by citing to cases discussing corroboration in situations where the evidentiary record had been developed one way or another, the Defendants acknowledged this fact and argued that what must be pled to survive a motion to dismiss should and must track what must be supported by evidence to survive a motion for summary judgment. Def. MOL (Dkt. #120) at p.22.

Second, in the *Opternative* case discussed by the Defendants in their opening brief (which produced two reported decisions relevant here), the Plaintiff acknowledges in its opposition that the court followed the very same logic urged by the Defendants and dismissed – at the pleading stage - the plaintiff's Section 256 claim under circumstances virtually identical to those presented here.  In the first reported decision, that court held that "Opternative has failed to provide sufficient corroborating evidence of Dr. Lee's inventorship.  Opternative claims that Dr. Lee relayed the invention of the patent over a teleconference, but fails to provide any further corroborating details or documentation of this teleconference, including the date the teleconference took place or Dr. Lee's specific contribution."  *Opternative, Inc. v. JAND, Inc.*, 2018 WL 3747171, at *9 (S.D.N.Y. Aug. 7, 2018).  In the second reported decision, addressing the plaintiff's motion to amend, the *Opternative* court made its point even more clearly and emphatically, holding simply that "an inventor must allege facts that 'corroborate conception of the invention.'"  *Opternative, Inc. v. JAND, Inc.*, 2019 WL 624853, at *8 (S.D.N.Y. Feb. 13, 2019), *citing Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1229 (Fed. Cir. 1994). Plaintiff argues that its allegations that the Defendants considered GateGuard its main competitor

in pitch materials and that GateGuard's own marketing materials corroborate Ari Teman's invention of highly technical and very specific technological elements embodied in the two patents at issue, but these fall far short in both detail and basic relevance, and cannot satisfy Section 256's corroboration element.

Plaintiff also glosses over the fact that federal patent law preempts any state law claim that seeks to vindicate "patent-like" rights asserted by the plaintiff.  Here, Plaintiff is not seeking to protect the secrecy of any of its technical trade secrets, which are coextensive with Plaintiff's patent claims, or vindicate any state law trade secret right that would not require the Court to find that Ari Teman is the inventor of the technology at issue.  Despite Plaintiff's protestations to the contrary, the Plaintiff's claims create the very real risk that the Defendants will remain named by the USPTO as the original and sole inventors of the technology at issue, while the Plaintiff could obtain a judgment declaring Ari Teman the sole inventor.  These results are in direct and irreconcilable conflict, and in such cases federal patent law must win out.  The Defendants do not ask this Court to overrule decades of precedent; rather, the Defendants argue that *as applied* to the particular facts and circumstances presented here, the Plaintiff's trade secrets and patent claims cannot co-exist and as such Plaintiff's state law claims must be dismissed.

### D.   FRAUDULENT CONVEYANCE AND ALTER EGO/SUCCESSOR LIABILITY/DE FACTO MERGER THEORIES

The Plaintiff's claims against newly-named Defendant MVI Industries are based on nothing more than paranoid suspicions and rank speculation.  As MVI Industries argued in its opening brief, Plaintiff has failed to allege any *facts* to support the necessary elements of intent to frustrate creditors, conveyance without fair consideration, and that the selling entity is left insolvent by the conveyance, and certainly does not plead any of these elements with the particularity required to establish fraud – most were pled "on information and belief" in the

Second Amended Complaint, which caveat inexplicably disappeared from the Third Amended Complaint despite no discovery having taken place.

As MVI Industries explained, Plaintiff has no basis to claim that MVIS will be left unable to pay any judgments against it in this case, and Plaintiff does not have any knowledge regarding MVI Systems' finances. Moreover, as MVI Systems and Taub explained in their brief, Plaintiff has steadfastly refused to put a dollar value on its own case, including by refusing to provide the required damages calculation in its initial disclosures despite the Defendants' repeated demands. As such, if Plaintiff has no idea how much this case may be worth, it cannot be heard to argue that the Defendants have failed to maintain sufficient capital to cover any resulting judgments. Moreover, at least as far as the patents are concerned, which even Plaintiff acknowledges are the most valuable assets at issue, Plaintiff's Section 256 claim *follows the patents* no matter how many times they are transferred, which means that nothing the Defendants have done could possibly affect the value of Plaintiff's patent claims. Plaintiff also does not allege any facts to support the necessary inference that MVI Industries paid anything less than fair consideration for the assets it purchased from MVI Systems, and Plaintiff does not explain how or why it believes that the transferred assets were worth more than MVI Industries paid for them. Most tellingly, Plaintiff has conspicuously failed to account for its own case, and has failed to explain away the fact that this very litigation casts a long and dark cloud over the patents at issue and clearly must have a substantial negative impact on their current value.

Similarly, Plaintiff does not allege any facts to supports its "alter ego" and "successor liability" theories, and its claims must therefore be dismissed to the extent they rely on these theories. As with above, no relevant discovery has taken place in this case and Plaintiff has absolutely no insight into how either MVI company operates other than what is publicly known.

29

Plaintiff cannot and does not allege "complete domination" of any corporate entities, and cannot and does not allege any facts to support a conclusion that MVI Systems is no longer in existence.

The same is true of Plaintiff's "de facto merger" theory, which is in fact belied by the fact that MVI Systems – a named Defendant – still exists and the fact that Plaintiff's fraudulent conveyance claims are based on Plaintiff's allegations that MVI Industries did *not* assume MVI Systems' liabilities.  In similar fashion, Plaintiff's allegation that MVI Industries paid hundreds of thousands of dollars in cash for certain MVI Systems assets in of itself defeats Plaintiff's theory.

## CONCLUSION

For the reasons set forth herein, the moving Defendants respectfully request that this case be referred to arbitration or, in the alternative, that the Court dismiss each and every one of Plaintiff's claims against each of the Defendants.

Dated: Bondville, Vermont
February 17, 2021

THE ENGEL LAW GROUP, PLLC

By: _____
Adam E. Engel

280 Madison Avenue – Suite 705
New York, NY  10016
(212) 665-8095

*Counsel for Defendants MVI Systems,
MVI Industries, and Samuel Taub*