UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
: 
GATEGUARD, INC., :
:
Plaintiff, :
:
                       -v-                                        :
:
:
MVI SYSTEMS LLC *et al.*, :
:
Defendants. :
:
-------------------------------------------------------------------X

19 Civ. 2472 (JPC)

OPINION AND
ORDER

JOHN P. CRONAN, United States District Judge:

Plaintiff GateGuard, Inc. sued Defendants MVI Systems, LLC ("MVI"), Samuel Taub, and MVI Industries, LLC ("MVII") for allegedly misappropriating trade secrets and confidential information relating to GateGuard's "AI Doorman" technology.  In response to GateGuard's Third Amended Complaint, Defendants moved to compel arbitration or, in the alternative, to dismiss the case under Federal Rule of Civil Procedure 12(b)(6).  Because GateGuard and Taub entered into a mandatory arbitration agreement that delegates questions of arbitrability to the arbitrator for all the claims, the Court grants the motions to compel, stays the claims against Defendants pending arbitration, and denies as moot Defendants' motions to dismiss.

## I.  Background

### A.  Factual Overview

The following facts are taken from the allegations in the Third Amended Complaint and the documents it incorporates by reference and are assumed to be true only for purposes of this motion.[1]  Because the Court grants Defendants' motion to compel, it focuses on the allegations specific to that motion and provides a brief factual background for context.

GateGuard developed technologies for a video intercom device that could be installed at non-doorman buildings to meet the needs of tenants, property owners, and property managers. Dkt. 104 ("Third Am. Compl.") ¶¶ 3-5, 35-37.  These technologies "included a software platform that integrated proprietary machine vision and facial recognition algorithms with artificial intelligence ('AI') techniques to automate building access for tenants and enhance building security."  *Id.* ¶ 4; *see id.* ¶¶ 39-42.  The resulting product—the "AI Doorman"—performs many roles that one would expect from a human doorman.  For example, the video intercom provides selective building access by allowing only tenants and other authorized people "to access a building by simply approaching the door."  *Id.* ¶ 39.  It also "automatically identif[ies] and track[s] instances of illegal subletting" and allows landlords to view the event logs that the system produces.  *Id.* ¶¶ 39, 41.  The system can also "coordinate package/delivery management."  *Id.* ¶ 42.

---

[1] While "[c]ourts deciding motions to compel apply a standard similar to the one applicable to a motion for summary judgment," meaning that they can consider relevant evidence outside the complaint, *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 281 n.1 (2d Cir. 2019), here the standard does not affect the Court's reasoning.  The parties have only asked the Court to examine the documents appropriate to consider on a motion to dismiss—*i.e.*, the Third Amended Complaint and the documents incorporated by reference in it.

GateGuard recognized that its "Intellectual Property was of immense value to the company." *Id.* ¶ 46.  But instead of patenting this technology, GateGuard chose to protect "its proprietary technologies using trade secret protection." *Id.* ¶ 52.  So GateGuard enters into contracts with its employees, customers, and potential customers to maintain the confidentiality of its trade secrets. *Id.* ¶ 54.

One of those potential customers was Taub, who "is the Chairman, CEO, and Founder of MVI." *Id.* ¶ 25.  Beginning mid-November 2016, Taub started to contact GateGuard purporting to be an installer of security systems who was interested in serving as a reseller for GateGuard. *Id.* ¶¶ 9, 96-97.  Around that same time, Taub completed an interactive online form on GateGuard's website in which he agreed to keep GateGuard's trade secret information confidential and not to offer a competing or similar product. *See, e.g.*, *id.* ¶¶ 10-11, 82-94.  After Taub accepted this agreement, he communicated with GateGuard about the AI Doorman technology. *Id.* ¶¶ 100-121. GateGuard then disclosed to Taub technological trade secrets and business trade secrets including customer lists and marketing information. *See, e.g.*, *id.* ¶¶ 102-112.

According to GateGuard, "Taub unlawfully used and continues to use GateGuard's technical trade secrets." *Id.* ¶ 122.  Taub used "GateGuard's trade secrets as the technical and business foundation for MVI" by incorporating GateGuard's trade secrets to create its products and further used those trade secrets to file for patents for MVI to compete with GateGuard. *Id.* ¶¶ 13, 124-140.  Then, in August 2019, MVII purchased MVI's assets including its patents and intellectual property. *Id.* ¶¶ 190-191.  GateGuard contends that "MVII knew such assets included GateGuard's trade secrets which were improperly obtained through misrepresentation and under circumstances requiring that confidentiality of such trade secrets be maintained." *Id.* ¶ 199.  In buying MVI's assets, MVII allegedly did not pay fair value and MVI did not receive "fair

consideration." *Id.* ¶¶ 193, 200.   GateGuard contends that this is because Taub wanted "to 'liquidate' MVI such that there was 'nothing left' of the company, in a fraudulent attempt to prevent GateGuard and others from bringing successful claims against and collecting judgments or debts from MVI." *Id.* ¶ 200.   MVII allegedly still uses GateGuard's trade secrets "to aggressively pursue GateGuard customers and prospective customers to choose MVII's offerings over GateGuard." *Id.* ¶ 223.

## B.  GateGuard's Terms of Service

The online agreement that Taub accepted incorporated GateGuard's Terms of Service through a hyperlink in the agreement.  *Id.* ¶¶ 85-86; Dkt. 121, Exh. A at 1-14.  The Terms of Service incorporated a policy titled "Governing Law and Dispute Resolution," Dkt. 121, Exh. A at 24-26 ("Dispute Resolution Policy"), which included the following arbitration provision:

> Arbitration - Notwithstanding anything to the contrary contained herein, you and GateGuard agree that any dispute, claim or controversy arising out of or relating to the Terms or the breach, termination, enforcement, interpretation or validity thereof, or to the use of the Site will be settled by binding arbitration, except that GateGuard alone retains the right to seek injunctive or other equitable relief in a court of competent jurisdiction to prevent the actual or threatened infringement, misappropriation or violation of a its [sic] copyrights, trademarks, trade secrets, patents, or other Intellectual Property rights. GateGuard may refuse arbitration at any point and demand a trial. You agree that no arbitration organization that has found in favor of Airbnb[2] may serve as an arbiter. You acknowledge and agree that you are waiving the right to a trial by jury or to participate as a plaintiff or class member in any purported class action or representative proceeding. Further, unless both you and GateGuard otherwise agree in writing, the arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of any class or representative proceeding. If this specific paragraph is held unenforceable, then the entirety of this "Dispute Resolution" section will be deemed void. Except as provided in the preceding sentence, this "Dispute Resolution" section will survive any termination of the Terms.

---

[2] The Court recites this arbitration provision verbatim.  It is not readily apparent to the Court whether the reference to prior arbitration involving Airbnb was intentional or a scrivener's error.

4

*Id.* at 1.  The Dispute Resolution Policy also laid out the arbitration rules:

> The arbitration will be administered by the American Arbitration Association ("AAA") in accordance with the Commercial Arbitration Rules and the Supplementary Procedures for Consumer Related Disputes (the "AAA Rules") then in effect, except as modified by this "Dispute Resolution" section.  (The AAA Rules are available at www.adr.org/arb_med or by calling the AAA at 1-800-778-7879.)  The Federal Arbitration Act will govern the interpretation and enforcement of this section.

*Id.*

The Terms of Service therefore incorporated the AAA Rules for arbitration.  The AAA Rules say that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." Commercial Arbitration Rules and Mediation Procedures R-7(a) (Am. Arb. Ass'n 2013).  The Dispute Resolution Policy also had a jurisdiction section in which the parties consented to personal jurisdiction in Delaware state and federal court "for any actions for which the parties retain the right to seek injunctive or other equitable relief in a court of competent jurisdiction to prevent the actual or threatened infringement, misappropriation or violation of a party's copyrights, trademarks, trade secrets, patents, or other Intellectual Property rights."  Dispute Resolution Policy at 1.

## C.  Procedural History

GateGuard commenced this action on March 20, 2019, bringing a host of claims against MVI and Taub.  Dkt. 1.  GateGuard later added MVII as a Defendant on February 19, 2020 in a Second Amended Complaint, Dkt. 51, which Defendants moved to dismiss on May 22, 2020, Dkts. 66, 69.  The Honorable Ronnie Abrams, to whom this case was previously assigned, denied without prejudice that motion, after granting GateGuard leave to file the Third Amended Complaint.  Dkt. 103.

GateGuard filed the Third Amended Complaint on August 5, 2020.  In it, GateGuard brings claims for misappropriation of trade secrets, correcting inventorship for two patents, breach of contract, tortious interference with business relationships, unfair competition, and fraudulent conveyance.  Third Am. Compl. ¶¶ 233-322.  Besides damages and fees, GateGuard asks for this Court to "[g]rant[] a temporary restraining order, and preliminary and permanent injunction against Defendants, enjoining them from violating their legal and contractual duties to Plaintiff, from accessing, using or disclosing Plaintiff's trade secrets and from any further infringement of Plaintiff's intellectual property."  *Id.* at 58.

This case was reassigned to the undersigned on September 29, 2020.  On October 16, 2020, Defendants moved to compel arbitration or, in the alternative, for dismissal under Rules 12(b)(1) and 12(b)(6).  Dkts. 118, 119, 120 ("MVI-Taub Motion").  GateGuard filed its opposition on December 29, 2020, Dkt. 149 ("Opposition"), and Defendants filed a joint reply on February 8, 2021, Dkt. 154.  GateGuard also has sought leave to file a sur-reply.  Dkt. 156.[3]

## II.  Applicable Legal Standard

Under the Federal Arbitration Act ("FAA"), a written agreement to arbitrate is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  "The FAA embodies a national policy favoring arbitration founded upon a desire to preserve the parties' ability to agree to arbitrate, rather than litigate, their disputes."  *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 250 (2d Cir. 2019) (quotations and alterations omitted).  Because the FAA "intended to place arbitration agreements upon the same footing as

---

[3] GateGuard seeks to submit a sur-reply to respond to arguments made by Defendants in their reply about estoppel, based on prior litigation positions supposedly taken by GateGuard, and about the asserted unconscionability of certain portions of the arbitration provision.  Dkt. 156. Because the Court reaches neither argument in resolving Defendants' motion to compel, the Court denies GateGuard's request to file a sur-reply.

other contracts," arbitration remains "a creature of contract." *Id*. (quotations and alterations omitted).

Before compelling arbitration, this Court must therefore perform a two-step inquiry that looks at contract law principles "governed by state rather than federal law." *Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel*, 346 F.3d 360, 365 (2d Cir. 2003). At step one, the Court looks to see whether "the parties enter[ed] into a contractually valid arbitration agreement." *Id.* At step two, the Court first asks "whether a court or an arbitrator should decide if the dispute falls within the scope of the agreement to arbitrate." *Convergen Energy LLC v. Brooks*, No. 20 Civ. 3746 (LJL), 2020 WL 5549039, at *13 (S.D.N.Y. Sept. 16, 2020). "[I]f the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019). But if it does not, then the Court must determine whether "the parties' dispute fall[s] within the scope of the arbitration agreement." *Nackel*, 346 F.3d at 365.

Two state law principles are particularly relevant to interpreting the Dispute Resolution Policy. First, "[t]he courts should construe a contract in a manner that avoids inconsistencies and reasonably harmonizes its terms." *Alpha Cap. Anstalt v. Real Goods Solar, Inc.*, 311 F. Supp. 3d 623, 629 (S.D.N.Y. 2018) (quotations omitted). Second, "a contract should not be interpreted to produce a result that is absurd." *Id.* (quotations and alterations omitted).[4]

### III. Discussion

Defendants argue that GateGuard's Dispute Resolution Policy requires that GateGuard arbitrate all its claims. Defendants assert that (1) the contract delegated to the arbitrator the right

---

[4] The Dispute Resolution Policy has a Delaware choice-of-law provision. Dispute Resolution Policy at 1. Neither party contests that the above principles apply, whether under New York or Delaware law.

to determine the scope of the arbitration provision and (2) even if the Court were to determine the scope of the arbitration provision, GateGuard's claims would fall within matters to be arbitrated. *See* Dkt. 118-6 at 24-26; MVI-Taub Motion at 2-6; Dkt. 159 at 2-16.  For the below reasons, the Court agrees that the contract delegated to the arbitrator the right to determine the arbitration provision's scope.

## A.  Whether the Parties Entered into a Valid Arbitration Agreement

The party moving to compel arbitration has the initial burden of showing that the parties agreed to arbitrate.  *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) (citing *Almacenes Fernandez, S. A. v. Golodetz*, 148 F.2d 625, 628 (2d Cir. 1945)).  While parties may "agree to arbitrate threshold questions such as whether the arbitration clause applies to a particular dispute, . . . parties may not delegate to the arbitrator the fundamental question of whether they formed the agreement to arbitrate in the first place."  *Alemayehu*, 934 F.3d at 251 (citing *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299-301 (2010)).  Or said a bit differently, parties can agree to arbitrate questions about a contract's enforceability and scope but *cannot* agree to arbitrate "threshold questions concerning contract formation."  *Id.* (emphasis removed) (citing *Granite Rock*, 561 U.S. 299).  Thus, "[t]o satisfy itself that such agreement exists, the court must resolve any issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce."  *Granite Rock*, 561 U.S. at 297.

This case has a somewhat unusual wrinkle to answering whether the parties formed the agreement to arbitrate.  Taub—as the party moving to compel arbitration—would need to establish a valid contract with GateGuard.  Yet, in the context of moving to dismiss on the merits, Taub argues that GateGuard did not properly plead the formation of a contract, contending that GateGuard failed to allege that Taub agreed to the Terms of Service, that the Terms of Service had

the necessary bargained-for-consideration, and that Taub was put on "inquiry notice."  MVI-Taub Motion at 6-11.  Meanwhile, GateGuard—as the party opposing arbitration—has alleged in its Third Amended Complaint that Taub accepted the Terms of Service (and therefore the incorporated Dispute Resolution Policy).  *See* Third Am. Compl. ¶¶ 84-88.

When ruling on a previous motion to dismiss, Judge Abrams noted that Defendants "raise[d] serious and viable arguments that the website's terms do not constitute a binding agreement because Defendant Taub received nothing in consideration for visiting the website or there was no meeting of the minds."  Dkt 58 at 8.  Still, this Court held that Taub's contract claim survived the motion to dismiss.  *Id.*  And by moving to compel arbitration, Taub concedes that he agreed (at least in part) to the Terms of Service.[5]  In other words, by arguing that the parties agreed to arbitrate, Taub concedes that he agreed to the arbitration provision.  *See, e.g.*, MVI-Taub Motion at 5 ("[T]he parties *intended* to delegate the issue of arbitrability to the arbitrator . . . ." (emphasis added)).  In that same vein, GateGuard has conceded that the parties agreed to an arbitration agreement by alleging that Taub accepted the Terms of Service.  *See* Third Am. Compl. ¶¶ 84-88.  The parties therefore agreed to a contractually valid arbitration agreement.

**B.  Whether the Parties Delegated the Question of Arbitrability to the Arbitrator**

Turning to the next question, "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so."  *First Options of Chi. v. Kaplan*, 514 U.S. 938, 944 (1995) (quotations and alterations omitted).  To show "clear and unmistakable evidence of the parties' intent to delegate arbitrability to an arbitrator," parties may point to the arbitration agreement "explicitly incorporat[ing] procedural rules that empower an

---

[5] With that said, the Court does not decide whether Taub accepted the other provisions in the Terms of Service or whether those other provisions had adequate consideration.

arbitrator to decide issues of arbitrability." *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 318 (2d Cir. 2021) (quotations omitted).

But incorporating procedural rules does not per se show the intent to delegate.  Instead, "context matters." *Id.*  So when "the arbitration agreement is broad and expresses the intent to arbitrate all aspects of all disputes, this—coupled with incorporation of rules that expressly empower an arbitrator to decide issues of arbitrability—constitutes clear and unmistakable evidence of the parties' intent to delegate the question of arbitrability to the arbitrator." *Id.* at 318-19.

By contrast, when "the arbitration agreement is narrower, vague, or contains exclusionary language suggesting that the parties consented to arbitrate only a limited subset of disputes, incorporation of rules that empower an arbitrator to decide issues of arbitrability, standing alone, does not suffice to establish the requisite clear and unmistakable inference of intent to arbitrate arbitrability." *Id.* at 319.  In other words, when "there is a qualifying provision (whether described as a carve-out or carve-in) that arguably excludes the present dispute from the scope of the arbitration agreement, that provision creates ambiguity regarding the parties' intent to delegate arbitrability to the arbitrator." *Id.* at 322.  This ambiguity then "delays application of AAA rules until a decision is made as to whether a question does or does not fall within the intended scope of arbitration, in short, until arbitrability is decided." *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1032 (2d Cir. 2014).

Here, a plain construction of the Dispute Resolution Policy's provisions shows clear evidence that the parties intended to delegate the question of arbitrability to the arbitrator. Consider first that the arbitration agreement says that "[t]he arbitration will be administered . . . in accordance with the Commercial Arbitration Rules and the Supplementary Procedures for

Consumer Related Disputes (the 'AAA Rules') then in effect, except as modified by this 'Dispute Resolution' section." Dispute Resolution Policy at 1. "Because the AAA Commercial Arbitration Rules . . . explicitly empower an arbitrator to resolve questions of arbitrability," the Second Circuit "ha[s] found incorporation of these rules into an arbitration agreement to be relevant in evaluating whether there is clear and unmistakable evidence of the parties' intent to delegate the question of arbitrability to the arbitrator." *DDK Hotels*, 6 F.4th at 318.

Consider next the arbitration provision. To recap, it says that the parties:

> agree that *any* dispute, claim or controversy *arising out of or relating to* the Terms or the breach, termination, enforcement, interpretation or validity thereof, or to the use of the Site will be settled by binding arbitration ["Clause 1"], except that GateGuard alone retains the right to seek injunctive or other equitable relief in a court of competent jurisdiction to prevent the actual or threatened infringement, misappropriation or violation of a its [sic] copyrights, trademarks, trade secrets, patents, or other Intellectual Property rights ["Clause 2"].

Dispute Resolution Policy at 1 (emphasis added).

Clause 1's mandate that "any" dispute or claim that "arise[s] out of or relat[es] to" the agreement be settled in arbitration "is 'categorical, unconditional and unlimited' and thus encompasses a dispute over whether a claim is within the scope of arbitration." *Bolden v. DG TRC Mgmt. Co.*, No. 19 Civ. 3425 (KMW), 2019 WL 2119622, at *4 (S.D.N.Y. May 15, 2019) (quoting *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996)). Courts have often found similar language to be a broad arbitration clause. For instance, the Second Circuit recognized that an agreement to arbitrate "any controversy arising with respect to this Agreement" left "no doubt" that the agreement bound its signatories to arbitrate "any disputes with the Agreement's other signatory." *Contec Corp. v. Remote Sol. Co.*, 398 F.3d 205, 208 (2d Cir. 2005). So too when the parties agreed to arbitrate "[a]ll disputes . . . concerning or arising out of th[e] Agreement." *Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 120-21 (2d Cir. 2003); *accord Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995). And another judge of this District

11

recently recognized that an arbitrator needed to resolve arbitrability questions for a contract that read: "any disputes regarding the enforcement, interpretation, or effect of this Settlement Agreement will be submitted to arbitration." *Raymond Downing & Studio Macbeth, Inc. v. A&E Television Networks, LLC*, No. 20 Civ. 4747 (KMW), 2021 WL 4131652, at *5 (S.D.N.Y. Sept. 10, 2021).

GateGuard contends, however, that Clause 2 at a minimum creates ambiguity as to whether the parties assigned questions of arbitrability to the arbitrator.  In GateGuard's view, Clause 2 excludes the entire case from arbitration whenever GateGuard seeks "injunctive or other equitable relief" for *any* claim to prevent infringing its trade secret or patent right, which GateGuard sought in the Third Amended Complaint.  Opposition at 42-43.  The Court disagrees with this reading of the significance of Clause 2.  Courts have typically only found an equitable relief provision to serve as a carve-out when the provision says that all "claims" or "actions" seeking equitable relief are exempted from arbitration.  *See, e.g.*, *Frydman v. Diamond*, No. 14 Civ. 8741 (GHW), 2015 WL 5294790, at *8 (S.D.N.Y. Sept. 10, 2015); *Major, Lindsey & Afr., LLC v. Mahn*, No. 10 Civ. 4329 (CM), 2010 WL 3959609, at *3-4 (S.D.N.Y. Sept. 7, 2010); *Archer & White Sales, Inc. v. Henry Schein, Inc.*, 935 F.3d 274, 281 (5th Cir. 2019), *remanded from* 139 S. Ct. 524 (2019);[6] *Aetrex Worldwide, Inc. v. Sourcing for You Ltd.*, 555 F. App'x 153, 153-55 (3d Cir. 2014); *Dickey's Barbecue Rests., Inc. v. Mathieu*, No. 12 Civ. 5119 (AJF), 2013 WL 5268976, *6-9 (N.D. Tex. Sept. 18, 2013); *SunCoke Energy Inc. v. MAN Ferrostaal Aktiengesellschaft*, 563 F.3d 211, 213 & nn.2-3 (6th Cir. 2009).

---

[6] GateGuard focuses heavily on *Schein* in its briefing.  *See* Opposition at 46-47.  But unlike here, *Schein* involved a provision that applied to any "*action* seeking injunctive relief."  935 F.3d at 282-283 (emphasis added).  It is thus inapt for the reasons discussed herein.

But when, as here, that language is lacking, an equitable relief provision does not "transform[] arbitrable claims into nonarbitrable ones depending on the form of relief prayed for." *Bolden*, 2019 WL 2119622, at *5 (quotations omitted).  It instead "simply confirm[s] an already extant, independent legal right," *Gen. Mills, Inc. v. Champion Petfoods USA, Inc.*, No. 20 Civ. 181 (KMK), 2020 WL 915824, at *6 (S.D.N.Y. Feb. 26, 2020), "to make injunctive relief in judicial courts of proper jurisdiction available to the parties in aid of arbitration," *Bolden*, 2019 WL 2119622, at *5 (quotations omitted).

And so, judges of this District (and the Second Circuit) have held that clauses like Clause 2 do not serve as carve-outs when coupled with a broadly worded arbitration clause like Clause 1. That is especially true when, as here, the agreement also incorporates arbitration rules like the AAA Rules.  For example, a judge of this District held that the parties assigned questions of arbitrability to the arbitrator in an agreement that said that "any dispute or controversy arising under, out of, in connection with or in relation to this Agreement shall be resolved by final and binding arbitration . . . .  [I]n addition to and not in lieu of any damages sustained by [the plaintiff,] [the plaintiff] shall have the right to equitable relief, including but not limited to the issuance of a temporary or permanent injunction or restraining order, by any court of competent jurisdiction." *WMT Invs., LLC v. Visionwall Corp.*, No. 09 Civ. 10509 (RMB), 2010 WL 2720607, at *2 (S.D.N.Y. June 28, 2010) (alterations omitted).  Another judge of this District found the same when considering an agreement that provided: "any claim, controversy, or other matter in question based upon, arising out of, or otherwise in respect of this Agreement . . . will be resolved by arbitration before one arbitrator . . . .  Notwithstanding the foregoing or anything in this Agreement to the contrary, no Party shall be prevented from seeking equitable remedies for relief . . . in a court of competent jurisdiction." *Bolden*, 2019 WL 2119622, at *1.  And the Second Circuit recognized

13

that a clause saying that a party had "the right in its sole discretion to institute judicial proceedings for the purpose of obtaining an injunction or other equitable relief" was "merely declaratory of existing legal rights" by allowing a party "to preserve the *status quo* during the pendency of the arbitration." *Erving v. Va. Squires Basketball Club*, 468 F.2d 1064, 1066-67 & n.1 (2d Cir. 1972); *see also Remy Amerique, Inc. v. Touzet Distrib., S.A.R.L.*, 816 F. Supp. 213, 218 (S.D.N.Y. 1993) (finding that the effect of a similar equitable relief provision was "to make injunctive relief in judicial courts of proper jurisdiction available to the parties in aid of arbitration, rather than . . . transforming arbitrable claims into nonarbitrable ones depending on the form of relief prayed for").

Other courts have interpreted equitable relief clauses similarly. Examples of arbitration agreements with equitable relief provisions that courts found did not create a carve-out include:

- "You and we agree that any dispute, claim or controversy . . . will be settled by binding arbitration between you and us, and not in a court of law, with the exception of either party seeking injunctive or equitable relief . . . ." *Tabas v. MoviePass, Inc.*, 401 F. Supp. 3d 928, 938 (N.D. Cal. 2019); *see also id.* at 940.

- "Notwithstanding any other provision herein to the contrary, any Claim involving a request for equitable or injunctive relief or specific performance may will? [sic] be litigated at any time under the exclusive jurisdiction of the courts . . . ." *Jacobs Field Servs. N. Am., Inc. v. Wacker Polysilicon N. Am., LLC*, 375 F. Supp. 3d 898, 902 (E.D. Tenn. 2019); *see also id.* at 913.

- "Notwithstanding the foregoing, either PARTY may elect to seek injunctive relief or other equitable remedies against the other PARTY from any court of competent jurisdiction, without waiving the PARTY's right to arbitrate disputes for money or damages."

14

*McKesson Corp. v. Health Robotics, S.R.L.*, No. 11 Civ. 728 (JCS), 2011 WL 3157044, at *2 (N.D. Cal. July 26, 2011); *see also id.* at *9.

- "Notwithstanding this agreement to arbitrate, the parties, in addition to arbitration, shall be entitled to pursue equitable remedies and agree that the state and federal courts shall have exclusive jurisdiction for such purpose . . . ." *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1281 (9th Cir. 2009); *see also id.* at 1285.

- "Notwithstanding the foregoing, either [party] may apply to a court of competent jurisdiction for the imposition of an equitable remedy . . . ." *DXP Enters., Inc. v. Goulds Pumps, Inc.*, No. 14 Civ. 1112 (LHR), 2014 WL 5682465, at *1 (S.D. Tex. Nov. 4, 2014); *see also id.* at *4.

- "Notwithstanding any provision of this section to the contrary, each party shall be entitled to seek injunctive and other equitable relief in any court or forum of competent jurisdiction to enforce the provisions of this Agreement . . . ." *Clarus Med., LLC v. Myelotec, Inc.*, No. 05 Civ. 934 (DWF/JJG), 2005 WL 3272139, at *3 (D. Minn. Nov. 30, 2005); *see also id.* at *4.

As noted, the explicit and broad arbitration language in the Dispute Resolution Policy, including the express incorporation of the AAA Rules, reflects the parties' decision to delegate arbitrability to the arbitrator. Moreover, mindful of the principle that "[c]ontracts are interpreted under well-settled rules that aid in determining the intent of the parties drawn from the language they chose to use," *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 148 (2d Cir. 1993) (citations omitted), the wealth of case law interpreting provisions much like Clause 2 as not creating a carve-out only reinforces the lack of any ambiguity. Clause 2 simply reaffirms that GateGuard may seek equitable relief "to prevent the . . . misappropriation or violation of . . . [its] Intellectual Property

rights."  Dispute Resolution Policy at 1.  Or said a bit differently, Clause 2 "merely declar[es] [GateGuard's] . . . existing legal rights . . . to preserve the *status quo* during the pendency of the arbitration."  *Erving*, 468 F.2d at 1066-67 & n.1; *see also Gen. Mills*, 2020 WL 915824, at *6 (equitable relief "provisions simply confirm an already extant, independent legal right").[7]

The absurd results that GateGuard's interpretation might cause further bolsters this plain construction.  *See Alpha Cap. Anstalt*, 311 F. Supp. 3d at 629 (noting that "a contract should not be interpreted to produce a result that is absurd" (quotations and alterations omitted)).  Because Clause 2 does not exclude actions, it would at most exclude claims.  But if Clause 2 created a carve-out for intellectual property claims seeking equitable relief, what should the Court do when GateGuard seeks both equitable and legal remedies for the *same* intellectual property claim?  Under GateGuard's reading, it would seem that this Court would have jurisdiction over the equitable remedy, but an arbitrator would have authority over the legal remedy.  That would make no sense, as these dual tracks could yield differing results for the *same* claim.[8]

In sum, the unambiguous and broad arbitration provision in Clause 1, combined with the lack of a carve-out in Cause 2 and the incorporation of the AAA rules, establishes "clear and

---

[7] Despite GateGuard pleading that it was seeking a preliminary injunction and temporary restraining order for certain claims, *see* Third Am. Compl. at 38, GateGuard never filed a motion for either a temporary restraining order or a preliminary injunction.

[8] There is one case in which a court provided somewhat analogous relief.  There, the court compelled arbitration for the claims and said that the arbitrator could award whatever non-injunctive relief he "sees fit," but then stayed the injunctive relief remedy for the court to decide. *See Plump Eng'g, Inc. v. Westshore Design Eng'rs, P.C.*, No. 18 Civ. 00027 (BKS/DJS), 2018 WL 3730168, at *6 (N.D.N.Y. Aug. 6, 2018).  But there, the arbitration agreement specifically excluded "*claims* brought by either party for injunctive relief."  *See id.* at *2, *6. As discussed, equitable relief provisions excluding "claims" seeking injunctive relief are different in kind from provisions that do not mention "claims" or "actions."

unmistakable" evidence of GateGuard's and Taub's agreement to delegate issues of arbitrability to an arbitrator.[9]

## C.  Whether to Compel Arbitration for GateGuard's Claims against MVI and MVII

The Court next turns to whether to compel arbitration for MVI and MVII.  Neither party signed the agreement.  But "traditional principles of state law allow a[n] [arbitration] contract to be enforced by or against nonparties to the contract through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (quotations omitted).[10]

Here, GateGuard claims that all "Defendants are and were at all relevant times the agents, affiliates, alter egos, partners, assignees, successors-in-interest, or principals of each other."  Third Am. Compl. ¶ 27.  GateGuard relies on this alter ego and successor liability theory throughout the Third Amended Complaint to explain why MVI and MVII are liable for allegedly misappropriating GateGuard's trade secrets and the harm that stemmed from it.  GateGuard therefore cannot now claim that MVI and MVII as non-signatories lack the authority to compel arbitration because they

---

[9] GateGuard also claims to "exercise[] its right to 'refuse arbitration'" by pointing to a sentence in the arbitration clause that says that "'GateGuard may refuse arbitration at any point and demand a trial.'"  Opposition at 45 n.23 (quoting Dispute Resolution Policy at 1).  Because the parties agreed for the arbitrator to decide arbitrability issues, it is for the arbitrator to determine this sentence's import.

[10] The Second Circuit previously noted that "it remain[ed] an open question in this Circuit whether the non-signatory may proceed upon any theory other than estoppel" to compel arbitration.  *Ross v. Am. Express. Co.*, 547 F.3d 137, 143 n.3 (2d Cir. 2008).  *Arthur Andersen* resolved that open question.  *See* 556 U.S. at 631-32; *see also Republic of Iraq v. ABB AG*, 769 F. Supp. 2d 605, 609 (S.D.N.Y. 2011) ("A non-party may compel arbitration where 'traditional principles of state law' such as 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel' render an arbitration agreement enforceable at the non-party's behest." (quoting *Arthur Andersen*, 556 U.S. at 631)), *aff'd sub nom. Republic of Iraq v. BNP Paribas USA*, 472 F. App'x 11 (2d Cir. 2012).

"were never parties to the agreement at issue." Opposition at 44. Thus, the Court grants the motion to compel arbitration for MVI and MVII as well.

### D. Whether to Dismiss or Stay GateGuard's Claims

Because the Court grants the motions to compel arbitration, it must next determine whether to dismiss or stay this case. MVII asks that, if the Court refers all the claims to arbitration, the Court stay the case pending arbitration. Dkt. 118 at 1. MVI and Taub are unclear on their preferred relief, but seemingly ask the Court to dismiss the case. *See, e.g.*, MVI-Taub Motion at 34 ("Defendants respectfully request that all of GateGuard's claims against them be dismissed with prejudice.").

For MVII, whether to stay or dismiss the case is straightforward: "when all of the claims in an action have been referred to arbitration and a stay requested," the FAA "mandate[s] a stay of proceedings." *Katz v. Cellco P'ship*, 794 F.3d 341, 347 (2d Cir. 2015). For MVI and Taub, even though they did not explicitly ask for a stay with their motion to compel, the "court has the discretion to dismiss the case or issue a stay." *Lewis v. ANSYS, Inc.*, No. 19 Civ. 10427 (AJN), 2021 WL 1199072, at *9 (S.D.N.Y. Mar. 30, 2021). The Second Circuit has "counsel[ed] that courts should stay litigation pending arbitration to avoid converting an otherwise-unappealable interlocutory stay order into an appealable final dismissal order, thus enabling parties to proceed to arbitration directly." *Dylan 140 LLC v. Figueroa*, 982 F.3d 851, 858 n.2 (2d Cir. 2020) (quotations and alterations omitted). It would also not make sense to stay the case for MVII but dismiss the case for MVI and Taub—converting the intertwined issue about arbitrability into an appealable order. Thus, the Court exercises its discretion to stay the case for all Defendants.

### IV.  Conclusion

For these reasons, the Court grants Defendants' motions to compel, stays all claims against Defendants pending arbitration, denies without prejudice Defendants' motions to dismiss as moot, and denies GateGuard's motion to file a sur-reply brief.  The parties must submit quarterly joint letters informing the Court of the status of the arbitration proceeding; the first letter is due by December 20, 2021.  The Clerk of the Court is respectfully directed to terminate the motions pending at Docket Numbers 118, 119, and 156.

SO ORDERED.

Dated: September 28, 2021
       New York, New York

_____
JOHN P. CRONAN
United States District Judge